## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

**SANDPIPER RESIDENTS**
**ASSOCIATION,**
        **3916 Winnie St.,**
        **Galveston, TX 77550,**

**LARRY BERNARD BROOKS, SR.,**
        **3916 Winnie St., Apt.**
        **Galveston, TX 77550,**

**AND**

**BETTY ANN DERGIN**
        **3916 Winnie St., Apt.**
        **Galveston, TX 77550,**

*Plaintiffs,*

**v.**

**THE UNITED STATES**
**DEPARTMENT OF HOUSING**
**AND URBAN DEVELOPMENT,**
        **451 7th Street S.W.,**
        **Washington, DC 20410**,

        *Defendant.*

**NO._____**

**Table of Contents**

Table of Contents ........................................................................................................... 2

I.     Introduction ............................................................................................................ 4

II.    Jurisdiction and Venue .......................................................................................... 7

III.   Parties .................................................................................................................... 8

    A.    Plaintiffs .......................................................................................................... 8

    B.    Defendant ........................................................................................................ 8

IV.    HUD's final agency action is demonstrated by HUD's withholding the required assistance and relief to Plaintiffs and the other tenants who wish to relocate ................................. 9

    A.    Chronology showing HUD final agency action withholding assistance and relief to Plaintiffs ........................................................................................................... 10

    B.    The 2019 REAC inspection report found that units and conditions that constitute imminent health and safety risks to residents ....................................................... 11

    C.    HUD has known of the imminent health and safety risks at Sandpiper Cove since at least 2016 when a HUD contractor found conditions that were imminent health and safety risks to residents .......................................................................................... 13

    D.    May 15, 2019 HUD Notice of Default to owner of Sandpiper Cove/Compass Pointe .. 15

    E.    The Notice of Default is final agency action from which legal consequences flow ...... 16

    F.    The deficiencies identified in the May 15, 2019 Notice of Default have not been cured in the specified time period and the units pose an imminent and substantial risk to health and safety of the tenants ............................................................................................. 17

    G.    HUD is withholding the relief of assistance for plaintiffs and the Sandpiper Cove/Compass Pointe tenants to relocate to decent, safe, and sanitary housing ..................... 19

    H.    HUD's response to Plaintiffs' demand letter indicates it will continue funding the complex ............................................................................................................. 21

    I.    The Owner is attempting to sell the Sandpiper Cove Apartments and raise the Maximum Permissible Rents on the property in violation of HUD's civil rights laws or site selection standards ........................................................................................................... 22

V.     HUD's withholding any assistance to help Plaintiffs relocate is final agency action that is arbitrary, capricious, an abuse of discretion and is not in accordance with the relevant law ....... 23

VI.    The Sandpiper Cove residents live in dangerous and unfit conditions ............................. 25

    A.    High number of crimes at the Apartment ................................................................. 25

    B.    Many of units cannot be made physically secure ....................................................... 27

    C.    The units and other areas are not free from mold ...................................................... 28

    D.    The housing provided in return for the HUD and tenant rent payments is not decent, safe, and sanitary ......................................................................................................... 29

VII.   Plaintiffs' facts...................................................................................................... 29

VIII.    VIII. HUD's decision to withhold Tenant Protection Vouchers as a form of relocation assistance is final agency action that violates the Fair Housing Act and the Constitution .......... 32

IX.   HUD's breach of its obligation to pay the owner only for units that are decent, safe, and sanitary is based at least in part on the race of Plaintiffs and the other tenants........................... 35

   A.   The additional evidence showing the existence of *Village of Arlington Heights* factors supports the finding of intentional discrimination.................................................................. 37

   B. The historical background of the racial segregation and unequal conditions affecting PBRA and other HUD assisted housing in Galveston reveals a series of actions taken for invidious purposes. .................................................................................................................................. 39

   C.   HUD's decisions to renew the PBRA contracts for Sandpiper Cove Apartments were made in violation of HUD substantive standards are consistent with and show the existence of discriminatory intent ...................................................................................................................... 42

X.   Claims for relief ...................................................................................................................... 43

   A.   APA claim for relief based on the final agency action withholding the assistance required by the 2019 Consolidated Appropriations Act and 24 C.F.R. § 886.323(e) ............. 43

   B.   APA claim for relief based on the final agency action unlawfully withholding the relocation assistance required by 24 C.F.R. § 886.323(e) ....................................................... 44

   C.   APA claim for relief based on the final agency action withholding the Tenant Protection Vouchers assistance authorized by the 2020 and the 2019 Consolidated Appropriations Acts 45

   D.   APA claim for relief based on the final agency action withholding the Tenant Protection Vouchers and the other relocation assistance authorized by the 2020 and the 2019 Appropriations Acts and 24 C.F.R. § 886.323(e) that violates HUD's obligations to provide, within constitutional limitations, for fair housing in all of its housing programs as required by 42 U.S.C. § 3608(e)(5)........................................................................................................... 45

   E.   Claim for intentional discrimination in violation of 42 U.S.C. § 3604(a) .................... 46

   F.   Claim for intentional discrimination in violation of the Equal Protection component contained in the due process clause of the Fifth Amendment to the Constitution of the United States ...................................................................................................................................... 47

XI.   Prayer for relief ...................................................................................................................... 48

# COMPLAINT

## I.   Introduction

1.      Plaintiffs are current residents of Compass Pointe Apartments (a/k/a Sandpiper Cove Apartments), located at 3916 Winnie St, Galveston, TX 77550.  This privately owned apartment complex is subsidized through a contract between the owner and the U.S. Department of Housing and Urban Development (HUD) under HUD's Project Based Rental Assistance (PBRA) program. HUD provides approximately two million dollars ($2,000,000.00) in annual rent subsidies to the owner for the 192 PBRA units at the complex.  The PBRA tenants further pay approximately $319,000 in annual rent for the 192 PBRA units.

2.      Despite the federal investment in and subsidies for the owners of the apartment, the unit, project, site, and neighborhood conditions at Sandpiper Cove Apartments are dangerous and unfit for family life and the presence of children.  HUD's contract with the property owner provides that HUD will only pay the subsidy for units that are decent, safe and sanitary as required by law and applicable regulations.  HUD has violated the law by withholding the relief necessary to assist the Plaintiffs with moving to decent, safe and sanitary housing.  This complaint requests judicial relief requiring HUD to provide each plaintiff with the assistance needed to obtain housing in better condition, including a Tenant Protection Voucher.  The law does not require that HUD terminate the owner's Housing Assistance Payment (HAP) contract with HUD before or as a result of providing the relocation assistance.  HUD has the legal authority to continue the HAP contract in effect and provide the relocation assistance[1] which can include the issuance of Tenant Protection

---

[1] FURTHER CONSOLIDATED APPROPRIATIONS ACT, 2020, PL 116-94, December 20, 2019, 133 Stat 2534; CONSOLIDATED APPROPRIATIONS ACT, 2019, PL 116-6, February 15, 2019, 133 Stat 13, Public and Indian

Vouchers.[2]  Alternatively, and without waiving the foregoing, Plaintiffs request that court order HUD to transfer the PBRA contract to decent, safe and sanitary housing units within the City of Galveston or Galveston County.

3.     HUD conducted a physical inspection and issued a summary report for Sandpiper Cove on or about May of 2019.  This inspection was performed by a HUD-certified inspector habitability standards at the complex and was performed pursuant to HUD regulations at 24 CFR Part 5 and Part 200.  The property obtained a failing score of 33c out of a possible 100 points.  HUD issued a Notice of Default on May 15, 2019 to the owner of Sandpiper Cove. HUD informed the owner that the owner was in default of the statutory and contractual obligation to maintain the project in a decent, safe, and sanitary condition.  Over a year later, the owner has so far failed to make repairs necessary to obtain a passing grade on required physical inspections and make the property habitable. Plaintiffs and Sandpiper Cove tenants continue to live in conditions of known imminent health and safety risks.  Since the inspection, there have been electric outages at the property, overflowing sewage and other electrical failures associated with lack of or deferred maintenance. Physical conditions that have contributed to a high crime rate at the project include a lack of security cameras, inoperable or broken gates and fences. A significant percentage of individual units remain without doors and windows with locks, lack basic sanitary equipment including sinks, toilets, showers, heaters, operable air conditioning units and refrigerators that work.  There is widespread mold and other microorganism growth inside the apartments, on both exterior and interior surfaces.  Some roofs leak and moisture seeps into inhabited areas.

---

Housing Tenant-Based Rental Assistance (2)
[2] FURTHER CONSOLIDATED APPROPRIATIONS ACT, 2020, PL 116-94, December 20, 2019, 133 Stat 2534; CONSOLIDATED APPROPRIATIONS ACT, 2019, PL 116-6, February 15, 2019, 133 Stat 13, Public and Indian Housing Tenant-Based Rental Assistance (2)

4.      On September 5, 2019, Plaintiffs specifically asked HUD that they wished to be rehoused and transferred out of the horrible conditions at Sandpiper and asked for HUD assistance finding another unit. HUD refused to provide plaintiffs and the tenants with another unit or with a voucher. Instead of providing the requisite assistance to tenants, HUD continues to keep the assistance contract in effect and subsidizes substandard, dangerous apartment units.  It has been over a year since HUD found the owner in default of the obligation to provide decent, safe, and sanitary housing at Sandpiper Cover, and the tenants continue to remain in horrific conditions that pose imminent health and safety risks to them. HUD has not provided Plaintiffs with the relief they requested, which is voucher assistance necessary to obtain housing in decent, safe and sanitary conditions or transfer of the PBRA subsidy to a decent, safe and sanitary location.

5.      HUD's withholding the assistance to help Plaintiffs relocate is final agency action in violation of the relevant law.  Agency action is defined to include an agency "sanction."  5 U.S.C. §551(13).  The Administrative Procedures Act (APA) defines "sanction" as including an agency's "withholding of relief."   5 U.S.C.A. § 551(10)(B).   "Relief is defined as the "grant of… assistance… or remedy." 5 U.S.C.A. §551(13)(A).  The relevant law and regulations require HUD to provide the relief of assistance for relocation once HUD has determined that property owner is in violation of the HAP contract and the owner has not corrected the deficiencies set out in the notice, and HUD continues to keep the contract in effect and is paying rent to the owner under the contract.[3]   Each of requirements for the provision of relocation assistance is met, yet HUD continues to withhold the assistance, which is the relief provided by law under these conditions. HUD's withholding the relocation assistance and the relief provided by law is final agency action

---

[3] CONSOLIDATED APPROPRIATIONS ACT, 2019, PL 116-6, February 15, 2019, 133 Stat 13, Public and Indian Housing Tenant-Based Rental Assistance (2); 24 C.F.R. § 886.323(e ).

and judicially reviewable.  5 U.S.C. § 551(13); 5 U.S.C. § 551 (10)(B), 5 U.S.C. 13(A).

6.      The project is located in a predominantly minority census tract.  The tract is 16% White non-Hispanic, 59% Black or African-American and 24% Hispanic.  The project is located in a census tract in which 57.4% of people are below poverty as reported by the 2016 U.S. Census American Community Survey data.  71.4% of the children under 6 years of age are below poverty and 74.9% of all children under 18 years of age are below poverty according to the same report.

7.      HUD's refusal to provide the relocation assistance perpetuates racial segregation and imposes severe injuries on the predominantly Black or African-American and a completely minority population, the tenants at the complex. HUD pays for decent, safe and sanitary PBRA housing at predominantly White non-Hispanic locations near Galveston County while refusing to require decent, safe, and sanitary housing at Sandpiper Cove.  HUD's actions violate the discriminatory intent standard of the Fair Housing Act and the 5th Amendment of the U.S. Constitution.  HUD's actions violate its obligation under 42 U.S.C. § 3608(e)(5) to prevent federal funding of low income housing in units, projects, and conditions that perpetuate racial segregation and that are not part of an ongoing and effective housing and community revitalization effort. There is no such effort underway for these units.

8.      Plaintiffs seek injunctive relief requiring HUD to provide Plaintiffs with the assistance necessary to obtain housing in decent, safe and sanitary conditions or in the alternative, that the court order HUD to transfer the PBRA subsidy to decent, safe and sanitary housing within the City of Galveston or Galveston County.

## II.   Jurisdiction and Venue

9.      This court has jurisdiction under 42 U.S.C. §1331 and 42 U.S.C. § 3613(a)(1)(A).  The right to judicial review of the claim for HUD's violation of 42 U.S.C. § 3608(e)(5) and of the claim

that HUD's withholding relief is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and the waiver of sovereign immunity for these claims is pursuant to 5 U.S.C. §§ 702, 706.   The waiver of sovereign immunity for the claim that HUD's withholding relief violates 42 U.S.C. § 3604(a) is pursuant to 5 U.S.C. § 702.  The right to judicial review and the absence of sovereign immunity for the claim that HUD officials are violating the equal protection principle included in the Fifth Amendment to the United States Constitution is constitutional. Sovereign immunity does not bar a suit to enjoin unconstitutional actions by a federal officer. *Larson v. Domestic and Foreign Commerce Corp.*, 337 U.S. 682, 690-91 (1948); *Pollack v. Hogan*, 703 F.3d 117, 120 (D.C. Cir. 2012).

10.     The venue is appropriate pursuant to 28 U.S.C. § 1391(b)(1).

### III.    Parties

#### A. Plaintiffs

11.     The Plaintiffs are the Sandpiper Residents Association, Larry Bernard Brooks, Sr. and Betty Ann Dergin.

12.     Plaintiffs are current residents of Sandpiper Cove Apartments for whom the Defendant United States Department of Housing and Urban Development (HUD) pays a subsidy to the owners of the apartments under the Project Based Rental Assistance (PBRA) program.  Each Plaintiff except the Sandpiper Residents Association also pays 30% of their adjusted household income as tenant's share of the rent, in accordance with regulations.   Sandpiper Residents Association is a tenant association established in accordance with federal regulations to protect the rights of Sandpiper Cove residents. 24 C.F.R. § 245.110 *et. seq*.

#### B. Defendant

13.     The Defendant United States Department of Housing and Urban Development (HUD) is an executive agency of the United States government.   HUD's withholding of the required relocation assistance is a final agency action for which there is no other adequate remedy in a court. Only HUD is obligated under the law to provide the assistance.  A lawsuit against the owner cannot provide this relief.  HUD's withholding the relief in the form of the assistance to obtain decent, safe and sanitary housing is final agency action.

### IV.     HUD's final agency action is demonstrated by HUD's withholding the required assistance and relief to Plaintiffs and the other tenants who wish to relocate

14.     HUD issued a Notice of Default to the owner of Sandpiper Cove based on the owner's violations of the obligation to provide decent, safe and sanitary housing in May 2019.  This occurred after the 2019 HUD REAC inspection, which showed serious issues at the property and indicated that Sandpiper Cove Apartments fell far below the minimum acceptable standard of habitability.  The failing inspection itself triggered a necessity to issue a Notice of Default and obligates HUD to enforce its own regulations.  The Notice of Default, constituting a formal notice by the Secretary of the United States Department of Housing & Urban Development was issued on May 15, 2019 and notified the property owners of their HAP contract default.  The Sandpiper Cove Apartments owner has so far not undertaken necessary steps to cure violations identified in the 2019 HUD REAC inspection.  HUD continues to leave the project-based contract, the Housing Assistance Payment contract, in place. HUD continues to pay for housing that HUD has determined is not decent, safe, and sanitary. The conditions at Sandpiper Cove in the units and at the site pose serious imminent health and safety risks to the tenants on a daily basis. HUD continues to withhold the relief for assistance to Plaintiffs and the other tenants who wish to relocate.  HUD's withholding the relief for or assistance to Plaintiffs and the other tenants who wish to relocate is

final agency action.

### A. Chronology showing HUD final agency action withholding assistance and relief to Plaintiffs

15.     The contract between HUD and Sandpiper Cove Apartments owner for the payment of the federal subsidy funds is the Housing Assistance Payment contract (HAP).  The most recent HAP basic renewal contract was signed in February 2012 for a period of 20 years.  The owner is Compass Pointe Apartments Texas Ltd.  The current owner was assigned that contract from the previous owner Sandpiper Cove Apartments, LLC in March 2015. The assignment incorporates all of the obligations of the original HAP contract.

16.     The HAP contract provides that HUD will only make payments to the owner for units occupied by eligible families leasing, decent, safe, and sanitary units from the owner.  HAP contract, Section 14(a), April 19, 1984.  If the Contract Administrator (HUD or a third party acting for HUD) determines that the owner has failed to maintain units in decent, safe, and sanitary condition, HUD may abate the housing assistance payments and use the amounts for the purpose of relocating or rehousing assisted residents in other housing.  The original HAP contract requires the owner to maintain and operate the contract units, unassisted units if any, and related facilities to provide decent, safe and sanitary housing and provides for tenant relocation if the units are not maintained in decent, safe and sanitary condition.  HAP contract, Section 26(b)(2)(b).

17.     HUD approved the renewal of the HAP contract for a twenty-year term in 2012.  The Renewal Contract is a HAP contract. HAP Renewal, Section 4(a)(1). Except as specifically modified by the Renewal Contract, all provisions of the expiring HAP contract are renewed.  HAP Renewal, Section 5a.  The owner warrants that the units to be leased by the owner under the Renewal Contract are in decent, safe and sanitary condition (as defined and determined in

accordance with HUD regulations and procedures), and shall be maintained in such condition

during the term of the Renewal Contract.  HAP Renewal, Section 7b.  The renewal states:

> Housing assistance payments shall only be paid to the Owner for contract units occupied by eligible families leasing decent, safe and sanitary units from the Owner in accordance with statutory requirements, and with all HUD regulations and other requirements.  If the Contract Administrator determines that the Owner has failed to maintain one or more contract units in decent, safe and sanitary condition, and has abated housing assistance payments to the Owner for such units, the Contract Administrator may use amounts otherwise payable to the Owner pursuant to the Renewal Contract for the purpose of relocating or rehousing assisted residents in other housing.  4.d.(2).

18.     HUD appointed Southwest Housing Compliance Corporation (SHCC) to be the Project

Based Contract Administrator (PBCA) acting on HUD's behalf under the terms of the HAP

contract.

**B. The 2019 REAC inspection report found that units and conditions that constitute imminent health and safety risks to residents**

19.     A HUD Real Estate Assessment Center (REAC) physical inspection of Sandpiper Cove

was completed on or about May 8, 2019.  The final report was issued on May 9, 2019.

20.     The report included results of inspections of the physical conditions, appearance and

security at Sandpiper Cove Apartments.

21.     The final inspection score was Unsatisfactory, with a score of 33c out of a possible 100.

According to HUD regulations, a Physical Inspection score below 60 is failing and indicates that

the owner may not be fulfilling his/her contractual obligations to HUD and that the residents may

not be receiving the quality of housing to which they are entitled.

22.     The failing inspection score was based on numerous shortcomings, including the site,

building exteriors, building systems, common areas and unit evaluations.  HUD's Inspector

observed a total of 122 health and safety deficiencies in 24 buildings and 24 actually inspected

units.  The report estimates that an inspection of all units and all buildings would have resulted in

11

a total of 878 health and safety deficiencies on the property. The inspection also found a total of 73 non-life threatening deficiencies on the property (535 projected). 31 deficiencies were deemed life-threatening (199 projected). Finally, 18 deficiencies involved smoke extinguishers on the property (144 projected). Identified systemic deficiencies are varied, and involve everything from exposed foundations, missing/inoperable smoke detectors, damaged/missing roof components, leaky plumbing, insect/roach infestations and mold/mildew observed. Other deficiencies include missing/damaged stoves, inoperable/not lockable windows, missing/broken outlets and obstructed accessibility/escape routes.

23.     HUD's REAC Inspection found missing or inoperable window locks that present safety concerns. Kitchen appliances were found to be deteriorated to the point of replacement, some entry doors have damaged frames and will not lock, presenting an obvious safety hazard. Multiple dead and live roaches were observed across the property and in inspected units. The inspector also found evidence of water infiltration leading to mold and mildew infestation, by itself a violation of HUD regulations and a threat to tenant health and safety.

24.     The Compass Pointe/Sandpiper Cove management company responded to the failing REAC score primarily with cosmetic changes, announcing a change in on-site management and a new vice-president of operations for the property. While the property owner announced renovations in the future, those repairs are stated to be contingent upon funding that has not been secured. The Owner recognized approximately 2000 work orders have been made by tenants for conditions that currently exist on the property and inside all units. As a token concession and incentive to not cancel the HAP contract, property owner temporarily suspended management fees on the property, a provision covered by the contract in situations where a property does not satisfy HUD's habitability standards.

25.     The failing REAC score of 33c was based on the extensive list of irregularities and shortcomings uncovered during the Sandpiper Cove inspection.  The lower-case letter "c" is given if one or more exigent/fire safety violations are found, as these call for immediate attention or remedy.  Deficiencies found on the property were serious enough to warrant large cash outlays to address and are categorized as capital improvements, not merely repairs.  These health and safety violations include exposed electrical wires, missing smoke detectors, roach infestations and inoperable electrical systems.

26.     These health and safety violations remain in effect today over one year after HUD notified the owner of the violations.

### C. HUD has known of the imminent health and safety risks at Sandpiper Cove since at least 2016 when a HUD contractor found conditions that were imminent health and safety risks to residents

27.     HUD has known that the units pose an imminent health and safety risks to tenants at Sandpiper Cove since at least 2016.  HUD knew that the project, units, and neighborhood were not decent, safe, or sanitary from the 2016 Management and Occupancy Review of Sandpiper.

28.     HUD's contractor SHCC conducted a Management and Occupancy Review of Sandpiper Cove beginning on September 15, 2016.  The report was issued on October 14, 2016.

29.     The Management Review included inspections of the physical conditions, appearance and security at Sandpiper Cove Apartments.

30.     The Review found General Appearance and Security Unsatisfactory.  Follow-up and monitoring of Project Inspections was also rated Unsatisfactory.  Leasing and Occupancy as well as General Management Practices were found to be Unsatisfactory.  Maintenance and Standard Operating Procedures fared a little better, being rated Below Average.  In all instances, SHCC required corrective action to be taken within 30 days.

13

31.     The finding of Unsatisfactory Appearance was based on graffiti, deep cracks in buildings and parking lot as well as corroded exterior stairwells.  The Security rating was based on criminal activity that had occurred at the property within the previous twelve months.  The calls for police assistance included 910 calls for service within this time period, including 41 calls for Personal Assaults, 36 calls for Weapons Offenses, 29 for Auto Theft, 3 for Sexual Assault, 3 for Structure Fire, 21 for Break-Ins and 14 for Criminal Mischief.  The report found that the property owner contracts for off-duty police personnel patrol four days a week for four to five hours per day; however these patrols typically end on or before 11pm.  The Report found these current efforts not to be sufficient to deter significant criminal activity at the property.

32.     The review rated Project Inspections Unsatisfactory because of a blocked egress to only windows in bedrooms, outlets missing covers, holes in walls, damaged entry door frames and damaged frames inside apartments.

33.     The review found insufficient oversight of the property staff by the management agent to ensure the property is maintained in decent, safe and sanitary condition and HUD's leasing and occupancy requirements were properly implemented.

34.     In the 2016 Management Occupancy Review inspection, SHCC required a number of crime/safety corrective actions to be taken.  Owner/Agent was to perform an assessment of the safety program at the property to include, but not be limited to, reviewing the concerns outlined in the findings, implement an action plan to improve the safety program at the property and decrease the level and severity of criminal activity occurring on-site.  A copy of the plan must be forwarded to SHCC.  The plan was to address key participants, including the owner/agent, Galveston Police Department, residents, local agencies and resources.  The Owner/Agent was to provide a signed certification that the action plan would be implemented throughout the coming year and

14

periodically reviewed and adjusted for effectiveness. The 2019 MOR asserts that insufficient actions had been taken to address the crime and safety issues at the complex. The 2019 MOR notes that this issue is a "repeat finding from the 2016 report."

36. HUD did not require the owner to provide decent, safe, and sanitary housing for the tenants at Sandpiper Cove after this 2016 report. HUD did not eliminate the imminent health and safety risks to tenants that were present at this time and that continue to be present.

36. HUD's contractor conducted another Management and Occupancy Review of Sandpiper in 2019. HUD knows the 2019 Review resulted in another Unsatisfactory rating and the projects were not decent, safe or sanitary. The 2019 Review continued to show that units and conditions at Sandpiper present imminent health and safety risks to the tenants.

**D. May 15, 2019 HUD Notice of Default to owner of Sandpiper Cove/Compass Pointe**

37. HUD sent a Notice of Default to the owner of Sandpiper Cove Apartments on May 15, 2019. The Notice of Default stated:

> This letter constitutes formal notice by the Secretary of the U.S. Department of Housing and Urban Development that Compass Pointe Texas Ltd. ("Owner"), owner of Compass Pointe Apartments Texas ("Project"), is in default of the above-referenced project-based housing assistance payments ("HAP") Contract, as authorized under section 8 of the United States Housing Act of 1937 ("Act"). 42 U.S.C. § 1437f.

> On May 8, 2019, HUD's Real Estate Assessment Center ("REAC") inspected the Project, which resulted in a score of 33c. The inspection report, which HUD has made available to the Owner, identified serious deficiencies that demonstrate that the Owner is in default of its statutory, contractual, and/or regulatory duties to maintain the Project in decent, safe and sanitary condition.

HUD based this Notice of Default on the May 8, 2019 Real Estate Assessment Center inspection. Deficiencies found in the report include missing/inoperable smoke detectors, insect/roach infestations, leaky plumbing, including faucet and pipes, clogged drains, missing, damaged or inoperable range and stove holes in ceiling/walls and damaged frames/threshold/lintels/trim. The

15

May 15, 2019 Notice of Default is addressed to Compass Pointe Texas Ltd. as the Owner.

Attention: Frank Sinito
127 Public Square
Cleveland, OH 44114

Project is referred to as Compass Pointe Apartments Texas and the HUD HAP Contract Number

is listed as TX24M000018.

### E.  The Notice of Default is final agency action from which legal consequences flow.

38.     The Notice of Default is the product of HUD's decision-making process, including the

inspections.  The Notice of Default is not merely tentative or interlocutory in nature.  HUD states

that issuing a Notice of Default is the prerequisite for HUD action to remedy the conditions

constituting the default:

> Notwithstanding the provisions of Section 222, NOVs/NODs are legal notices required under our business agreements, and they provide the basis for any enforcement action taken by HUD if the compliance requirements in the notices are not met.  Therefore, the notices must be accurate and include all elements required under the business agreements, regardless of the minimum requirements stated in this Notice.  HUD Notice: H 2018-08, Issued: October 29, 2018, page 4.

39.     Even an administrative appeal that results in a higher score does not require HUD to

withdraw the Notice of Default. *Id*.

40.     The Notice is final on its face.  The owner is in default and the time to cure has expired.

The Notice of Default sets out the legal consequences flowing from the Notice.

> If the Owner fails to take the necessary corrective actions required by this Notice of Default of Housing Assistance Payments (HAP) Contract letter, the Secretary will, without further notice, declare the Owner in default of the HAP contract and will seek any and all available remedies, including but not limited to, acceleration of the outstanding principal indebtedness, foreclosure, abatement of the Housing Assistance Payments (HAP) Contract or any other appropriate remedies.

41.     HUD has already entered an adverse finding with legal consequences against the owner

and the manager of the project based on the findings in the Notice of Default.

16

42.     HUD had already entered an adverse finding with legal consequences against the owner and the manager of the project, based on the findings in the Notice of Default.  As a result of the unsatisfactory REAC score, Compass Pointe Apartments Texas Ltd. and its principals were flagged in HUD's Active Partners Performance System (APPS): Compass Pointe Apartments Texas LLC – Owner Entity. These flags may adversely affect the Owner's and Management Agent's eligibility for participation in HUD programs, under HUD's Previous Participation Certification procedure, by constituting a standard for disapproval.

43.     HUD's regulation further sets out legal consequences flowing from the Notice of Default.

> 24 C.F.R. § 886.323(e) – Failure to maintain decent, safe and sanitary units.  If HUD notifies the owner that he/she has failed to maintain a dwelling unit in decent, safe and sanitary condition, and the owner fails to take corrective action within the time prescribed in the notice, HUD may exercise any of its rights or remedies under the contract, or Regulatory Agreement, if any, including abatement of housing assistance payments (even if the family continues to occupy the unit) and rescission of the sale.  If, however, the family wishes to be rehoused in another dwelling unit, HUD shall provide assistance in finding such a unit for the family.  24 C.F.R. § 886.323(e).

44.     The owner has failed to take corrective action pursuant to the Notice of Default. Plaintiffs remain in conditions that pose imminent health and safety risks.

### F. The deficiencies identified in the May 15, 2019 Notice of Default have not been cured in the specified time period and the units pose an imminent and substantial risk to health and safety of the tenants

45.     The deficiencies set out in the May 15, 2019 Notice of Default have not been cured within the sixty-day period as required.  These deficiencies remain in place. HUD refuses to require the owner to address the serious health and safety deficiencies at the property and continues to pay the owner for housing that is not decent, safe or sanitary and poses imminent health and safety risks to the tenants.

46.     There have been no corrective measures implemented to remediate health and safety

hazards to tenants.  Mold remains in the units.  Insect infestations continue to plague the residents.

Electrical problems persist months following the inspection and doors/windows are still damaged

and are still in need of repair.

47.     The lack of standard electrical equipment fails to meet HUD's definition of decent, safe,

or sanitary housing.  24 C.F.R. § 5.703.

48.     There has been no repair or remediation of mold in the units and on building exteriors.

49.     Air conditioning units are not operational in certain units.

50.     Since the May 15, 2019 Notice of Default, mold presence at the property has worsened.

Tenants have filed repeated repair requests with property management and complained to the City

of Galveston and HUD, however the mold has not been addressed.  The mold is a result of frequent

water leaks in residents' apartments and broken air conditioning units which cause moisture to

accumulate in and around walls.  Incessant exposure to mold causes residents to have trouble

breathing, in addition to eye, throat and skin irritations.  HUD received three mold-related

complaints from Sandpiper Cove residents since October 2019 alone.  Instead of removing the

mold-infested sheetrock, property management paints over the mold, which invariably returns.

51.     The property has continued deteriorating since the May 15, 2019 Notice of Default.  There

is a widespread pest problem, as cockroaches and other insects thrive in vacant and occupied

apartments with little or no pest control to alleviate the conditions.

52.     There are still no functioning smoke detectors in some units, a condition that presents a

substantial hazard to tenant health and safety.

53.     The leaks in some apartments are so severe tenants are forced to place towels on window

sills when it rains in order to absorb incoming water.  The leaky air conditioning units at the

complex frequently fail, leaving tenants in hot and humid apartments.

18

54.     In March 2019, 66 of the 192 units on the property lost power for nearly four days. Management did not provide an explanation for the extended outage.  A generator allowed management to restore power, but not to all affected buildings.  Out of six buildings, only five received power as the unit was not strong enough to provide electricity to all six.  For the duration of the outage, tenants had no electricity, power to their refrigerators, wall outlets or ovens. Residents in the building that remained without power were forced to move out in order to have electricity.

55.     The entire complex again suffered a power outage in the summer of 2019 lasting several days; residents escaped their unbearably hot homes by spending time in the public library and community center.

56.     Complaints of unbearable conditions on the property continue without abatement.  Reports of blocked and overflowing drains, tubs leaking black or discolored water and leaky ceilings with holes are a recurring feature as residents attend city council meetings seeking help.  As the city council does not have oversight power over the HAP contract, Sandpiper Cove residents' efforts are fruitless.

57.     The property crime rate consistently places Sandpiper Cove in the top five locations for police response on the island.  This negative record has been persisting for years.  Dissatisfied with crime conditions at the complex, Galveston's City Manager petitioned HUD to enforce housing standards at the property or force a sale to a new private owner.

**G. HUD is withholding the relief of assistance for plaintiffs and the Sandpiper Cove/Compass Pointe tenants to relocate to decent, safe, and sanitary housing**

58.      HUD has continued to ensure that the project based contract, the Housing Assistance Payment contract, remains in effect and has continued to pay the owner for the units.

59.    HUD has not provided any assistance for Plaintiffs or other Sandpiper Cove/Compass Pointe tenants to relocate from the property despite being requested to do so on September 5, 2019. The Plaintiffs requested that HUD rehoused them another location with a voucher or by transfer to another location that met decent, safe, and sanitary requirements. HUD refused to do so.

60.    HUD's regulation requires that HUD shall provide this relocation assistance when there has been a notice of default and when the owner fails to take corrective action within the time specified by the notice. 24 C.F.R. § 886.323(e).  The requirement for HUD to provide the assistance is mandatory.

61.    HUD is continuing to make payments to the owner under the HAP contract for units and conditions that are not decent, safe, or sanitary.  HUD continues to keep the project based contract for Sandpiper Cove in effect.

62.    HUD is not going to provide relocation assistance to Plaintiffs.

63.    HUD's withholding of relief for Plaintiffs by not providing any relocation assistance has legal consequences.  The owner continues to be paid.  The Plaintiffs do not receive relocation assistance.

64.    Congress has provided the funding and authorization for HUD to provide relocation assistance to tenants such as Plaintiffs who are living in units that pose imminent health and safety risks. The Appropriations Acts of 2020 and of 2019 both state rental assistance is available to transfer the tenants where the owner has received a Notice of Default and the units pose an imminent health and safety risk.

> That the Secretary may provide section 8 rental assistance from amounts made available under this paragraph for units assisted under a project-based subsidy contract funded under the "Project-Based Rental Assistance" heading under this title where the owner has received a Notice of Default and the units pose an imminent health and safety risk to

residents. [4]

In this case, the owner of Sandpiper has received a Notice of Default, the owner has not corrected the deficiencies, and the units continue to pose an imminent health and safety risk to Plaintiffs and the other residents. HUD is required to provide relocation assistance to tenants who wish to be rehoused after an owner has received a Notice of Default and not corrected the problems within time set out in the notice. HUD is withholding the relocation assistance relief to Plaintiffs.

### H. HUD's response to Plaintiffs' demand letter indicates it will continue funding the complex

65.     On September 5, 2019, Plaintiffs sent a letter to HUD, informing the agency of the conditions in the units and on the property that pose imminent health and safety risks to the tenants. Plaintiffs requested that HUD provide tenant protection vouchers for the tenants because of the imminent health and safety risks these conditions pose to the residents.  On or about December 2, 2019, HUD responded to Plaintiffs' correspondence, confirming the failing REAC score the property obtained in the most recent HUD inspection.

66.     HUD informed Plaintiffs that Compass Pointe Apartments Texas LLC, the owner of Sandpiper Cove, responded to HUD's Notice of Default by providing a plan to improve the property's physical condition.  The owner plans to either pursue a sale of the property to a buyer who would rehabilitate it or to refinance the rehabilitation and preservation of Sandpiper Cove itself.  HUD further informed Plaintiffs that either the sale or financing would be completed by the end of 2019.  The only enforcement action HUD acknowledged undertaking so far is requiring the

---

[4] FURTHER CONSOLIDATED APPROPRIATIONS ACT, 2020, PL 116-94, December 20, 2019, 133 Stat 2534; CONSOLIDATED APPROPRIATIONS ACT, 2019, PL 116-6, February 15, 2019, 133 Stat 13, Public and Indian Housing Tenant-Based Rental Assistance (2)

owner to change on-site management.

67.     HUD's letter makes it clear that HUD is not providing the tenants with tenant protection vouchers and relocation assistance. No actions have been taken by the owner to address the imminent health and safety risks the unequal and dangerous conditions pose to the residents. The owner has not addressed the physical conditions of the property or made any improvements to the property. The plaintiffs and tenants continue to be forced to live in units that HUD admits are not decent, safe, or sanitary while HUD lets the owner pursue a sale. Under the law, HUD can pursue its contractual remedies against the owner without forcing the tenants to reside in conditions that are imminent health and safety risks. HUD has chosen to withhold this relief from plaintiffs and the tenants.

**I.  The Owner is attempting to sell the Sandpiper Cove Apartments and raise the Maximum Permissible Rents on the property in violation of HUD's civil rights laws or site selection standards**

68.      On or about May 22, 2020, J. Allen Management, on behalf of the owner, issued a Notice to Residents of Intention to Submit to HUD for Approval of an Increase in Maximum Permissible Rents. The Notice also stated that the property was going to be purchased by Galveston 3916 Winnie Street, LP.

69.     The Notice cites that the proposed increase in rent is needed from HUD to completely rehabilitate the units, including: repairs to the plumbing, electrical, HVAC and other integral systems. Additionally, the Notice admits that there are repairs needed to bring the property into compliance with the Americans with Disabilities Act.

70.     The proposed increase in rents is insufficient to completely rehabilitate the complex "down to the sheetrock" as described in the Notice. Moreover, demolition of the units will not bring the

units into compliance with HUD's civil rights laws or site selection standards. These units will remain located in a densely minority, low income census tract. The units will continue to be subject to high crime and lack access to many basic amenities. The Notice does not indicate when the Owner will come into compliance with the imminent health and safety hazards cited in the Notice of Default and it is further evidence that tenants will remain subject to these dangerous conditions unless they are issued tenant protection vouchers.

> **V.    HUD's withholding any assistance to help Plaintiffs relocate is final agency action that is arbitrary, capricious, an abuse of discretion and is not in accordance with the relevant law**

71.    Agency action is defined to include an agency sanction. 5 U.S.C. § 551(13).[5] The APA defines sanction as including an agency withholding of relief. 5 U.S.C. § 551 (10)(B). Relief is defined as the grant of . . . assistance . . . or remedy. 5 U.S.C. § 551 (13)(A). *Trudeau v. Fed. Trade Commission, 384 F. Supp. 2d 281, 289 (D.D.C. 2005), aff'd, 456 F. 3d 178 (D.C. Cir 2006).).*

72.    Both the 2020 and the 2019 Appropriations Act and the HUD regulation 24 C.F.R. § 886.323(e) require HUD to provide the relief of assistance for relocation upon the occurrence of specified events. Both authorities include the same two events:

- the issuance of a Notice of Default, and

- the failure of the owner to cure the deficiencies set out in the notice,

- 2020 and 2019 Appropriations Act, 24 C.F.R. § 886.323(e).

---

[5] (13) "Agency action" includes the whole or a part of an agency rule, order, license, **sanction**, **relief**, or the equivalent **or denial thereof**, or failure to act; 5 U.S.C.A. ' 551 (13). (emphasis added.)

73.     Both of these events have occurred.  HUD has issued a Notice of Default.  The owner did not remedy the deficiencies within the time specified.  HUD continues to make payments under the HAP while the tenants continue to live in conditions of imminent health and safety risk. Even though the predicate for the relief is satisfied, HUD is withholding the relief of relocation assistance for the tenants.

74.     The HUD regulation specifically requires HUD to provide relocation assistance to tenants who want to be rehoused after a notice of default and the failure of the owner to comply within the time specified in the notice:

> If a family wishes to be rehoused in another dwelling unit, **HUD shall provide assistance in finding such a unit for the family**.  24 C.F.R. § 886.323(e).

This event has occurred. With the September 5, 2019 letter to HUD, Plaintiffs have clearly expressed their wish to be rehoused with a voucher as have other tenants. Despite the predicate being met, HUD has withheld the assistance. The Plaintiffs and other tenants also requested assistance to relocate including voucher assistance in the public comments provided to Galveston officials in 2018.

75.     HUD's sanction, the withholding of relief, is final. HUD's sanction is stated to be the product of HUD's full consideration of the facts and it has legal consequences. *U.S. Army Corps of Engineers v. Hawkes Co., Inc.*, U.S. 136 S.Ct. 1807, 1813-1814 (2016) *citing Bennett v. Spear*, 520 U.S. 154, 177-178 (1997).

76.     HUD is continuing to keep the project based contract at Sandpiper Cove Apartments in effect.  HUD is not going to provide relocation assistance or enforce its own regulations to ensure necessary renovations and rehabilitation of the property take place.

77.     HUD's action withholding a remedy that provides Tenant Protection Vouchers or

other assistance in finding another dwelling unit in decent, safe, and sanitary condition was outside the scope of HUD's discretion.  HUD's withholding the remedy is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.  *Senate Manor Properties, LLC v. U.S. Dep't of Hous. & Urban Dev.*, 2008 WL 5062784, at *1 (S.D. Ind. 2008) (HUD decision to abate PBRA subsidies was justified).

78.    HUD's own regulation limits its discretion once an owner has been given a Notice of Default and has failed to cure the violations. HUD may exercise any of its contract or regulatory agreement rights. But whatever choice HUD exercises, if a family wishes to be rehoused in another dwelling unit, HUD shall provide assistance in finding such a unit for the family. 24 C.F.R. § 886.323(e) (Emphasis added). HUD's withholding any assistance to help Plaintiffs relocate is final agency action that is arbitrary, capricious, an abuse of discretion and is not in accordance with the relevant law

###### VI.    The Sandpiper Cove residents live in dangerous and unfit conditions

##### A.  High number of crimes at the Apartment

79.    The high number of violent and serious crimes committed on the Sandpiper Cove Apartment premises victimizes the apartment residents. In 2016, HUD's agent, Southwest found that the failure to provide adequate security from criminal activity violated HUD's housing quality standards, the governing contract requiring the owner to provide decent, safe, and sanitary housing (Section 2.5), HUD Handbook 4350.3REV-1, CHG-4, 8-1, C, and HUD Handbook 7460.4-Security Planning for HUD-Assisted Multifamily Housing Handbook: Chapter2, (5)(c-e). SHCC found the level of criminal activity at the property was a condition in noncompliance with HUD guidelines. The review based its finding on service requests made to the Galveston Police

Department from 10/3/2015 through 10/3/2016. The review required corrective actions to "improve the safety program at the property and decrease the level and severity of criminal activity occurring on-site." The owner did not implement corrective actions and HUD continued to find high level of criminal activity.

80. Data obtained pursuant to an open records request from the Galveston Police Department indicates that crime statistics at or near the property have significantly worsened since 2016. From January 1, 2018 through December 31, 2019, the following serious offenses occurred at or in the immediate vicinity of Sandpiper Cove:

- **Weapon Offenses - 120**

- **Assault - 75**

- **Narcotics Violation - 53**

- **Robbery- 4**

- **Burglary- 76**

- **Terroristic Threats - 58**

- **Disturbance - 504**

- **Trespassing- 188**

- **Suspicious Activity/Person – 844**

- **Theft- 124**

- **Structural Fire - 12**

- **Criminal Mischief - 98**

- **Sexual Assault – 8**

- **Armed/Aggravated Robbery - 6**

26

81.    The owner did not cure the condition of non-compliance. The 2019 MOR cites that the owner stated that they would implement an action plan to address safety issues and periodically assess its effectiveness. The SHCC did not receive the owner's action plan and has received no response from the owner regarding this condition of non-compliance since December of 2016.

82.    The Plaintiffs continue to be subjected to this violation of the HUD requirement to provide decent, safe, and sanitary housing. The high number of serious crimes constitute a hazard to the tenants and their families.

83.    HUD knows that Sandpiper Cove is a place where persons (who do not live at the complex) habitually go to commit crimes and has taken no action to remedy the unsafe conditions. These multiple incidents of high crime violate the State law common nuisance statute. Tex. Civ. Prac. & Rem. Code § 125.0015. The repeated criminal activity subjects tenants to unsafe living conditions. This repeated violation of state law by the owner is a reason alone for HUD to provide tenants with the relief of housing away from Sandpiper Cove.

84.    The HUD Multifamily Security Manual finds that the fear of crime is exacerbated by the fear and insecurity caused by the often-justified fear of retaliation by criminals reported to the police or to management. Pages 51-52. Exposure to violence can harm a child's emotional, psychological and even physical development.

**B.  Many of units cannot be made physically secure**

85.    HUD requires the units receiving its rental subsidy to keep all doors and windows "functionally adequate, operable, and in good repair . . . ." 24 C.F.R. § 5.703(d)(1). The high crime activity at the apartments exacerbates the need for functionally adequate, operable, and in

good repair doors, windows, door locks, and window locks. The failure to provide operable locks on windows and doors is a consistent finding of non-compliance with the obligation to provide decent, safe, and sanitary housing.

### C. The units and other areas are not free from mold

86.     HUD requires the units and common areas to be free from mold in order to be decent, safe, and sanitary.

87.     The dwelling units and common areas must have proper ventilation and be free of mold, odor (e.g., propane, natural gas, methane gas), or other observable deficiencies. 24 C.F.R. § 5.703(f).

88.     The units and common areas at Sandpiper Cove Apartments have open and obvious colonies of mold with the resulting foul odor. The mold colonies were found to be an open violation of the decent, safe, and sanitary regulation in the 2019 REAC inspection.

89.     HUD states that the presence of mold as a serious health and safety issue.

> Even a small amount of mold or mildew can be potentially dangerous, especially if it is allowed to increase in size. The presence of mold or mildew should be identified, and the cause should be determined and corrected. Because mold/mildew has been recognized as a serious health and safety issue, it is also recorded as poor air quality. 77 FR 47708, 47713, 8/9/2012.

90.     Mold and mildew continue to be present. The 2019 REAC inspection found:

> Observed mold/mildew inside units.
> Level 3 Health & Safety deficiency – mold/mildew observed in every building inspected. Evidence of water infiltration or other moisture producing condition that causes mold, or mildew greater than or equal to 1 square foot of mold/mildew.
> Mold/mildew observed in bathrooms and living areas in every unit inspected.

91.     HUD is paying the owner for units that are not decent, safe, and sanitary housing and that pose imminent health and safety risks to the tenants.

### D. The housing provided in return for the HUD and tenant rent payments is not decent, safe, and sanitary

92.     HUD and the tenants have been paying substantial amounts of rent to the owner of the Sandpiper Cove Apartments. Despite the rent payments, HUD has not assured that the owner provide decent, safe, and sanitary housing.

93.     The HUD inspections consistently find the presence of unit, project and site conditions that violate the owner's obligation to provide decent, safe, and sanitary housing.

94.     These and other conditions in noncompliance with HUD requirements for decent, safe, and sanitary housing affecting each Plaintiff are set out in this complaint.

### VII.     Plaintiffs' facts

95.     Sandpiper Residents Association (SRA) is a tenant association established in accordance with federal regulations to protect the rights of Sandpiper Cove residents. 24 C.F.R. § 245.110 *et. seq*. It is comprised solely of current residents of Sandpiper Cove Apartments, all of whom receive a HUD housing subsidy. Sandpiper Residents Association has standing to bring suit on behalf of the tenants as its members would otherwise have standing to sue in their own right, the interests it seeks to protect are germane to the organization's purpose; and because neither the claim asserted nor the relief requested requires the participation in the lawsuit of each of the individual members. The injury to Sandpiper Residents Association members is directly related to the reason they joined the organization, namely to obtain decent, safe and sanitary housing. Sandpiper Residents Association members have standing to sue in their own right, as they are directly injured by defendant's acts and/or omissions.

96.     Sandpiper Residents Association was formed to protect and promote Sandpiper Cove tenants' interest in obtaining and maintaining decent, safe and sanitary housing at the

property.  Since its formation, SRA has been involved in several actions intended to publicize the habitability concerns on the property and obtain assistance with remediation of physical hazards.  The Association contacted local media outlets to report poor physical conditions at the property and make the residents' plight public.  The Houston Chronicle, a major Houston-area newspaper, published several articles focusing on dangerous conditions at Sandpiper Cove and residents' efforts to obtain assistance.  The Association has also been involved in filing complaints with the Southwest Housing Compliance Corporation ("SHCC"), which is tasked with inspecting PBRA properties, including Sandpiper Cove and ensuring compliance with HUD habitability standards.  SRA continues to monitor conditions at the property and contact elected officials, SHCC, HUD and local media as necessary to bring attention to issues affecting tenant health and safety on the property.  The Association has meetings during which residents may bring up any complaints or requests for assistance.  In its efforts to assist residents, SRA has previously addressed the Galveston City Council to bring habitability complaints at Sandpiper Cove to its attention.  Yet despite SRA's efforts to alert relevant agencies, including HUD, Defendant has not responded to the Association's requests for providing decent, safe, and sanitary housing.

97.     Furthermore, neither the claims asserted nor the relief requested requires the participation of Sandpiper Residents Association members in the lawsuit.  Sandpiper Residents Association seeks injunctive relief, and it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.

98.     Sandpiper Residents Association was formed to protect and promote Sandpiper Cove tenants' interest in obtaining and maintaining decent, safe and sanitary housing at the property. The members are majority Black tenants at Sandpiper. Since its formation, SRA has been involved in

several actions intended to publicize the habitability concerns on the property and obtain assistance with remediation of physical hazards. The Association contacted local media outlets to report poor physical conditions at the property and make the residents' plight public. The Houston Chronicle, a major Houston-area newspaper published several articles focusing on dangerous conditions at Sandpiper Cove and residents' efforts to obtain assistance. The Association has also been involved in filing complaints with the Southwest Housing Compliance Corporation ("SHCC"), which is tasked with inspecting PBRA properties, including Sandpiper Cove and ensuring compliance with HUD standards. The Association continues to monitor conditions at the property and contacts elected officials, SHCC, HUD and local media as necessary to bring attention to issues affecting tenant health and safety on the property. SRA has regular meetings during which residents may bring up any complaints or requests for assistance. In its efforts to assist residents, SRA has previously addressed the Galveston City Council to bring habitability complaints at Sandpiper Cove to its attention. Yet despite SRA's efforts to alert relevant agencies, including HUD, Defendant has not responded to the Association's requests for providing decent, safe, and sanitary housing.

99.     Plaintiff Larry Bernard Brooks Sr. resides at Sandpiper Cove. Part of his rent is paid under HUD's Project-Based Section 8 Rental Assistance contract. Mr. Brooks is Black or African American. He moved to Sandpiper Cove in 2011. He lives alone in a two-bedroom unit. Mr. Brooks is disabled and supports himself through Supplemental Security Income ("SSI") of $771/month. He has never been cited for any infractions at the complex. Mr. Brooks lost valuable possessions as a result of physical conditions at Sandpiper Cove. Recently, an electric transformer malfunctioned and Mr. Brooks' television set was damaged by the resulting power surge. There is mold in the apartment and a noticeable odor in the unit. He regularly cleans visible areas with

cleaning solutions to limit the spread of spores but the mold returns.  Mr. Brooks is concerned about long-term health impacts of being exposed to mold in the apartment and is afraid for his safety as a result of electrical malfunctions.  Mr. Brooks' limited income precludes him from moving elsewhere without the assistance of a tenant protection voucher.

100.    Plaintiff Betty Ann Dergin has lived at Sandpiper Cove since the early 1980s. She lives in a 3-bedroom apartment with her adult son and minor grandson. Ms. Dergin is Black or African American. Ms. Dergin and her son are both disabled and disability benefits are their sole source of income.  There are numerous habitability issues in their apartment, including water leaks, defective plumbing and roof problems. Slugs regularly enter the kitchen through the sink.  Frequent power surges inside the living room have damaged electronic devices so family them to an outside plug to avoid additional losses.  Ms. Dergin is tired of the poor conditions at Sandpiper Cove. She has mold in her apartment that cannot be removed regardless how often she cleans her home.  Ms. Dergin seeks to move to a decent, safe and sanitary unit but cannot do so without the assistance of a tenant protection voucher.

### VIII.    VIII. HUD's decision to withhold Tenant Protection Vouchers as a form of relocation assistance is final agency action that violates the Fair Housing Act and the Constitution

101.    HUD has the authority under the law to provide a specific remedy for Plaintiffs. Because HUD has issued the Notice of Default and the units continue to pose an imminent health and safety risk to residents, HUD can issue Tenant Protection Vouchers to Plaintiffs and the other tenants. FURTHER CONSOLIDATED APPROPRIATIONS ACT, 2020, PL 116-94, December 20, 2019, 133 Stat 2534; CONSOLIDATED APPROPRIATIONS ACT, 2019, PL 116-6, February 15, 2019, 133 Stat 13, Public and Indian Housing Tenant-Based Rental Assistance (2). The prerequisites are met.  HUD issued the Notice of Default. The units pose an imminent health and safety risk to

residents. HUD does not have to terminate the HAP contract with the owner in order to provide these vouchers. HUD can pay for the vouchers from the funds already appropriated. *Id.* If the HAP is not terminated, the vouchers are relocation vouchers and sunset when the current participant leaves the voucher program. If the HAP is terminated, the vouchers are replacement vouchers and remain available for re-use in the community. HUD Notice PIH 2018-09.

102.    HUD has made the final decision to withhold this relief from Plaintiffs. The decision has legal consequences. Plaintiffs do not receive the voucher assistance that could be used for relocation. The facts show that HUD's decision to withhold the relief is based on the discriminatory purpose to maintain racial segregation and to disadvantage a group of minority households. The use of discretion to accomplish intentional racial discrimination violates both the U.S. Constitution, 42 U.S.C. § 3604(a), and 42 U.S.C. § 3608(e)(5). *N.A.A.C.P. v. Sec'y of Hous. & Urban Dev.*, 817 F.2d 149, 157 (1st Cir. 1987); *Clients' Council v. Pierce*, 711 F.2d 1406, 1425 (8th Cir. 1983).

103.    HUD's withholding the relief of Tenant Protection vouchers or the other assistance in finding another dwelling unit in decent, safe, and sanitary conditions is illegal final agency action based on the following facts:

A. It makes decent, safe, and sanitary housing unavailable because of race as shown by the facts shown in this complaint as summarized below and showing the circumstantial evidence of HUD's intent to discriminate on the basis of race and ethnicity.

1) The action disadvantages a predominantly minority group, the tenants at Sandpiper Cove Apartments, by causing them to live in units, a project, and a neighborhood that poses an imminent health and safety risk to them and to their families. HUD reports that over 88% of the

tenants at Sandpiper Cove are Black and Hispanic.

2) The action subjects the minority group to continued residence in units, a project, and a neighborhood that is substantially unequal to the unit, project, and neighborhood conditions for the majority White non-Hispanic Project Based Rental Assistance projects in nearby metropolitan areas. There are several comparable Project Based Rental Assistance properties in adjacent Brazoria County that are in substantially better physical condition and without the health and safety hazards present at Sandpiper Cove. They are majority White, non-Hispanic. These properties are habitable and do not present imminent health hazards to residents.

3) HUD's action is contrary to the substantive norm requiring it to assure that the tenants residing in Project Based Rental Assistance are receiving decent, safe, and sanitary housing. 24 C.F.R. §§ 886.323 (a), (d), (e).

4) HUD's action is contrary to the substantive norm that once HUD notifies the owner that he/she has failed to maintain a dwelling unit in decent, safe, and sanitary condition and the owner fails to take corrective action within the time prescribed in the notice, HUD shall provide assistance in finding a unit in decent, safe, and sanitary condition for each family that "wishes to be rehoused in another dwelling". . . . 24 C.F.R. § 886.323(e).

5) HUD's action is contrary to the procedural norm that once HUD notifies the owner that he/she has failed to maintain a dwelling unit in decent, safe, and sanitary condition, and the owner fails to take corrective action within the time prescribed in the notice, further payments for the units violate the Housing Assistance Payment Contract between HUD and the owner.

> (2) Housing assistance payments shall only be paid to the Owner for contract units occupied by eligible families leasing decent, safe and sanitary units from the Owner in accordance with statutory requirements and with all HUD regulations and other requirements. Project-based Section 8 HOUSING ASSISTANCE PAYMENTS BASIC RENEWAL CONTRACT MULTI-YEAR TERM.

6) HUD's action is contrary to the procedural and substantive HUD obligation in the administration of the HAP contract with the owner of Sandpiper Cove, Compass Pointe, LLC to take and require meaningful actions that:

- address significant disparities in housing needs and in access to opportunity,

- replace segregated living patterns with truly integrated and balanced living patterns,

- transform racially and ethnically concentrated areas of poverty into areas

of opportunity,

and

- foster and maintain compliance with civil rights and fair housing laws.

42 U.S.C. §3608(e)(5); *N.A.A.C.P. v. Sec'y of Hous. & Urban Dev.*, 817 F.2d 149, 156 (1st Cir. 1987); *Shannon v. U.S. Dep't of Hous. & Urban Dev.*, 436 F.2d 809, 819, 821-822 (3d Cir. 1970). HUD's refusal to provide plaintiffs with the grant of assistance necessary to obtain decent, safe, and sanitary housing in site and neighborhood conditions substantially equivalent to the conditions in which majority White non-Hispanic occupied PBRA projects are located is the failure to provide the assistance that would address the significant disparities, segregated living patterns in racially concentrated areas of poverty, and comply with civil rights and fair housing laws.

## IX.   HUD's breach of its obligation to pay the owner only for units that are decent, safe, and sanitary is based at least in part on the race of Plaintiffs and the other tenants

102.  Plaintiffs will show the following facts that give rise to an inference of discrimination by HUD.

103.   HUD contracts with private landlords to provide affordable housing to low income tenants through the PBRA program. Pursuant to the contract, HUD makes payments to the

landlord to rent the units to eligible low income tenants. HUD has the contractual authority to require that the landlord comply with the HUD housing quality standards that govern this housing program.

104.    Plaintiffs are Black or African American.  Sandpiper Cove is located in a 16% White non-Hispanic census tract.  Sandpiper Cove's units are 87% occupied by Black or African American households. HUD is paying for housing that is provided by the owner to Plaintiffs but which is not decent, safe, and sanitary housing.

105.    Plaintiffs entered into a lease for the HUD subsidized PBRA housing at Sandpiper Cove that, had it met the HUD housing quality standards, would have provided them and their families with decent, safe, and sanitary housing. The Plaintiffs' lease for the HUD subsidized PBRA housing at Sandpiper Cove would have provided them and their families with equal neighborhood living conditions without conditions that adversely affect the health, safety, and general welfare of residents.

106.    The unit, project, and site conditions that do not comply with minimum standards for decent, safe, and sanitary housing.

107.    The living conditions that adversely affect the Plaintiffs and other Sandpiper Cove tenants are factors that adversely affect the health, safety, and general welfare of residents, and cannot be mitigated by HUD.

108.    HUD pays for decent, safe, and sanitary housing for similarly situated, disproportionately White non-Hispanic low income PBRA tenants in majority White, non-Hispanic census tracts. These PBRA units include the PBRA projects in Brazoria County which the county adjacent to

Galveston County where Sandpiper Cove is located.

109.    The rents for the assisted units at the projects in Brazoria County are comparable to the rents for the assisted units at Sandpiper Cove. The unit, site, and project conditions at other PBRA projects are decent, safe, and sanitary.

110.    HUD does not make the disproportionately White tenants in the Brazoria County PBRA projects live in conditions that present imminent health and safety risks to the residents. HUD does not require those tenants to reside in conditions of imminent health and safety risks in order to "preserve" the affordable housing units.

111.    When Plaintiffs and residents at Sandpiper Cove asked HUD to be rehoused after the Notice of Default and the owner's non-compliance HUD refused to provide the relocation assistance. One reason given by HUD for the refusal to relocate the Sandpiper residents was that HUD wanted to preserve the affordable housing units at Sandpiper.

112.    HUD's payments to the owner of Sandpiper Cove for units that are not decent, safe, and sanitary is not based on any legitimate, non-discriminatory reason and is final agency action.

113.    HUD has no statutory or regulatory authority for paying to provide Plaintiffs with housing that is not the decent, safe, and sanitary housing required by the relevant housing quality standards. HUD has no statutory or regulatory authority for paying to provide Plaintiffs with housing in locations with neighborhood living conditions that are free from high crime and other conditions that adversely affect the health, safety, and general welfare of the area residents.

   A.  **The additional evidence showing the existence of *Village of Arlington Heights* factors supports the finding of intentional discrimination**

114.    The U.S. Supreme Court set out a list on non-exclusive factors that may provide

circumstantial evidence showing racial discrimination was a motivating factor in government decisions affecting the availability and location of housing. *Vill. of Arlington Heights v. Metro Hous. Dev. Corp.*, 429 U.S. 252, 265-268 (1977). The following evidence shows the existence of Arlington Heights factors that support the inference of intent. The facts show that HUD intentional support for racial segregation is longstanding in duration and pervades HUD's administration of the PBRA program in the City of Galveston.

115.    Sandpiper Cove apartment complex in the City of Galveston is located in a predominantly minority census tract.  It is further adversely affected by various unequal neighborhood living conditions.  Sandpiper Cove is disproportionately occupied by Black or African American low-income tenants.  Several similar PBRA projects in White, non-Hispanic Brazoria County and surrounding census tracts that would offer Plaintiffs a racially integrated housing opportunity in equal neighborhood conditions are restricted to elderly tenants only.

116.    Brooks Manor is a similar PBRA complex located in Brazoria County.  However, the tenant community is 79% White Non-Hispanic. The most recent REAC inspection score was 87c. Its buildings are in better physical condition, with well-maintained common areas, lawns and a children's playground in operable condition and located in a census tract with a lower crime rate.

117.    Alvin Memorial is another comparable PBRA property located in adjacent Brazoria County. Its residents are 66% White Non-Hispanic.  The most recent REAC inspection score was 92b. The property is in superior physical condition than Sandpiper Cove and units visibly appear to be decent, safe and sanitary.  Property maintenance is conducted regularly and the crime rate in the census tract is lower than that Sandpiper Cove is located in.

118.    Magnolia Acres is a comparable PBRA property in adjacent Brazoria County.  The complex's tenant population is 69% White Non-Hispanic. The most recent REAC inspection score is 94b. The complex is decent, safe and sanitary. It is a gated, fenced in community with 66 units featuring a children's playground.  The property is in better physical condition than Sandpiper Cove. The property is zoned to better-performing public schools than any that Sandpiper Cove residents may enroll in.

**B. The historical background of the racial segregation and unequal conditions affecting PBRA and other HUD assisted housing in Galveston reveals a series of actions taken for invidious purposes.**

119.    HUD's administration of Galveston's public housing system and the PBRA program has perpetuated segregation in the city since the early 20th century. HUD's administration of the PBRA program at Sandpiper Cove continues the segregation of the low income Black and Hispanic tenants in Galveston today.

120.    HUD's public housing was purposefully constructed and concentrated in an industrial area known as Galveston's Sixth Ward. According to census data, this area was historically black. Four public housing facilities were built in the area, including: Oleander Homes (1943), Palm Terrace (1943), Magnolia Homes (1953) and Cedar Terrace (1953).

121.    In 1971, HUD approved the subsidy associated with Sandpiper Cove Apartments.

122.    In 1997, residents and applicants for public housing administered by Galveston Housing Authority (GHA) filed suit against the agency for failing to remedy the segregation related to the administration of the City's Public Housing Program. Plaintiffs' claims alleged violations of the 5th and 14th Amendments and Title VI and Title VIII of the Civil Rights Act.

HUD knows of the racial segregation of GHA public housing. In 1997, HUD found GHA in violation of Title VI of the Civil Rights Act.

123.     The parties entered into a consent decree to resolve Plaintiffs' claims.

124.     As a result, the Galveston Housing Authority was ordered to deconcentrate the families living in GHA public housing. However, the properties were never properly desegregated.

125.     In 2008, Hurricane Ike struck Galveston Island and significantly damaged all four of the Galveston Housing Authority properties. GHA demolished all 569 units. GHA promised to rebuild them each unit and add over 1500 units over the next 10 years. GHA abandoned that plan after significant public opposition.

126.     In October 2009, Texas Low Income Housing Service and Texas Appleseed filed a Fair Housing complaint with HUD against the State of Texas' Amendment to its Action Plan for Hurricane Disaster Relief Block Grant Funds. The Complaint asserted that the State of Texas and the City of Galveston failed to adequately address the impediments to Fair Housing as required to receive Block Grant funds.

127.     In May 2010, a Conciliation Agreement was executed between the parties. The Agreement advised that the recipients of the CDBG Disaster Relief funds must identify and address all impediments to Fair Housing. The City of Galveston received 20 million dollars of the funds to rebuild family and senior public housing.

128.     Over ten years has elapsed since the dissemination of the funds to the City of Galveston to rebuild public housing and only half of the units have been constructed. The other half of the public housing units have been proposed to be rebuilt in the Sixth Ward area of Galveston that is

already densely concentrated with public housing.

129.    The continued concentration of GHA public housing and PBRA housing in the Sixth Ward of Galveston violates Federal Civil Rights laws and HUD site selection regulations.

130.    The unequal neighborhood conditions affecting HUD's PBRA housing in minority concentrated areas include high crime, high poverty including high childhood poverty, distressed neighborhoods, poor drainage, flooding, segregated and unequal schools, and lack of childhood opportunities.

131.    The injuries particularly to children from these conditions of racial segregation are foreseeable and were foreseen by HUD.

> Racially or ethnically concentrated areas of poverty merit special attention because the costs they impose extend far beyond their residents, who suffer due to their limited access to high-quality educational opportunities, stable employment, and other prospects for economic success. Because of their high levels of unemployment, capital disinvestment, and other stressors, these neighborhoods often experience a range of negative outcomes such as exposure to poverty, heightened levels of crime, negative environmental health hazards, low educational attainment, and other challenges that require extra attention and resources from the larger communities of which they are a part. Consequently, interventions that result in reducing racially and ethnically concentrated areas of poverty hold the promise of providing benefits that assist both residents and their communities. Affirmatively Furthering Fair Housing; Proposed Rule,78 Fed Reg 43710, 43714, July 19, 2013.

132.    HUD's site selection regulations prohibiting the concentration of HUD assisted housing in minority concentrated, low income areas with unequal living conditions were first enacted in 1972. 37 Fed. Reg. 203 (1972). The existing racial segregation in HUD assisted housing in the City of Galveston was funded and approved by HUD decisions in violation of HUD's site selection regulations. HUD provided the Sandpiper Cove with the original HUD assistance and

continued to renew the Housing Assistance Payments contract despite HUD's site selection regulations prohibiting housing in minority concentrated and low-income areas.

**C. HUD's decisions to renew the PBRA contracts for Sandpiper Cove Apartments were made in violation of HUD substantive standards are consistent with and show the existence of discriminatory intent**

133.    HUD has made several decisions to enter into, and continue renewing PBRA contracts with Sandpiper Cove Apartments since 1984.  These decisions were made in violation of the HUD regulatory standards for acceptable housing. 24 C.F.R. § 5.703. These decisions are consistent with and supportive of the racially segregative purpose to segregate Black or African American families and provide them with unequal facilities.  HUD's failure to affirmatively further fair housing with regard to the PBRA program and Sandpiper Cove Apartments is the violation of a substantive standard that is consistent with discriminatory intent.

134.    HUD has the legal obligation under 42 U.S.C. § 3608(e)(5) to affirmatively further fair housing:

-    address significant disparities in housing needs and in access to opportunity,

-    replace segregated living patterns with truly integrated and balanced living patterns,

-    transform racially and ethnically concentrated areas of poverty into areas of opportunity, and

-    foster and maintain compliance with civil rights and fair housing laws. *N.A.A.C.P. v. Sec'y of Hous. & Urban Dev.*, 817 F.2d 149, 156 (1st Cir. 1987); *Shannon v. U.S. Dep't of Hous. & Urban Dev.*, 436 F.2d 809, 819, 821-822 (3d Cir. 1970); 24 C.F.R. § 5.150, § 5.152; HUD, Affirmatively Further Fair Housing, Final Rule, 80 Fed. Reg. 42272, July 16 2015.

135.    HUD is aware of the racially segregated and unequal conditions in the living patterns provided by the PBRA projects located in the City of Galveston, in Galveston County, and in the adjoining county, Brazoria County. HUD obtains detailed Management and Occupancy Review reports as well as REAC reports on each PBRA project. These reports include the facts showing failure of units in these projects to provide decent, safe, and sanitary housing.  HUD's Picture of Subsidized Households database contains the census tract information showing the minority composition of each PBRA project and of the census tract in which each PBRA is located.

136.    Despite this knowledge, HUD has not taken meaningful action to affirmatively further fair housing in the PBRA program as administered at the Sandpiper Cove Apartments project. HUD's implementation of its legal obligation to provide for fair housing is violated by HUD's breach of its obligation to pay only for Sandpiper Cove units that are decent, safe, and sanitary housing. HUD's breach leaves in place a pattern of racially segregated and unequal living conditions at Sandpiper Cove Apartments.

### X.    Claims for relief

### A. APA claim for relief based on the final agency action withholding the assistance required by the 2019 Consolidated Appropriations Act and 24 C.F.R. § 886.323(e)

137.    The legal and factual prerequisites for HUD's provision of relocation assistance to Plaintiffs are met.  HUD has issued a Notice of Default for the owner's failure to maintain the units and the projects in decent, safe, and sanitary condition.   The time for the owner to cure the deficiencies has passed without the deficiencies being cured. Plaintiffs have requested the assistance to relocate to decent, safe and sanitary housing elsewhere. HUD's obligation to provide the assistance and the relief from the owner's breach of its obligation to provide decent, safe, and

sanitary housing is an obligation to provide assistance and relief and its withholding the assistance and relief is final agency action under the Administrative Procedure Act, 5 U.S.C. § 551(13); 5 U.S.C.A. § 551 (10)(B); 5 U.S.C.A. § 551 (13)(A).  The relevant law and regulation require HUD to provide the relief of assistance for relocation once HUD has given a Notice of Default, the owner has not corrected the deficiencies set out in the notice, and HUD continues the contract in effect and pay for units that are not decent, safe, and sanitary.[6]  Each of these requirements is met yet HUD continues to withhold the assistance which is the relief provided by law. HUD's withholding the assistance and the relief is final agency action. 5 U.S.C. § 551(13); 5 U.S.C. § 551 (10)(B), 5 U.S.C. § 13(A).  HUD's action is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the Appropriations Acts and 24 C.F.R. § 886.323(e).  The scope of review for this claim is set by 5 U.S.C. § 706 (2).

**B.  APA claim for relief based on the final agency action unlawfully withholding the relocation assistance required by 24 C.F.R. § 886.323(e)**

138.    The legal and factual prerequisites for HUD's provision of relocation assistance to Plaintiffs are met.  HUD has issued a Notice of Default for the owner's failure to maintain the units and the projects in decent, safe, and sanitary condition.  The time for the owner to cure the deficiencies has passed without the deficiencies being cured. Plaintiffs have requested the assistance to relocate to decent, safe and sanitary housing elsewhere and HUD has refused.

139.    HUD has the legal obligation to provide the tenants with relocation assistance pursuant to 24 C.F.R. § 886.323(e) and is refusing to do so. Plaintiffs bring this action is to compel agency action unlawfully withheld or unreasonably delayed. The scope of review for this claim is set by

---

[6] FURTHER CONSOLIDATED APPROPRIATIONS ACT, 2020, PL 116-94, December 20, 2019, 133 Stat 2534; CONSOLIDATED APPROPRIATIONS ACT, 2019, PL 116-6, February 15, 2019, 133 Stat 13, Public and Indian Housing Tenant-Based Rental Assistance (2); 24 C.F.R. § 886.323(e).

5 U.S.C. § 706 (1).

### C. APA claim for relief based on the final agency action withholding the Tenant Protection Vouchers assistance authorized by the 2020 and the 2019 Consolidated Appropriations Acts[7]

140.    The 2020 and the 2019 Consolidated Appropriations Acts authorize HUD to issue Tenant Protection Vouchers to tenants in PBRA projects for which HUD has issued a Notice of Default and in which the conditions constitute imminent health and safety risks to the residents. *See* note 6.

141.    HUD's final decision to withhold the assistance and relief of Tenant Protection Vouchers given the owner's refusal to provide decent, safe, and sanitary units, the Notices of Default, the failure to cure the deficiencies, and the imminent health and safety risks to Plaintiffs and the other tenants is final agency action. 5 U.S.C. § 551(13); 5 U.S.C.A. § 551 (10)(B); 5 U.S.C.A. § 551 (13)(A).

142.     HUD's final decision to withhold the assistance and relief of Tenant Protection Vouchers is arbitrary, capricious, and an abuse of discretion.

143.    The scope of review for this claim is set by 5 U.S.C. § 706(2).

### D. APA claim for relief based on the final agency action withholding the Tenant Protection Vouchers and the other relocation assistance authorized by the 2020 and the 2019 Appropriations Acts and 24 C.F.R. § 886.323(e) that violates HUD's obligations to provide, within constitutional limitations, for fair housing in all of its housing programs as required by 42 U.S.C. § 3608(e)(5)

144.    HUD's final decision to withhold the assistance and relief necessary for Plaintiffs to

---

[7] FURTHER CONSOLIDATED APPROPRIATIONS ACT, 2020, PL 116-94, December 20, 2019, 133 Stat 2534; CONSOLIDATED APPROPRIATIONS ACT, 2019, PL 116-6, February 15, 2019, 133 Stat 13, Public and Indian Housing Tenant-Based Rental Assistance (2)

obtain decent, safe, and sanitary housing elsewhere including the use of Tenant Protection Vouchers continues to subject Plaintiffs to racial segregation and unequal conditions in HUD's Project Based Rental Assistance program. As shown in this Complaint, HUD is funding and administering a racially separate and unequal PBRA system that denies Plaintiffs racially integrated and equal housing. HUD's decision to deny the assistance and relief for Plaintiffs to use the federal assistance to obtain racially integrated and equal housing violates HUD's duty to affirmatively further fair housing under 42 U.S.C. § 3608(e)(5).

145.    The scope of review for this claim is set by 5 U.S.C. § 706.

**E.  Claim for intentional discrimination in violation of 42 U.S.C. § 3604(a)**

146.    For units in PBRA projects in majority White non-Hispanic census tracts, HUD complies with its obligation to pay only for units that are decent, safe, and sanitary. HUD is breaching this obligation by knowingly and voluntarily paying the owner of Sandpiper Cove Apartments for units that are not decent, safe and sanitary. HUD's breach of this obligation at Sandpiper Cove is based at least in part on the race of Plaintiffs and the other tenants. The evidence for this claim is shown above.  HUD's discriminatory purpose subjects Plaintiffs to the injuries caused by the breach of HUD's obligation to pay only for decent, safe and sanitary housing.

147.    HUD's final decision to withhold the relocation assistance and relief necessary for Plaintiffs to obtain decent, safe, and sanitary housing elsewhere including Tenant Protection Vouchers makes the decent, safe, and sanitary housing that would be available with that assistance unavailable to a group that is predominantly Black or African American and completely minority. This is the group of tenants at Sandpiper Cove Apartments. This decision

continues to subject Plaintiffs to HUD's discriminatory purpose and the resulting effects.

148.   The evidence set out in this Complaint shows that HUD's final decision to withhold the assistance and the Tenant Protection Vouchers is intentional discrimination on the basis of race and ethnicity in violation of 42 U.S.C. § 3604(a).

### F. Claim for intentional discrimination in violation of the Equal Protection component contained in the due process clause of the Fifth Amendment to the Constitution of the United States

149.   For units in PBRA projects in majority White non-Hispanic census tracts, HUD complies with its obligation to pay only for units that are decent, safe, and sanitary. HUD pays for units at Sandpiper Cove that are not decent, safe, and sanitary. HUD's payments for units at Sandpiper Cove that are not decent, safe, and sanitary is based at least in part on the race of Plaintiffs and the other tenants. The evidence for this claim is shown in this Complaint. HUD's discriminatory purpose subjects Plaintiffs to the injuries caused by the breach of HUD's obligation to pay only for decent, safe and sanitary housing.

150.   HUD's final decision to withhold the assistance and relief of the assistance including Tenant Protection Vouchers as necessary for Plaintiffs to obtain decent, safe, and sanitary housing elsewhere makes the decent, safe, and sanitary housing that would be available with that assistance unavailable to a group that is predominantly Black or African American and almost exclusively minority. This is the group of tenants at Sandpiper Cove Apartments. This decision continues to subject Plaintiffs to HUD's discriminatory purpose and the resulting effects.

151.   The evidence set out in this Complaint shows that HUD's final decision to withhold the assistance and the Tenant Protection Vouchers is intentional discrimination on the basis of race

and ethnicity in violation of the Equal Protection component contained in the due process clause of the Fifth Amendment to the Constitution of the United States.

### XI.    Prayer for relief

152.    Plaintiffs request the following relief:

A.    an injunction ordering HUD to provide Plaintiffs with the assistance necessary to obtain affordable decent, safe, and sanitary housing in neighborhoods without substandard conditions for so long as Plaintiffs remain eligible for the assistance;

B.    an injunction ordering HUD to provide Plaintiffs with Tenant Protection Vouchers as part of the assistance necessary to obtain affordable decent, safe, and sanitary housing in neighborhoods without substandard conditions so long as Plaintiffs remain eligible for the Voucher; This relief includes relocation assistance to use the voucher to obtain decent, safe, and sanitary housing in neighborhoods without substandard conditions.

C.    In the alternative to the relief of a Tenant Protection Voucher, injunctive relief ordering HUD to transfer the PBRA subsidy to a decent, safe and sanitary within the City of Galveston or Galveston County. This relief includes relocation assistance for the Plaintiffs to transfer to the new housing for the PBRA contract that is decent, safe, and sanitary.

D.    injunctive relief that Plaintiffs' leases with Sandpiper Cove Apartments are terminated without any default by Plaintiffs and ordering a return of all funds paid by Plaintiffs as rent or deposits;

E.    any other appropriate injunctive relief; and

F.    an award of plaintiffs' attorney's fees, litigation expenses, and costs.

Respectfully Submitted,

/s/Kimberly Brown Myles
Kimberly Brown Myles
Attorney in charge
State Bar No. 24071805
LONE STAR LEGAL AID
P.O. Box 398
Houston, Texas 77001 0398
(713) 652-0077 ext. 1206
Fax: (713) 652-3141
Email: kbrown@lonestarlegal.org
D.C. Bar No. TX0180
Attorney for Plaintiffs

Velimir Rasic
State Bar No. 24065948
LONE STAR LEGAL AID
P.O. Box 398
Houston, Texas 77001 0398
 (713) 652-0077 ext. 1204
Fax: (713) 652-3141
Email: vrasic@lonestarlegal.org
D.C. Bar No. TX0179
Attorney for Plaintiffs

Of Counsel:
Laura B. Beshara
State Bar No. 02261750
DANIEL & BESHARA, P.C
3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: laurabeshara@swbell.net
D.C. Bar No. TX0171
Attorney for Plaintiffs

Michael M. Daniel
State Bar No. 05360500
DANIEL & BESHARA, P.C.

49

3301 Elm Street
Dallas, Texas 75226-1637
214-939-9230
Fax 214-741-3596
E-mail: daniel.michael@att.net
D.C. Bar No. TX0172
Attorney for Plaintiffs