# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **SANDPIPER RESIDENTS ASSOCIATION, et al.,** ) | |
| ) | |
| ) | |
| **Plaintiffs,** ) | |
| **v.** ) | |
| ) | **Case No. 20-1783 (RDM)** |
| **UNITED STATES DEPARTMENT OF HOUSING** ) | |
| **AND URBAN DEVELOPMENT,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## DEFENDANT'S MOTION TO DISMISS
## <u>AND MEMORANDUM IN SUPPORT THEREOF</u>

## TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………………1

BACKGROUND……………………………………………………………………………2

  **I.   Contractual, Statutory, and Regulatory Background** .................................................. 2

    **A.   Section 8 Program Background** .................................................. 2

    **B.   The Administrative Procedure Act** .................................................. 8

  **II.   Factual Background** .................................................. 9

STANDARD OF REVIEW…………………………………………………………………11

  **I.   Rule 12(b)(1) Standard** .................................................. 11

  II.   **Rule 12(b)(6) Standard**…………………………………………………………12

ARGUMENT .................................................. 14

  **I.   HUD's Decisions Are Committed to Agency Discretion** .................................................. 14

  **II.   Plaintiffs Do Not Challenge Any Final Agency Action** .................................................. 20

  **III.   Plaintiffs Have Failed To Identify Any Legal Requirement That HUD Take The Action They Prefer.** .................................................. 23

    **A.   Plaintiffs do not identify a discrete action which HUD is required to take under the 2020 Consolidated Appropriations Act.** .................................................. 24

    **B.   Plaintiffs do not identify a discrete action which HUD is required to take under 24 C.F.R. § 886.323.** .................................................. 25

    **C.   HUD has no duty under 42 U.S.C. §3608(e)(5) to provide plaintiffs with Tenant Protection Vouchers.** .................................................. 26

  **IV.   Plaintiffs' Discrimination and Equal Protection Claims Also Fail** .................................................. 27

    **A.   Plaintiffs' §3604 Fair Housing Act Claim Is Barred By Sovereign Immunity** ... 27

    **B.   Plaintiffs Have Failed to Plausibly Plead any Discriminatory Intent** ................. 29

CONCLUSION…………………………………………………………… ……………...32

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*Am. Disabled for Attendant Programs Today v. United States HUD*,
170 F.3d 381 (3d Cir. 1999)................................................................................. 17, 26

*Am. Forest Res. Council v. Hall*,
533 F. Supp. 2d 84 (D.D.C. 2008) ................................................................................. 20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................. 13, 31

*Baker v. Property Investors of Conn.*,
338 F. Supp. 2d 321 (D. Conn. 2004) .............................................................................. 5

*Baltimore Gas & Elec. v. FERC*,
252 F.3d 456 (D.C. Cir. 2001) ........................................................................... 14, 16, 17

*Barrick Goldstrike Mines Inc. v. Browner*,
215 F.3d 45, 342 U.S. App. D.C. 45 (D.C. Cir. 2000) .................................................. 20

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007)................................................................................................. 12, 13

*Bennett v. Spear*,
520 U.S. 154 (1997)................................................................................................. 20, 21

*Boyd v. Browner*,
897 F. Supp. 590 (D.D.C. 1995) .................................................................................... 31

*Cannon v. District of Columbia*,
717 F.3d 200 (D.C. Cir. 2013) ......................................................................................... 5

*Cisneros v. Alpine Ridge Grp.*,
508 U.S. 10 (1993)............................................................................................................ 3

*Commission v. United States HUD*, No. 19-8390,
2021 U.S. Dist. LEXIS 29457 (S.D.N.Y. Feb. 16, 2021)............................................. 28

*Conley v. Gibson*,
355 U.S. 41 (1957)......................................................................................................... 12

*Dallas Safari Club v. Bernhardt, Civ. A.*,
No. 19-3696 (APM), 2021 WL 495078 (D.D.C. Feb. 9, 2021)..................................... 27

*Drake v. F.A.A.*,
351 U.S. App. D.C. 409, 291 F.3d 59 (D.C. Cir. 2002) ............................................... 15

*EEOC v. St. Francis Xavier Parochial Sch.*,
117 F.3d 621 (D.C. Cir. 1997)................................................................................... 5, 13

*Erickson v. Pardus*,
551 U.S. 89 (2007)......................................................................................................... 12

*FDIC v. Meyer*,
510 U.S. 471 (1994)....................................................................................................... 27

*Fund for Animals, Inc. v. United States BLM*,
460 F.3d 13 (2006)......................................................................................................... 20

*Goodwin v. Sec'y of HUD*,
356 F.3d 310 (D.C. Cir. 2004) ...................................................................................... 14

*Hawkins v. HUD*, No. 18-3052,
2020 U.S. Dist. LEXIS 53564 ......................................................................... 18, 19, 22

*Heckler v. Chaney,*
  470 U.S. 821 (1985).................................................................................. 14, 15, 16
*Herbert v. Nat'l Acad. of,*
  Sci., 974 F.2d 192 (D.C. Cir. 1992)......................................................................... 12
*Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.,*
  920 F.3d 890 (5th Cir. 2019) ................................................................................... 4
*Islamic Am. Relief Agency v. Unidentified FBI Agents,*
  394 F. Supp. 2d 34 (D.D.C. 2005) .......................................................................... 30
*Jovanovic v. US-Algeria Bus. Council,*
  561 F. Supp. 2d 103 (D.D.C. 2008) ........................................................................ 12
*Lane v. Pena,*
  518 U.S. 187 (1996).................................................................................................. 27
*Lauderhill Hous. Auth. v. Donovan,*
  818 F. Supp. 2d 185 (D.D.C. 2011) ........................................................................ 20
*Lincoln v. Vigil,*
  508 U.S. 182 (1993).................................................................................................... 9
*Lipton v. MCI Worldcom, Inc.,*
  135 F. Supp. 2d 182 (D.D.C. 2001) ........................................................................ 13
*Louis v. Hagel,*
  221 F. Supp. 3d 40 (D.D.C. 2016) .......................................................................... 14
*Louisiana v. United States,*
  948 F.3d 317 (5th Cir. 2020) .................................................................................. 20
*Lujan v. National Wildlife Fed'n,*
  497 U.S. 871 (1990).................................................................................................. 20
*Markowicz v. Johnson,*
  206 F. Supp. 3d 158 (D.D.C. 2016) .......................................................................... 5
*Multi-Family Mgmt. v. Hancock,*
  664 A.2d 1210 (D.C. 1995) ....................................................................................... 3
*Nat'l Law Ctr. on Homelessness & Poverty v. Dep't of Veterans Affairs,*
  842 F. Supp. 2d 127 (D.D.C. 2012) ........................................................................ 27
*Nat'l Parks Conservation Ass'n v. Dep't of Interior,*
  794 F. Supp. 2d 39 (D.D.C. 2011) .......................................................................... 23
*Norton v. S. Utah Wilderness, All.* ("SUWA"),
  542 U.S. 55 (2004)............................................................................................ 23, 26
*Oryszak v. Sullivan,*
  576 F.3d 522 (D.C. Cir. 2009) ................................................................................ 14
*Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Human Servs.,*
  43 F. Supp. 3d 28 (D.D.C. 2014) .............................................................................. 5
*Rann v. Chao,*
  154 F. Supp. 2d 61 (D.D.C. 2001) .......................................................................... 12
*Schering Corp. v. Heckler,*
  779 F.2d 683 (D.C. Cir. 1985) ................................................................................ 17
*Sierra Club v. Larson,*
  882 F.2d 128 (4th Cir. 1989) .................................................................................. 17
*Smith v. Scalia,*
  44 F. Supp. 3d 28 (D.D.C. 2014) ............................................................................ 27

iii

*Thompson v. Capitol Police Bd.*,
  120 F. Supp. 2d 78 (D.D.C. 2001) ........................................................................ 11, 12
*Tri-State Hosp. Supply Corp. v. United States*,
  341 F.3d 571, 358 U.S. App. D.C. 79 (D.C. Cir. 2003) ............................................ 27
*Unimex, Inc. v. HUD*,
  594 F.2d 1060 (5th Cir. 1979) ................................................................................. 28
*United States v. Mitchell*,
  463 U.S. 206 (1983)................................................................................................. 27
*Vanover v. Hantman*,
  77 F. Supp. 2d 91 (D.D.C. 1999)........................................................................ 11, 12
*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)......................................................................................29, 31, 32
*Washington v. DOJ*,
  164 F. Supp. 3d 145 (D.D.C. 2016) ......................................................................... 14
*Wendland v. Gutierrez*,
  580 F. Supp. 2d 151 (D.D.C. 2008) ......................................................................... 15
*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
  139 S. Ct. 361 (2018) ................................................................................................ 9
*Wilson v. Wolf, Civ. A.*,
  No. 20-0100 (ABJ), 2021 WL 230136 (D.D.C. Jan. 22, 2021) .................................. 5

**Statutes**

5 U.S.C. § 701 ................................................................................................................ 14
5 U.S.C. § 701(a)(2) ...................................................................................................... 9, 14
5 U.S.C. § 702 ................................................................................................................ 14
5 U.S.C. § 703 ................................................................................................................ 14
5 U.S.C. § 704 ............................................................................................................. 8, 20
5 U.S.C. § 705 ................................................................................................................ 14
5 U.S.C. § 706 ................................................................................................................ 14
5 U.S.C § 706(1) ............................................................................................................ 17
42 U.S.C. §3608(e)(5)..................................................................................................... 26
42 U.S.C. § 1437f ............................................................................................................. 1
42 U.S.C. § 1437f(a) ..................................................................................................... 2, 3
42 U.S.C. § 1437f(c)(1)(A) ............................................................................................... 3
42 U.S.C. § 1437f(t)(2) ..................................................................................................... 5
42 U.S.C. § 3604 ............................................................................................................ 27
42 U.S.C. § 3604(a) .................................................................................................. 27, 28
42 U.S.C. § 3608 ............................................................................................................ 27
42 U.S.C. § 3608(d) ....................................................................................................... 17
42 U.S.C § 1437f(d)(1)(B) ................................................................................................ 3
Pub. L. No. 116-94................................................................................................. 4, 5, 7, 21
Pub. L. No. 116-6 ............................................................................................................. 7

**Regulations**

24 C.F.R. § 5.703 ............................................................................................................. 6

24 C.F.R. § 5.703(a) .................................................................................................. 6

24 C.F.R. § 200.857 .................................................................................................. 6

24 C.F.R. § 200.857(h) ............................................................................................. 6

24 C.F.R. § 200.857(i) .............................................................................................. 6

24 C.F.R. § 886.309 .................................................................................................. 3

24 C.F.R. § 886.323 ................................................................................................ 25

24 C.F.R. § 886.323(a) .......................................................................................... 3, 6

24 C.F.R § 886.323(e) .................................................................................... 4, 18, 25

24 C.F.R. § 982.1(b)(1) ............................................................................................. 3

24 C.F.R. § 886.123(a) ............................................................................................. 6

**Other Authorities**

44 Fed. Reg. 70361 (Dec. 6, 1979) ................................................................... 26, 30

44 Fed. Reg. 70363 (Dec. 6, 1979) ................................................................... 26, 30

Defendant, the United States Department of Housing and Urban Development ("HUD"), moves to dismiss the Complaint under Federal Rules of Civil Procedure ("Rules") 12(b)(1) and 12(b)(6). The grounds for this motion are set forth more fully below.

## INTRODUCTION

Plaintiffs are tenants at Compass Pointe Apartments (a/k/a Sandpiper Cove) ("Sandpiper Cove"), a HUD subsidized property subject to a Housing Assistance Payments Contract for project-based rental assistance issued under Section 8(b)(1) of the United States Housing Act of 1937, 42 U.S.C. § 1437f. Sandpiper Cove is the only project-based rental assistance property available to low-income tenants in Galveston, Texas. Plaintiffs filed the instant lawsuit against HUD alleging substandard conditions at the property and demanding HUD undertake the specific enforcement actions that Plaintiffs prefer rather than those that HUD, in its discretion, chose to take.

As part of its normal oversight of project-based rental assistance properties, HUD conducted inspections at Sandpiper Cove to ensure compliance with HUD statutes and regulations. (Compl. ¶ 3)   In May 2019, one such inspection resulted in a failing score for Sandpiper Cove. (*Id*.) As a result of the failing score, HUD issued a Notice of Default to the owner. (*Id*. ¶ 37) The Notice of Default prompted HUD to undertake a series of discretionary enforcement actions. (*Id*. ¶ 66)

Plaintiffs assert that HUD withheld certain *other* specific discretionary enforcement actions that they preferred, and that the withholding of those enforcement actions amounted to final agency action justiciable under the Administrative Procedure Act ("APA"). (*Id.* ¶¶13-14) Specifically, they contend that HUD should have "rehoused them [to] another location with a voucher or by transfer to another location." (*Id.* ¶¶ 59, 137-145; *id* at 48, Prayer for Relief)

1

However, HUD's enforcement pursuant to the Notice of Default is ongoing and the agency has not committed to a final agency action.   As permitted by the Notice of Default and applicable law, the owner of the property submitted and HUD approved an Action Plan to improve the conditions at the property. The improvements at the property remain ongoing, as is HUD's review of its enforcement options. Further, even if HUD had concluded its enforcement action against the owner (which it had not), Plaintiffs have failed to identify a legal mandate requiring that HUD take the specific actions that Plaintiffs seek. Accordingly, because Housing Assistance Payments contract enforcement is committed to agency discretion by law, this court lacks subject matter jurisdiction over this action or, alternatively, Plaintiffs have failed to state a claim under the APA. Moreover, because the Complaint fails to challenge a final agency action, the Complaint should be dismissed for failure to state a claim on that additional basis.

Plaintiffs additionally allege that HUD's alleged failure to act constitutes an intentional decision to withhold relief for the discriminatory purpose of maintaining racial segregation and disadvantaging a group of minority households.   (Compl. ¶ 114)   Because Plaintiffs fail to plausibly plead racial animus in HUD's actions, these claims fall far short of the burden necessary to state a plausible claim, and therefore should be dismissed.

**BACKGROUND**

I.   **Contractual, Statutory, and Regulatory Background**

A.  **Section 8 Program Background**

Section 8 of the United States Housing Act, as amended, authorizes several programs through which HUD provides financial assistance "to 'ai[d] low-income families in obtaining a decent place to live'" and "promot[e] economically mixed housing" 42 U.S.C. § 1437f(a). Section 8 programs take two principal forms: "tenant-based" assistance and "project-based" assistance.

*Id.* § 1437f(6-7); *see id.* § 1437f(d)(2*)*, (o); 24 C.F.R. § 982.1(b)(1). Tenant-based assistance is linked to individual households, while project-based assistance is linked to specific housing units and is paid to the units' owner pursuant to a housing assistance payment contract. 24 C.F.R. § 886.309.

### 1. Project-Based Rental Assistance Program

This case concerns project-based assistance. "Under the [project-based] program, tenants make rental payments based on their income and ability to pay; [HUD] then makes 'assistance payments' to the private landlords in an amount calculated to make up the difference between the tenant's contribution and a 'contract rent' agreed upon by the landlord and HUD." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 12 (1993); *see* 42 U.S.C. § 1437f(c)(1)(A).

Under this program, HUD does not contract with the tenants, and tenants do not apply to HUD for assistance. Pursuant to regulations applicable here, *see* 24 C.F.R. pt. 886, subpt. C, participating owners are required to "maintain and operate the project so as to provide decent, safe, and sanitary housing" and to fulfill all maintenance-related and utilities-related obligations under the Housing Assistance Payments contract. 24 C.F.R. § 886.323(a); *see also id.* § 5.703. HUD ensures compliance with these requirements by undertaking regular inspections and notifying owners of any deficiencies. *Id.* § 886.323(d), (e).[1] If the owner does not promptly resolve identified deficiencies, HUD may issue a Notice of Default and ultimately avail itself of various remedies, including, among other things, ceasing further payments to the owner and redirecting the

---

[1]     Additionally, each individual tenant residing in a project-based Section 8 property executes an individual lease directly with the owner. 42 U.S.C § 1437f(d)(1)(B). Accordingly, such tenants, like any other private tenant, have rights to enforce local housing code violations directly against the owner under local law.  *Multi-Family Mgmt. v. Hancock*, 664 A.2d 1210, 1215 (D.C. 1995) (Holding that so long as the D.C. Housing Code does not conflict with federal housing standards imposed by HUD, "…the landlord will be subject to both federal and local law").

"abate[d]" funds to other purposes, such as relocation assistance for the project's tenants, *id*. §
886.323(e), or "work[ing] with the owner, lender, or other related party to stabilize the property in
an attempt to preserve the property through compliance, transfer of ownership, or an infusion of
capital provided by a third-party that requires time to effectuate." Pub. L. No. 116-94, § 219(c)(2),
codified at 133 Stat. 2534, 3005-06 (Dec. 20, 2019). HUD and its contract administrators
administer more than 17,000 ongoing project-based Section 8 Housing Assistance Payments
contracts, serving approximately 1.2 million families across the country, and at any time a
significant number of those projects are troubled.[2]

### 2.  Tenant-based Rental Assistance

HUD administers another major form of Section 8 assistance: the Housing Choice Voucher
Program. Under this program, federal assistance is tenant-based rather than project-based:
"vouchers" administered by a local public housing authority are allotted to individual households
based on availability and need. "Once admitted to the voucher program, [participating households]
are responsible for finding a landlord in the private rental market willing to rent to them." *Inclusive
Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019), *cert. denied*, 140 S.
Ct. 2506 (2020). "When a rent payment exceeds a specified percentage of a family's monthly
income, the federal program pays the balance," subject to certain limits. *Id*

### 3.  Tenant Protection Vouchers

Tenant protection vouchers are a special type of Housing Choice Voucher generally
provided to protect HUD-assisted families from hardship as the result of a variety of activities or
actions that occur in HUD's Public Housing, Multifamily Housing, or Moderate Rehabilitation

---

[2]     *See* 2021 HUD Congressional Justification Budget Request for the Office of Housing
available at https://www.hud.gov/sites/dfiles/CFO/documents/24_FY21CJ_PBRA.pdf  (last
visited Sep. 3, 2021)

properties, that may result in the loss of a family's housing through no fault of their own. 42 U.S.C. § 1437f(t)(2); HUD Notice PIH-2019-08 § 6, available at https://www.hud.gov/sites/dfiles/PIH/documents/PIH-2019-08.pdf (last visited Aug. 31, 2021);[3] *see also Baker v. Property Investors of Conn.*, 338 F. Supp. 2d 321, 323 (D. Conn. 2004).  Tenant protection vouchers are authorized only in statutorily prescribed situations such as a Housing Assistance Payments contract termination or if HUD determines that a rental unit poses an imminent health and safety risk to the residents (a determination HUD has not made with respect to Sandpiper Cove).[4] Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, div. H, tit. II, § 219, 133 Stat. 2534, 3005-07 (2019) (FY 2020).

---

[3]  The Court may take judicial notice of information posted on official public websites of government agencies.  *See, e.g., Markowicz v. Johnson*, 206 F. Supp. 3d 158, 161 n.2 (D.D.C. 2016) (Contreras, J.) (citing *Pharm. Rsch. & Mfrs. of Am. v. Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) (Contreras, J.) ("Courts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies.") (citing *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (taking judicial notice of document posted on D.C. public website)))).  As such, the Court can consider the websites cited herein without converting this motion into one seeking summary judgment.  *See, e.g., Wilson v. Wolf*, Civ. A. No. 20-0100 (ABJ), 2021 WL 230136, at *4 (D.D.C. Jan. 22, 2021) ("In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only 'the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice.'") (citing, among others, *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997)).

[4]  As addressed in greater detail below, the decision to make or not make the "imminent health and safety risk" determination and any resulting enforcement action HUD chooses to take or not take as a result, is within HUD's discretion. *See* Pub. L. No. 116-94, div. H, tit. II, 133 Stat. 2534 (2019) (FY 2020) ("the Secretary *may* provide section 8 rental assistance from amounts made available under this paragraph for units assisted under a project-based subsidy contract funded under the 'Project-Based Rental Assistance' heading under this title where the owner has received a Notice of Default and the units pose an imminent health and safety risk to residents") (emphasis added)).

### 4. Decent, Safe, and Sanitary Requirements for the Project Based Rental Assistance Program

Section 8 "housing must be decent, safe, sanitary, and in good repair. Owners of [project-based Section 8] housing…must maintain such housing in a manner that meets the physical conditions standards set forth in this section to be considered decent, safe, sanitary and in good repair." 24 C.F.R. § 5.703; *see also* 24 C.F.R. §§ 886.123(a), 886.323(a). These standards require that the site be "free of health and safety hazards and be in good repair." 24 C.F.R. § 5.703(a). This obligation of the owner is also found in the Housing Assistance Payments contract governing the project at issue. (Compl. ¶ 14; see also Ex. 1 to Gamez Decl., at 3)

HUD's Real Estate Assessment Center performs inspections, assigning a numerical score on a 100-point scale. 24 C.F.R. § 200.857. The frequency of such inspections at a property is dependent on the previous physical condition score. 24 C.F.R. §§ 200.857.[5] A property that received a previous score of less than 80 points is inspected annually. *Id*.

HUD statutes and regulations provide for enforcement when Section 8 properties receive low inspection scores. For example, a multifamily property that receives a score of less than 30 points is referred to HUD's Departmental Enforcement Center for evaluation. 24 C.F.R. § 200.857(h). The regulations also establish discretionary enforcement by HUD, through the Departmental Enforcement Center, the appropriate HUD Multifamily Hub Director, or both. *Id*. Moreover, there is "[n]o limitation on existing enforcement authority," and HUD may take "whatever action may be necessary when necessary . . . to protect the residents of those properties." 24 C.F.R. § 200.857(i).

---

[5] In response to the COVID-19 pandemic, in March 2020, HUD suspended most in-person housing inspections by REAC. HUD increased housing REAC inspections on June 1, 2021. *See https://www.hud.gov/sites/dfiles/PA/documents/Signed_Sec_Fudge_PHA_Letter.pdf*

### 5. Congressionally-Authorized Enforcement Tools

The 2020 Consolidated Appropriations Act also outlines the Congressionally authorized enforcement tools HUD has at its disposal should Project-Based Rental Assistance property receive a failing physical inspection score. Pub. L. No. 116-94, div. H, tit. II, § 219, 133 Stat. 2534, 3005-07 (Dec. 20, 2019) (FY 2020).[6] Notably, pursuant to the Act, HUD is only *required* by law to take one discrete action in such a case; specifically, when a Project-Based Rental Assistance property receives an inspection score of 60 or less from HUD's Real Estate Assessment Center, HUD *must*, within 15 days of the issuance of a failing inspection score, "[p]rovide the owner with a Notice of Default with a specified timetable, determined by the Secretary, for correcting all deficiencies." *Id*. The Act then provides HUD with a wide range of discretionary enforcement options HUD may take if deficiencies are not corrected in HUD's specified timetable, stating that:

> At the end of the time period for correcting all deficiencies specified in the Notice of Default, if the owner fails to fully correct such deficiencies, the Secretary *may*:
>
> a. require immediate replacement of project management with a management agent approved by the Secretary;
> b. impose civil money penalties, which shall be used solely for the purpose of supporting safe and sanitary conditions at applicable properties, as designated by the Secretary, with priority given to the tenants of the property affected by the penalty;
> c. abate the section 8 contract, including partial abatement, as determined by the Secretary, until all deficiencies have been corrected;
> d. pursue transfer of the project to an owner, approved by the Secretary under established procedures, which will be obligated to promptly make all required repairs and to accept renewal of the assistance contract as

---

[6]     The 2020 Consolidated Appropriations Act and its successors (and predecessors) provide appropriations for HUD and other federal agencies and allocates funds to specific programs within the agency. The Act conditions the receipt of certain housing assistance payments on the recipient's maintaining decent, safe and sanitary units, as determined by HUD, and requires that the recipient comply with all state and local regulations relating to the physical condition of any property under a Housing Assistance Payments contract. Pub. L. No. 116-94 133 Stat. 2534, 3005-07 (Dec. 20, 2019) (FY 2020). An identical provision appears in the 2019 Act. *See* Pub. L. No. 116-6, div. G, tit. II, § 221, 133 Stat. 13, 461-63 (Feb. 15, 2019) (FY 2019).

> long as such renewal is offered;
>
> e. transfer the existing section 8 contract to another project or projects and owner or owners;
>
> f. pursue exclusionary sanctions, including suspensions or debarments from Federal programs;
>
> g. seek judicial appointment of a receiver to manage the property and cure all project deficiencies or seek a judicial order of specific performance requiring the owner to cure all project deficiencies;
>
> h. work with the owner, lender, or other related party to stabilize the property in an attempt to preserve the property through compliance, transfer of ownership, or an infusion of capital provided by a third-party that requires time to effectuate; or
>
> i. take any other regulatory or contractual remedies available as deemed necessary and appropriate by the Secretary.

*Id*. § 219(c)(2) (emphasis added).

Additionally, Housing Notice 2018-08 provides further guidance for the implementation of the Act, outlining procedures for the issuance of a Notice of Default, owner requests for time extensions of Notice of Default requirements, and discretionary enforcement options in cases of owner noncompliance. *See* HUD Notice H 2018-08 pp. 3, 5-7, https://www.hud.gov/sites/dfiles/OCHCO/documents/2018-08hsgn.pdf (hereinafter, "Housing Notice 2018-09") (last visited Sept. 6, 2021). HUD follows these guidelines in an effort to preserve affordable housing by bringing project-based rental assistance properties with failing Real Estate Assessment Center inspection scores back into compliance with HUD's decent, safe, and sanitary housing standards.

### B. The Administrative Procedure Act

The APA generally authorizes judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. When APA review is available, a court may set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), or "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1).

Review under the APA is unavailable if the relevant agency action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Action is committed to agency discretion if it is of the kind "traditionally regarded as unreviewable, such as the allocation of funds from a lump-sum appropriation," *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (citing *Lincoln v. Vigil*, 508 U.S. 182, 191-92 (1993)), or "an agency's decision not to institute enforcement proceedings," *Lincoln*, 508 U.S. at 191. Section 701(a)(2) also precludes review if the statute underlying a plaintiff's challenge "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln,* 508 U.S. at 191.

## II.   Factual Background

The owner of Sandpiper Cove, Compass Pointe Apartments, LLC (the "Owner"), was assigned the Housing Assistance Payments Contract in March 2015 from the previous owner, Sandpiper Cove Apartments, LLC.  (Compl. ¶ 15)  The Owner is a party to the Housing Assistance Payments contract with the Southwest Housing Compliance Corporation, the contract administrator engaged by HUD to  administer the project-based rental assistance program at Sandpiper Cove, formerly Parkland Apartments of Galveston.[7] (*Id*. ¶ 18) The Housing Assistance Payment contract was most recently renewed on March 3, 2012, for a term of twenty years.  (*Id*. ¶ 15) Sandpiper Cove is the *only* Section 8 project-based rental assistance housing option available to low-income residents in Galveston, Texas. (Ex. 3 to Gamez Decl. (Dec. 2, 2019 letter); *see also* Compl. ¶ 65, referencing Dec. 2, 2019 letter)

On or about May 8, 2019, HUD's Real Estate Assessment Center conducted an on-site inspection of the property, which resulted in a failing score of 33c.  (Compl. ¶ 37)  The inspection

---

[7]     The original contract was executed in April 1984 for an initial term of five years.  (Ex. 1 to Gamez Decl.)

identified deficiencies that demonstrated the Owner was in default of its duties to maintain the project in decent, safe, and sanitary condition.  (*Id.*) As a result of the inspection score, the Fort Worth Asset Management Division issued the Owner a Notice of Default on May 15, 2019.  (*Id.*)  In response and pursuant to the Notice of Default, the Owner submitted to HUD an Action Plan to make corrective actions at the property. (Exs. 2-3 to Gamez Decl.; Compl. ¶ 66)  The Action Plan, which included a survey of the property, a status report of all deficiencies identified in the REAC inspection, and a repair plan to correct the remaining deficiencies, was originally approved by HUD on September 16, 2019, and updates to the plan were approved on October 7, 2019, July 28, 2020 and July 14, 2021.  (Gamez Decl. ¶ 7)

In September 2019, Plaintiffs' counsel sent a letter to HUD demanding relief similar to what they request of the Court in this matter.  (Compl. ¶ 65)  On December 2, 2019, HUD sent a response letter outlining HUD's obligations under the Consolidated Appropriations Act and Housing Notice 2018-08, and detailing how HUD has complied and will continue to comply with those obligations.  (*Id.* ¶¶ 65-67; Ex. 3 to Gamez Decl.)  Further, the letter explained that "[b]ecause HUD continues to gather information regarding the owner's default, the condition of the property, and other relevant factors which will inform HUD's next steps, HUD has not committed to a final agency action."  (Ex. 3 to Gamez Decl. at 2)  Additionally, HUD's letter discussed the competing interests HUD must weigh when considering enforcement actions, explaining that:

> In all enforcement actions on subsidized properties, the Office of Multifamily Housing balances the need for timely improvement in living conditions at the subject property with the long-term preservation of the project-based subsidy. The decision to terminate a Section 8 contract is not a decision that HUD takes lightly. Such termination would require all tenants to relocate from the building or lose access to their project-based rental assistance. Further, if HUD terminates the subsidy contract on Sandpiper Cove, that affordable housing resource is lost to the community forever. Sandpiper Cove is the only subsidy contract in the City of Galveston and there are very few housing options for residents who have vouchers. HUD believes the loss of the subsidy contract may have substantial negative impact

10

on the City, and the current residents may be unable to find suitable alternative housing in the locality.

(Ex. 3 to Gamez Decl. at 1-2)

Since the Notice of Default was issued, the Owner has continued to make repairs to the property with oversight and coordination from HUD pursuant to the Notice of Default and the Action Plan. (Gamez Decl. ¶ 9)  In addition to monitoring the continued progress on the Action Plan, on December 20, 2019, HUD required the Owner to replace its on-site management company.  (Gamez Decl. ¶ 8)   HUD's Fort Worth Asset Management Division has been in regular contact with the Owner, the new management company, and the contract administrator. That regular contact includes bi-weekly meetings in which the status of the repairs and improvements at the property are discussed.  (Gamez Decl. ¶ 8)

Further, the Owner is in the process of executing a sale of the property to a buyer that plans to make significant improvements to the property.  (Gamez Decl. ¶ 11; Compl. ¶¶ 68-70) HUD is currently reviewing the parties' Housing Assistance Payments Contract Assignment Request, which will need to be approved before a new owner can become a party to the contract. The Owner and buyer have a tentative October 15, 2021 closing date for completion of the sale. (Gamez Decl. ¶ 11) The Complaint does not allege that any Plaintiffs have explored *any* landlord-tenant remedies to enforce owner compliance with local health and safety codes or lease obligations, other than filing suit against HUD pursuant to the APA.

## STANDARD OF REVIEW

### I.    Rule 12(b)(1) Standard

When reviewing a Rule 12(b)(1) motion to dismiss, "the court must accept the complaint's well-pled factual allegations as true and draw all reasonable inference in the plaintiffs favor." *Thompson v. Capitol Police Bd.*, 120 F. Supp. 2d 78, 81 (D.D.C. 2001); *Vanover v. Hantman*, 77

F. Supp. 2d 91, 98 (D.D.C. 1999). At the same time, "[t]he court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001), *aff'd*, 346 F.3d 192 (D.C. Cir. 2003). Plaintiff must carry the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *Thompson*, 120 F. Supp. 2d at 81; *Vanover*, 77 F. Supp. 2d at 98. In determining whether jurisdiction exists, a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence. *See Herbert v. Nat'l Acad. of Sci.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

## II.     Rule 12(b)(6) Standard

A Rule 12(b)(6) motion tests the legal sufficiency of a complaint. In ruling on a motion to dismiss, the Court "must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *Jovanovic v. US-Algeria Bus. Council*, 561 F. Supp. 2d 103, 110 (D.D.C. 2008).

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court clarified the standard of pleading that a plaintiff must meet in order to survive a motion to dismiss under Rule 12(b)(6). The Court noted that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Id*. at 555 (*quoting Conley v. Gibson*, 355 U.S. 41, 47, 78 (1957)); *see also Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Although "detailed factual allegations" are not necessary to survive a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. The Court stated that while there was no "probability requirement at

the pleading stage," *id.* at 556, "something beyond . . . mere possibility . . . must be alleged[.]" *Id.*
at 557-58.  The facts alleged in the complaint "must be enough to raise a right to relief above the
speculative level," *id*. at 555, or must be sufficient to "state a claim for relief that is plausible on
its face," *id*. at 570.  The Court referred to this newly clarified standard as "the plausibility
standard."  *Id*. at 560-61 (abandoning the "no set of facts" language from *Conley v. Gibson*).

The Court in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), further clarified the plausibility
pleading standard, explaining that this standard "demands more than an unadorned, the-defendant-
unlawfully-harmed-me accusation."  Rather, "[t]o survive a motion to dismiss, a complaint must
contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its
face."  *Id.* The plausibility standard "asks for more than a sheer possibility that a defendant acted
unlawfully. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere
possibility of misconduct, the complaint has alleged but it has not 'show[n] that the pleader is
entitled to relief.'"  *Id.*

On a motion to dismiss, under Rule 12(b)(6), the Court may consider, in addition to the
facts alleged in the complaint, documents either attached to, or incorporated into the complaint by
reference, as well as matters of which it may take judicial notice.  *See EEOC v. St. Francis Xavier
Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997); *see also Lipton v. MCI Worldcom, Inc.*,
135 F. Supp. 2d 182, 186 (D.D.C. 2001) ("[T]he court may consider the defendant's supplementary
material without converting the motion to dismiss into one for summary judgment.  This Court has
held that 'where a document is referred' to in the complaint and is central to plaintiff's claims,
such a document attached to the motion papers may be considered without converting the motion
to one for summary judgment.'").  Additionally, "'the Court may consider documents specifically

referenced in the complaint where the authenticity of the document is not questioned.'" *Louis v. Hagel*, 221 F. Supp. 3d 40, 43 (D.D.C. 2016) (citations omitted).[8]

## ARGUMENT

## I.   HUD's Decisions Are Committed to Agency Discretion

The APA generally permits judicial review of final agency action under the deferential standards set forth in 5 U.S.C. § 706. "[B]efore any review at all may be had," however, "a party must first clear the hurdle of § 701(a)." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985). Section 701 of the APA precludes judicial review when, *inter alia*, agency action is "committed to agency discretion by law" as is the case here. 5 U.S.C. § 701(a)(2). Consequently, the Complaint should be dismissed either under Rule 12(b)(1) for lack of jurisdiction or under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.[9]

Plaintiffs' claim amounts to an allegation that HUD has failed to enforce its rules against the Owner in the specific way in which Plaintiffs desire. However, because HUD's oversight and

---

[8] The exhibits accompanying the Gamez Declaration may be considered under the Rule 12(b)(6) standard because they are incorporated by reference into the Complaint. *See* Compl. ¶¶ 15, 65-66.

[9]     The D.C. Circuit has observed that the judicial review provisions of the APA, 5 U.S.C. §§ 701-706, provide 'a limited cause of action for parties adversely affected by agency action'", but do not operate as a jurisdictional bar. *Oryszak v. Sullivan*, 576 F.3d 522, 524-25 (D.C. Cir. 2009); *but see Goodwin v. Sec'y of HUD*, 356 F.3d 310, 312-13 (D.C. Cir. 2004) (holding that the availability of an alternative remedy deprived the Court of jurisdiction for a claim under the APA); *Baltimore Gas & Elec. v. FERC*, 252 F.3d 456, 461 (D.C. Cir. 2001) (no jurisdiction over challenge to FERC's discretionary decision to settle an enforcement action rather than to see it "through to fruition"); *see also Citizens for Responsibility & Ethics in Washington v. DOJ*, 164 F. Supp. 3d 145, 150 (D.D.C. 2016) (noting "a dispute among the courts of this District as to whether the argument Defendants make here—FOIA offers an alternative remedy and thus precludes a claim under the APA—should be reviewed under Rule 12(b)(6) for failure to state a claim or under Rule 12(b)(1) for lack of subject matter jurisdiction"). Consequently, Rule 12(b)(1) is cited as an alternative basis for dismissal.

use of enforcement remedies against a project-based Section 8 property owner who is in default of the Housing Assistance Payments contract is committed to agency discretion, HUD's alleged failure to take specific enforcement actions is judicially unreviewable under the APA.

The APA provides for judicial review of agency action (or failure to take action) except when a statute precludes judicial review or when "agency action is committed to agency discretion by law." *Wendland v. Gutierrez*, 580 F. Supp. 2d 151 (D.D.C. 2008) (citing 5 U.S.C. §§ 701(a)(1), (a)(2)); *Chaney*, 470 U.S. at 838.   It is well established that, absent some specific statutory limitation on an agency's prosecutorial discretion, the decision whether to institute enforcement action is committed to the agency's discretion by law and is therefore unreviewable. *Chaney*, 470 U.S. at 838.  The court in *Wendland* further explains that:

> There is "no law to apply" when there are no "substantive legal criteria against which an agency's conduct can be seriously evaluated." *Drake v. F.A.A.,* 351 U.S. App. D.C. 409, 291 F.3d 59, 70 (D.C. Cir. 2002). Thus, when a statute provides an agency with such broad decision-making powers that no "concrete limitations . . . on the agency's exercise of discretion" or "'judicially manageable standards' are discernable, meaningful judicial review is impossible, and agency action is shielded from the scrutiny of the courts." *Id.* at 70.

*Wendland,* 580 F. Supp. 2d at 153.

In *Chaney*, the Supreme Court held that an agency's decision not to take enforcement action is "generally committed to an agency's absolute discretion" and presumptively unsuitable for judicial review. *Chaney*, 470 U.S. at 831. The Court explained that an agency's decision not to invoke its enforcement measures involves a complicated balancing of factors that is peculiarly within the agency's expertise, i.e., not only must the agency assess whether a violation has occurred, but it must also determine (1) whether its resources are best spent on a particular violation rather than another; (2) whether the agency is likely to succeed if it acts; (3) whether the particular enforcement action under consideration best fits the agency's overall policies; and (4) whether the

agency has the resources to undertake the action. *Id*. An agency cannot act on every violation of a statute or a regulation that it is charged with enforcing, and "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id*. at 831-32.

Indeed, as the D.C. Circuit has observed, "*Chaney*'s recognition that the courts must not require agencies to initiate enforcement actions may well be a requirement of the separation of powers commanded by our Constitution. The power to take care that the laws be faithfully executed is entrusted to the executive branch -- and only to the executive branch. . . . One aspect of that power is the prerogative to decline to enforce a law, or to enforce a law in a particular way." *Baltimore Gas & Elec. v. FERC*, 252 F.3d 456, 459 (D.C. Cir. 2001).   Courts, therefore, presumptively lack jurisdiction over challenges to an agency's discretionary determination to "decline to enforce a law, or to enforce a law in a particular way" instead of a plaintiff's preferred way. *See id*. at 461.

*Chaney* also articulated the circumstances in which the presumption against judicial review of an agency's enforcement responsibilities may be overcome. The Court described the relevant inquiry as whether Congress has "indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion." *Chaney,* 470 U.S. at 834-35. In other words, courts must ask whether Congress has provided the judiciary with "law to apply." *Id*. at 832-33.  Here, Congress has not provided the courts with any meaningful standard to judge HUD's exercise of discretion in pursuing certain enforcement options over others.

Nor is such a standard found in the Fair Housing Act.  Although the Fair Housing Act imposed on HUD an affirmative duty to further fair housing goals, it does not provide this Court

with "law to apply" or a meaningful standard against which to judge HUD's exercise of discretion in dealing with troubled properties.  The applicable section of the Fair Housing Act, 42 U.S.C. § 3608(e)(5), is drawn in broad discretionary language, which courts have consistently read to permit HUD to balance a number of factors, such as expenses, personnel, resources, and likelihood of success, in fulfilling its duty.  *Id.  See also Darst-Webbe Tenant Ass'n Bd. v. St. Louis Hous. Auth.*, 299 F. Supp. 2d 952, 867 (E.D. Mo. 2004), aff'd, 417 F.3d 898 (8th Cir. 2005); *Alschuler v. Dep't of Hous. & Urban Dev.*, 686 F.2d 472, 481 (7th Cir. 1982); *N.A.A.C.P. v. Sec'y of Hous. & Urb. Dev.*, 817 F.2d 149, 158 (1st Cir. 1987).  Accordingly, the Fair Housing Act does not provide any meaningful standards to rebut the presumption of unreviewability of agency inaction with regard to the discretionary enforcement action Plaintiffs seek, or upon which to base any assertion here that HUD, under 5 U.S.C § 706(1), must take some specific action. *See, e.g., Am. Disabled for Attendant Programs Today v. United States HUD*, 170 F.3d 381 (3d Cir. 1999) (concluding that the Fair Housing Act's requirement that HUD administer programs in a manner affirmatively to further the Fair Housing Act's policies did not override the presumption that agency decisions not to enforce are unreviewable); *Baltimore Gas & Elec.*, 252 F.3d at 460 ("FERC's decision to settle with Columbia, and its consequent decision not to see its enforcement action through to fruition, is a paradigmatic instance of an agency exercising its presumptively nonreviewable enforcement discretion."); *Schering Corp. v. Heckler*, 779 F.2d 683, 686 (D.C. Cir. 1985) (discretionary decision to hold enforcement action in abeyance pending further agency assessment is "a paradigm case of enforcement discretion"); *Sierra Club v. Larson*, 882 F.2d 128, 132 (4th Cir. 1989) (discretionary decision not to recommend a formal penalty action is nonreviewable).

Similarly, as discussed above, the 2020 Consolidated Appropriations Act and HUD's regulations impose requirements on the landlord and provide enforcement authority to the

Secretary, but do not *require* the Secretary to act and certainly do not provide any standards that could rebut the presumption of unreviewability of agency inaction. Therefore, while HUD takes its duties to enforce its rules seriously, enforcement decisions of its project-based Section 8 program are not subject to judicial review under the APA.

Plaintiffs bring this suit because they disagree with HUD's choices about how to remedy the problems it discovered at Sandpiper Cove. In particular, Plaintiffs complain that HUD did not take one immediate step: exercising its discretion to draw upon appropriated funds to move all residents out of Sandpiper Cove while HUD pursued other, ongoing enforcement options.  (Compl. ¶ 59; Ex. 2 to Gamez Decl.)

Plaintiffs' claims fail because the relevant statutes entrust HUD with the task of determining how best to redress violations discovered during inspections of project-based Section 8 housing. The Consolidated Appropriations Act provides that, if an owner fails to adequately correct all deficiencies upon issuance of a Notice of Default, the agency "may" take any of various enforcement measures, including replacing project management, transferring the contract to another project or owner, and imposing civil money penalties. 2020 Act § 219(c)(2), 133 Stat. at 3005-06. The 2020 Act also contemplates that HUD may invoke its contractual right to abate payments and use the abated funds to relocate tenants, *see id.*; *cf.* 24 C.F.R. § 886.323(e), or alternatively, that HUD may draw from its appropriation to fund the relocation of residents without abating the contract, *see* 133 Stat. at 2977. But the 2020 Act also expressly recognizes that HUD may "work with the owner . . . to stabilize the property" without immediately invoking those other remedies. *Id.* § 219(c)(2)(H), 133 Stat. at 3005-06.

Thus, nothing required HUD to follow Plaintiffs' preferred course of action.  This precise issue was addressed by the Court in *Hawkins v. HUD*, No. 18-3052, 2020 U.S. Dist. LEXIS 53564,

*adopted by* 2020 U.S. Dist. LEXIS 52854 (S.D. Tex. Mar. 26, 2020).  There, the District Court

adopted a report and recommendation that reasoned that the consideration by HUD's regional

office of other enforcement options, namely to attempt to secure compliance before taking more

extreme measures, was a matter committed to agency discretion and not subject to review under

the APA.  The reasoning in that decision, which is excerpted below, applies equally here:

> [N]o legal consequences flowed from HUD's decision to take a less draconian
> enforcement action with respect to Coppertree Village.  Instead, HUD opted to
> secure compliance with HUD's regulations through additional inspections and
> other  administrative enforcement actions. The Act's permissive language, "if the
> owner fails to fully correct such deficiencies, the Secretary may . . .," conferred on
> HUD the discretion to decide what options to pursue and when to pursue them. One
> of the options contained in the Act was that HUD could continue to work with the
> owner to obtain compliance.  The Amended Complaint makes it clear that
> Plaintiffs' preference was that HUD determine that Coppertree Village could not
> be remediated and issue housing vouchers to its residents. But the decision to
> pursue compliance with the regulations with the existing management was
> committed to HUD's discretion by law and is not reviewable under Section
> 701(a)(2).

*Hawkins*, 2020 U.S. Dist. LEXIS 53564, at 18-19.  Although Plaintiffs evidently desired that HUD

determine that Sandpiper Cove could not be remediated and issue housing vouchers to its

residents, HUD acted well within its authority in "deciding to pursue compliance with the

regulations with the existing management." *Id.*  Because that choice was "committed to HUD's

discretion by law," it is not reviewable under Section 701(a)(2), *id.*, and thus either deprives this

Court of subject matter jurisdiction or warrants dismissal for failure to state a claim. Accordingly,

HUD necessarily has to balance many factors when deciding which of its many enforcement tools

are appropriate when conducting oversight over the thousands of properties in the project-based

Section 8 program and cannot be subject to second-guessing each time a tenant does not agree

with the specific route HUD chooses to take.

## II.     Plaintiffs Do Not Challenge Any Final Agency Action

Plaintiffs' claims are unreviewable for another reason: they do not challenge final agency action. "When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'" *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 882 (1990)); *see* 5 U.S.C. § 704 (allowing review only of "final agency action for which there is no other adequate remedy in a court").

For agency action to be "final" and thus reviewable under the APA, several requirements apply. First, plaintiffs must challenge a specific, "identifiable action or event" rather than an agency's general course of conduct. *Lujan*, 497 U.S. at 899; *see also Louisiana v. United States*, 948 F.3d 317, 323 (5th Cir. 2020). Second, the identified agency action must both (1) "mark the 'consummation' of the agency's decisionmaking process" and (2) be an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997); see also *Lauderhill Hous. Auth. v. Donovan*, 818 F. Supp. 2d 185 (D.D.C. 2011) (citing *Barrick Goldstrike Mines Inc. v. Browner,* 215 F.3d 45, 48, 342 U.S. App. D.C. 45 (D.C. Cir. 2000). Whether there has been "agency action" or "final agency action" within the meaning of the APA are threshold questions; if these requirements are not met, the action is not reviewable. *Fund for Animals, Inc. v. United States BLM*, 460 F.3d 13, 18 (2006). Because Plaintiffs have failed to meet these requirements, this Court should dismiss the Complaint for failure to state a claim for which relief can be granted. *Lauderhill* at 193 (citing *Fund for Animals,* 460 F.3d at 18 n.4); *see also Am. Forest Res. Council v. Hall*, 533 F. Supp. 2d 84, 94 (D.D.C. 2008).

Plaintiffs here allege that the final agency action they are challenging is HUD's failure to

provide the tenants of Sandpiper Cove with Tenant Protection Vouchers and relocation assistance, instead choosing to continue to "leave the project-based contract, the Housing Assistance Payment contract, in place" (Compl. ¶ 14) Plaintiffs allege that the Notice of Default set a time period to cure the violations contained in the notice, and that the Owner did not comply with that deadline. (*Id.* ¶ 40) Though legally irrelevant to the question of reviewability, HUD notes that the Owner *did* comply with the Notice of Default by submitting an Action Plan which HUD approved, extending the time to cure the violations contained in the notice. *See* HUD Notice 2018-08 pp. 5-6; *see also* (Gamez Decl. ¶ 7). Regardless of whether an owner "complies" with a Notice of Default, HUD still has discretion regarding enforcement remedies, including discretion over what tools and ongoing oversight it *may* use to spur compliance. Such options provided by Congress to HUD include requiring the replacement of project management with a management agent approved by the Secretary and working with the owner to stabilize the property in an attempt to preserve the property through compliance, both of which HUD utilized here. Pub. L. No. 116-94, div. H, tit. II, § 219, 133 Stat. 3005-07 (Dec. 20, 2019) (FY 2020); *see also* (Gamez Decl. ¶ 7-10). HUD continues to work with the owner to ensure compliance pursuant to the Notice of Default.

Accordingly, because HUD continues to explore enforcement options, HUD has not taken final agency action and, even if it had, Plaintiffs do not identify any statutory or regulatory provisions that requires HUD to take the action Plaintiffs' demand.

HUD has neither "consummat[ed]" its enforcement efforts at Sandpiper Cove nor taken any action to fix "the rights or obligations" of any party. *Bennett*, 520 U.S. at 178 (quotation marks omitted). Rather, at the time this lawsuit was filed, HUD had merely commenced the enforcement process by issuing a Notice of Default and actively monitoring the owner's response. The Owner presented HUD with a plan and schedule for repairs and reached an agreement with HUD on the

nature and timeline of those repairs. During this period, HUD communicated regularly with the Owner concerning the status of the property and the repair efforts. None of those interlocutory steps constitutes final agency action, and, thus, no final agency action had occurred as of the time this lawsuit was filed.

Contrary to Plaintiffs' assertion, the date specified in a Notice of Default does not reflect a hard deadline after which, HUD either will or will not have taken final enforcement action. This date merely marks when HUD expects the Owner to repair physical deficiencies or else request an extension of the NOD requirements, accompanied by a survey of the property, a status report of all the deficiencies identified by the survey and the Real Estate Assessment Center inspection, and a thorough repair plan to correct all remaining deficiencies. *See* Housing Notice 2018-08; Ex. 2 to Gamez Decl. at p. 3. Here, the Owner has submitted a survey of the property along with a plan to repair the property and has been updating HUD on a bi-weekly basis on the status of the repairs. (Gamez Decl. ¶¶ 7, 10). Until HUD has either determined that the Owner is no longer in default or has decided to terminate the Housing Assistance Payment Contract, HUD's decision concerning how to handle the Owner's default is still under consideration and is not final. As in *Hawkins*, this Court should

> [r]eject[] Plaintiffs' attempt to recharacterize HUD's tacit rejection of certain available enforcement options as final agency actions that may be reviewed under the APA's Sections 702 and 704. If Coppertree Village's condition ultimately cannot be brought into compliance with applicable housing regulations, terminating its HAP contract and relocating its residents are still actions that may be taken by HUD. But simply because HUD has not opted to implement the extreme measure of closing Coppertree Village when Plaintiffs deemed it appropriate, does not transform a potential action or a "wait and see" posture into a final agency action because no rights have been affected by HUD's keeping its options open.

*Hawkins*, 2020 U.S. Dist. LEXIS 53564, at *19.

Indeed, HUD still is considering its enforcement options concerning the Owner's default of the Housing Assistance Payment contract. HUD's alleged failure to act so far in the specific manner in which Plaintiffs' demand does not "mark the consummation of the agency's decisionmaking process" as required by the APA but is at most "merely tentative or interlocutory in nature" *Lauderhill* at 193.[10]

## III.  Plaintiffs Have Failed To Identify Any Legal Requirement That HUD Take The Action They Prefer.

"[T]he only agency action that can be compelled under the APA is action legally required . . . . § 706(1) empowers a court only to compel an agency to perform a ministerial or non-discretionary act, or to take action upon a matter, without directing how it shall act." *Norton v. S. Utah Wilderness All.* (*"SUWA"*), 542 U.S. 55, 63-64 (2004).  "[A] 'failure to act' is properly understood to be limited, as are the other items in § 551(13), to a discrete action." *Id.* at 63. As explained below, none of the legal authorities cited by Plaintiffs mandate a discrete action which HUD is legally required to take, and at most provide HUD with discretionary authority. Therefore, Plaintiffs have not identified an agency action which HUD was required to take and the Complaint should be dismissed for this additional reason.

---

[10]   HUD also notes that the Owner is in the process of executing a sale of the property to a buyer that plans to make significant improvements to the property.  (Gamez Decl. ¶ 11)  HUD is currently review the parties' Housing Assistance Payments Contract Assignment Request, which will need to be approved before a new owner can become a party to the contract. The Owner and buyer have a tentative October 15, 2021 closing date for completion of the sale. (Gamez Decl. ¶ 11)  Such a sale, were it to be consummated, would moot Plaintiffs' claims in this lawsuit and provide an additional basis for dismissal due to a lack of an ongoing case or controversy. *See, e.g., In re Howard,* 2014 U.S. App. LEXIS 13380, at *3 (D.C. Cir. July 14, 2014) ("Any injunctive relief concerning appellant's student loans would be moot, as they have been discharged"); *Nat'l Parks Conservation Ass'n v. Dep't of Interior,* 794 F. Supp. 2d 39, 44 (D.D.C. 2011) ("If . . . an agency does respond to a petition, even after a suit to compel a response is filed, such a suit is rendered moot.").

### A. Plaintiffs do not identify a discrete action which HUD is required to take under the 2020 Consolidated Appropriations Act.

Plaintiffs allege that "[t]he relevant law and regulation *require* HUD to provide the relief of assistance for relocation once HUD has given a Notice of Default, the owner has not corrected the deficiencies set out in the notice, and HUD continues the contract in effect and pay for units that are not decent, safe, and sanitary. (Compl. ¶ 137)  Plaintiffs assert that such a requirement is set forth in the 2020 Appropriations Act, but they are mistaken.

As explained above, when a project-based rental assistance property receives an inspect score of 60 or less, the Appropriations Act mandates only that HUD provide the owner with a Notice of Default within 15 days of the issuance of the inspection score. The Appropriations Act then provides HUD with wide discretion to both set the timetable to cure the deficiencies specified in the notice, or if the owner fails to fully correct the deficiencies within that time period, the discretion to make or not make use of several enforcement options as HUD sees fit. 2020 Appropriations Act Sec. 219 (c), 133 Stat. at 3005-06 ("At the end of the time period for correcting all deficiencies specified in the Notice of Default, if the owner fails to fully correct such deficiencies, the Secretary may. . .")

Further, the 2020 Act provides that the Secretary *may* provide tenant protection vouchers where the owner has received a Notice of Default and the units pose an imminent health and safety risk to residents.[11] *Id*., 133 Stat. at 3006.  Here, HUD has not found that the units pose an imminent health and safety risk to the residents. Further even if it had, the Act does not provide a discrete

---

[11]     Plaintiffs cite to both the 2019 and 2020 Consolidated Appropriations Act as a basis for this argument. While both Acts contain identical provisions regarding "decent, safe, and sanitary" conditions and the authorization for the Secretary to provide tenant protection vouchers if HUD determines units to be an imminent health and safety risk, neither the 2019 or 2020 Act mandates that HUD issue vouchers in the situation Plaintiffs describe. *See* 133 Stat. 13, 461-63; 133 Stat. 2534, 3005-07.

mandate to issue tenant protection vouchers but rather gives HUD the discretion to determine whether or not to issue such vouchers in that situation.

### B.  Plaintiffs do not identify a discrete action which HUD is required to take under 24 C.F.R. § 886.323.

Plaintiffs allege that "the legal and factual prerequisites for HUD's provision of relocation assistance to plaintiffs are met."  (Compl. ¶ 138)  Plaintiffs allege that these prerequisites are satisfied by (1) HUD issuing a Notice of Default, (2) the time to cure deficiencies has passed, and (3) plaintiffs have requested the assistance to relocate. According to the Complaint, HUD now has the "legal obligation to provide the tenants with relocation assistance pursuant to 24 C.F.R. § 886.323(e) and is refusing to do so."  (Compl. ¶139)  However, no such legal standard exists within 24 C.F.R. § 886.323(e).

On the contrary, this regulation provides discretionary authority, noting that HUD "*may* exercise any of its rights or remedies under the contract, or Regulatory Agreement[.]" 24 C.F.R. § 886.323(e) (emphasis added). Plaintiffs also appear to allege that, because HUD issued a Notice of Default, HUD is required to relocate the tenants if they request relocation, regardless of whether the Housing Assistance Payment Contract is terminated.  (Compl. ¶ 138)  The provision cited by Plaintiffs, however, merely states that a family may remain in their unit even after HUD terminates a contract, but if the family chooses to be relocated from the terminated project-based housing, HUD shall provide assistance. 24 C.F.R. § 886.323(e).  Specifically, the provision acknowledges that one available discretionary enforcement option is "abatement of housing assistance payments (even if the family continues to occupy the unit)" and that, in the event of abatement, "the family wishes to be rehoused in another dwelling unit" instead of "continu[ing] to occupy the unit" then "HUD shall provide assistance in finding such a unit for the family."  *Id.*

Thus, the purpose of this provision is to provide tenants with options if and only if HUD exercises its discretion to terminate a contract (i.e., abate housing assistance payments). *See* Office of the Assistant Secretary for Housing-Federal Housing Commissioner; Section 8 Housing Assistance Program for the Disposition of HUD-Owned Projects, 44 Fed. Reg. 70361, 70363 (Dec. 6, 1979) (amending 24 C.F.R. Part 886) ("HUD will provide assistance in finding eligible families suitable units in other buildings or projects *in the event assistance payments are abated*. However, it is the Department's intention to work with owners, tenants, and other interested parties to the extent possible to forestall such action" (emphasis added)).  Because HUD has not exercised its discretion to terminate the Housing Assistance Payments contract, Plaintiffs' reliance on this provision is misplaced.

### C.  HUD has no duty under 42 U.S.C. §3608(e)(5) to provide plaintiffs with Tenant Protection Vouchers.

Plaintiffs allege that HUD's duty to affirmatively further fair housing requires HUD to provide plaintiffs with tenant protection vouchers.  (Compl. ¶ 144) Although HUD takes its statutory duty to affirmatively further fair housing seriously with respect to all its programs, section 3608(e)(5) does not compel HUD to take the specific acts Plaintiffs seek to compel. Plaintiffs have not cited to, nor is there any language in the statute that suggests otherwise. Rather, Plaintiffs rely solely on section 3608(e)(5)'s broad mandate to demand that this Court provide Plaintiffs with tenant protection vouchers. No such particular duty manifests in this statute. *See, e g.*, *Am. Disabled for Attendant Programs Today v. U.S. Dep't of Hous. & Urban Dev.*, 170 F.3d 381, 388-89 (3d Cir. 1999) (concluding that HUD did not violate § 3608(e)(5) and refusing to order HUD to, among other things, "gather statistical information on housing discrimination" because to do so "we would be creating an independent guideline to limit HUD's discretion that would conflict with the plain text of the statute"); *SUWA*, 542 U.S. at 66-67 (no authority under

APA to compel compliance with broad statutory mandates).[12]

## IV.   Plaintiffs' Discrimination and Equal Protection Claims Also Fail

### A.   Plaintiffs' §3604 Fair Housing Act Claim Is Barred By Sovereign Immunity

"It is axiomatic that the United States may not be sued without its consent and the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). Absent a waiver, sovereign immunity shields the federal government and its agencies from suit. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). A waiver of sovereign immunity "must be unequivocally expressed in statutory text, and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (internal citation omitted). The burden is on the plaintiff to establish a waiver. *Smith v. Scalia*, 44 F. Supp. 3d 28, 40 (D.D.C. 2014) (citing *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575, 358 U.S. App. D.C. 79 (D.C. Cir. 2003).

Here, Plaintiffs have alleged a non-APA claim for intentional discrimination pursuant to the Fair Housing Act, 42 U.S.C. § 3604(a).[13] However, Plaintiffs' complaint fails to identify an adequate statutory basis for a waiver of sovereign immunity for their Fair Housing Act claim.

---

[12]     Lastly, although Plaintiff brings APA claims, the basis for Plaintiff's challenge is not final agency action, but rather agency inaction.  Accordingly, the requirement of the Local Rules to produce an administrative record with the filing of this dispositive motion does not apply.  *See* LCvR 7(n) (requirement applies "[i]n cases involving the judicial review of administrative agency *actions*") (emphasis added); *Dallas Safari Club v. Bernhardt*, Civ. A. No. 19-3696 (APM), 2021 WL 495078, at *3 (D.D.C. Feb. 9, 2021) (noting the two flavors of APA review—review of agency action and agency inaction—concluding both are considered on an administrative, not discovery record, on summary judgment).  Moreover, the production of an administrative record at this stage is unnecessary—the United States seeks to dismiss this case not based on an administrative record, but instead based on the facts alleged in the complaint.  *See generally Nat'l Law Ctr. on Homelessness & Poverty v. Dep't of Veterans Affairs*, 842 F. Supp. 2d 127, 130 (D.D.C. 2012) (Lamberth, J.) (noting that often "if an agency fails to act, there is no 'administrative record' for a federal court to review.") (citing *TRAC,* 750 F.2d at 79).

[13]     While Plaintiffs' claims pursuant to 42 U.S.C. § 3604 are specifically barred by Sovereign Immunity, Plaintiffs' claims brought under the APA based on 42 U.S.C. § 3608 are not.

(Compl. ¶¶ 146-147) It is well-established that the Fair Housing Act does not waive the federal government's sovereign immunity. *See, e.g., Zhu v. United States*, Civil Action No. 04-1216 (RMC), 2005 U.S. Dist. LEXIS 11503, at *12 (D.D.C. June 9, 2005) ("the Fair Housing Act does not waive sovereign immunity to permit suits against the federal government."); *see also Soniat v. HUD*, No. 16-337, 2016 U.S. Dist. LEXIS 181397, at *7 (E.D. Tex. Dec. 16, 2016) (stating that "the Fair Housing Act … do[es] not include a waiver of the federal government's sovereign immunity" and citing to *Unimex, Inc. v. HUD*, 594 F.2d 1060, 1061-62 (5th Cir. 1979) for the holding that "the Fair Housing Act does not apply to the federal government"); *Edwards v. Alexander Cty. Hous. Auth.*, No. 19--879-JPG, 2021 U.S. Dist. LEXIS 5482, at *7 (S.D. Ill. Jan. 12, 2021) ("Because neither the Fair Housing Act, Title VI, nor the Illinois Civil Rights Act contains an unequivocal waiver of the Federal Government's sovereign immunity, Defendants HUD and Ben Carson are dismissed from the case."); *Rockwell v. United States DOD*, No. 18-cv-00001-SLG, 2018 U.S. Dist. LEXIS 208167, at *2 (D. Alaska Dec. 10, 2018) ("The government is correct that the Fair Housing Act does not contain a waiver of sovereign immunity. Therefore, the Rockwells' claims against the United States for violations of the Fair Housing Act are barred by the federal government's sovereign immunity and must be dismissed."); *Commission v. United States HUD*, No. 19-8390 (VSB), 2021 U.S. Dist. LEXIS 29457, at *1 (S.D.N.Y. Feb. 16, 2021) (same); *Tranchmontagne v. United States HUD*, No. 20-12842, 2021 U.S. Dist. LEXIS 120573, at *19 (E.D. Mich. June 29, 2021) (same).

Because Congress has not waived HUD's sovereign immunity, and Plaintiffs cannot meet their burden to establish that a waiver of sovereign immunity exists, Plaintiffs Fair Housing Act claim should be dismissed.

**B.  Plaintiffs Have Failed to Plausibly Plead any Discriminatory Intent**

Plaintiffs allege that HUD's "final decision" to withhold relocation assistance amounts to intentional discrimination in violation of 42 U.S.C. § 3604(a) (Compl. ¶ 146) and also amounts to a violation of the Fifth Amendment's Equal Protection Clause.  (*Id*. ¶ 151)  Because proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 265 (1977), both claims require the pleading of allegations that plausibly could give rise to an inference of discriminatory intent.  As Plaintiffs have failed to plausibly plead such intent, both claims should be dismissed.

Section 3604(a) makes it unlawful to "make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."  Plaintiffs have failed to allege that HUD has denied them a dwelling.  Rather, their apparent assertion is that HUD allowed them to continue to live in allegedly unsafe and unsanitary units (rendering the units in their view "unavailable") while it worked with the Owner to obtain compliance after issuing a Notice of Default rather than immediately relocating them.

Moreover, Plaintiffs have failed to plausibly plead that HUD's actions were motivated by intentional discrimination, as opposed to HUD's discretionary determination to attempt to pursue certain enforcement options before terminating the Housing Assistance Payments contract for the reasons explained in HUD's letter dated December 2, 2019.  (Ex. 3 to Gamez Decl.)   Although the threshold for pleading facts in support of an inference of discriminatory intent may not be high, Plaintiff still must plead facts that make such an inference plausible. *Kabakova v. Off. of the Architect of the Capitol*, Civ. A. No. 19-1276, 2020 U.S. Dist. LEXIS 65101, at *43 (D.D.C. Apr. 14, 2020).  In *Kabakova*, for instance, the Court dismissed a claim for an allegedly discriminatory

termination because the plaintiff acknowledged in her complaint that she had been absent from work for one year and alleged that the stated reason for her termination was her absence from work.  *Id.*  Because the complaint failed to plead any facts that could support an inference that her absence from work was not the real reason for her termination, the Court held that the plaintiff there had failed to plausibly plead a discrimination claim.  *Id.* at *45.

Here too Plaintiffs have failed to plead sufficient facts to make it plausible that HUD's decision to attempt first to obtain compliance from the Owner, rather than immediately terminating the contract and relocating tenants, was a mere pretext for intentional discrimination—Plaintiff's burden once a legitimate, non-discriminatory reason is identified.  Plaintiffs acknowledge that HUD responded to their request for relocation assistance or tenant protection vouchers with the explanation set forth in the December 2, 2019 letter, which is incorporated by reference into the Complaint, and which explains that HUD was first attempting to obtain Owner compliance. (Compl. ¶¶ 65-66)  That approach is consistent with HUD's long-stated "intention to work with owners . . . to the extent possible" before choosing to abate assistance payments. *See* 44 Fed. Reg. 70361, 70363 (Dec. 6, 1979) ("HUD will provide assistance in finding eligible families suitable units in other buildings or projects in the event assistance payments are abated. *However, it is the Department's intention to work with owners, tenants, and other interested parties to the extent possible to forestall such action*" (emphasis added)).  Plaintiffs have failed to plausibly plead how conduct by HUD that is consistent with such a long-stated intention constitutes intentional discrimination towards them.

Disparate treatment claims based on a comparative showing of intentional discrimination must show that others who were similarly situated but outside the plaintiff's class received different treatment. *Islamic Am. Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d 34

(D.D.C. 2005).  Plaintiffs allege that the housing quality at Sandpiper Cove Village is poor relative to the housing quality in other Section 8 properties in a majority-white census tract outside of Galveston. (Compl. ¶¶ 7, 103, 108, 115-118)  But the claim here focuses on alleged discriminatory intent in HUD's selection of certain enforcement actions over others following the issuance of a Notice of Default, not in the relative quality of available Section 8 property as between majority-white and majority-minority areas.  As to the claim actually asserted in this case – that is, the failure to choose relocation assistance as its enforcement option – Plaintiffs have failed to plead any facts that could raise an inference of intentional discrimination by HUD in that determination. For instance, Plaintiffs have not pled that HUD has taken that type of enforcement action more often in majority-white neighborhoods or properties under comparable circumstances.  Plaintiffs have not even pled that Sandpiper Cove and the other Section 8 properties are similarly situated, i.e., have similar REAC scores.  Under Plaintiffs' rationale, a plausible inference of intentional discrimination would arise whenever HUD acts consistent with its long-stated intention in 44 Fed. Reg. at 70363 to first attempt owner compliance whenever the property at issue is in a predominantly minority neighborhood so long as the plaintiff alleges the existence of housing in good repair in a predominantly non-minority neighborhood.  That is insufficient.  *Iqbal*, 556 U.S. at 678 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged but it has not 'show[n] that the pleader is entitled to relief.'"); *Boyd v. Browner*, 897 F. Supp. 590, 594 (D.D.C. 1995) ("The naked assertion that Carver Terrace is an African-American community and that residents of Times Beach, Missouri, and Forest Glen, New York, were 'almost entirely white,' . . . does not begin to establish the requirement of 'similar circumstances,' to establish an Equal Protection violation.)

Plaintiffs also cite in their Complaint to a Supreme Court case, *Arlington Heights,* as guidance on what may be considered evidence of intentional discrimination.  (Compl. ¶ 114)  In a discriminatory intent case, *Arlington Heights* states that "impact alone is not determinative," and evidence of invidious discrimination may be shown through the historical background of a decision, "particularly if it reveals a series of official actions taken for invidious purposes." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-67 (1977). *Arlington Heights* suggests as an example that discriminatory intent might be shown if a property that was zoned for one use was changed to another upon learning of plans to erect integrated housing. *Id*. Plaintiffs here allege no course of action taken because of race, and their only allegations of racial discrimination is that HUD originally contracted to provide housing assistance in predominantly minority census tracts over 40 years ago, continues to provide assistance in such areas, and was allegedly a party in unrelated litigation over 20 years ago.  (Compl. ¶¶ 119-132)  Under Plaintiffs' reasoning, decisions occurring decades ago relating to housing subsidies provided in a predominantly minority district raise a plausible inference of discriminatory intent as to any enforcement decision undertaken by HUD since that time.  Plaintiffs' conclusory and speculative assertions fail to satisfy their pleading burden under *Iqbal*.

## CONCLUSION

For the foregoing reasons, this Court should grant the instant motion and dismiss the Complaint with prejudice.

Respectfully submitted,

CHANNING  D. PHILLIPS, D.C. BAR #415793
Acting United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

By: _____/s/_____
JEREMY S. SIMON, D.C. BAR #447956
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2528
Jeremy.Simon@usdoj.gov

Counsel for Defendants