UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SANDPIPER RESIDENTS ASSOCIATION, et al., )<br>)<br>)<br>Plaintiffs, )<br>v. )<br>)<br>UNITED STATES DEPARTMENT OF HOUSING )<br>AND URBAN DEVELOPMENT, )<br>)<br>Defendant. )<br>) | Case No. 20-1783 (RDM) |

**DEFENDANT'S MOTION TO DISMISS SECOND AMENDED COMPLAINT AND
OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
<u>AND MEMORANDUM IN SUPPORT THEREOF</u>**

# TABLE OF CONTENTS

INTRODUCTION…………………………………………………………………………...1

BACKGROUND…………………………………………………………………………...4

    I.     Contractual, Statutory, and Regulatory Background……………………………..4

        A.     Section 8 Program Background……………………………………………4

            1.     Project-Based Rental Assistance Program…………………………4

            2.     Tenant-based Rental Assistance………………………………….6

            3.     Tenant Protection Vouchers……………………………………….7

            4.     Decent, Safe, and Sanitary Requirements for the Project-Based Rental Assistance Program……………………………………….11

            5.     Congressionally-Authorized Enforcement Tools………………..13

        B.     The Administrative Procedure Act………………………………………15

    II.    Factual Background………………………………………………......…………15

STANDARD OF REVIEW………………………………………………………………...18

    I.     Rule 12(b)(1) Standard…………………………………………………………18

    II.    Rule 12(b)(6) Standard…………………………………………………………19

ARGUMENT……………………………………………………………………………...20

    I.     Plaintiffs' Claims are Moot…………………………………………………….20

    II.    HUD's Enforcement Decisions Are Committed to Agency Discretion…………24

        A.     Plaintiffs' Claims Relate To HUD's Determination About How To Spend A Lump-Sum Appropriation…………………………...25

        B.     HUD's Discretion To Choose Among Various Enforcement Options Is Not Reviewable Under The APA…………………………...27

    III.    Plaintiffs Do Not Challenge Any Final Agency Action…………………………33

    IV.    Plaintiffs Have Failed To Identify Any Legal Requirement That HUD Take The Action They Prefer……………………………………………...35

        A.     Plaintiffs do not identify a discrete action which HUD is required to take under the Consolidated Appropriations Act……………36

        B.     HUD has no duty under 42 U.S.C. §3608(e)(5) to provide plaintiffs with Tenant Protection Vouchers………………………………...37

    V.    Plaintiffs' Discrimination and Equal Protection Claims Also Fail……………..39

        A.     Plaintiffs' Section 3604 Fair Housing Act Claim Is Barred By Sovereign Immunity......……………………………………………39

        B.     Plaintiffs Have Failed to Plausibly Plead any Discriminatory Intent……………………………………………………………….40

    VI.    Plaintiffs' Motion For Preliminary Injunction Should Be Denied………………44

        A.     Preliminary Injunction Standard…………………………………………44

        B.     Plaintiffs Have Failed to Meet Their Burden for Preliminary Injunctive Relief……………………………………………………….46

            1.     Plaintiffs cannot demonstrate they are likely to suffer irreparable harm in the absence of preliminary relief…………….47

            2.     The balance of equities and public interest are not in Plaintiffs' favor…………………………………………………..…51

CONCLUSION…………………………………………………………………………...53

**<u>TABLE OF AUTHORITIES</u>**

<u>Cases</u>                                                                                                               <u>Pages</u>

*Am. Disabled for Attendant Programs Today v. United States HUD*,
  170 F.3d 381 (3d Cir. 1999).................................................................. 32, 37
*Am. Forest Res. Council v. Hall*,
  533 F. Supp. 2d 84 (D.D.C. 2008) ........................................................ 33
*Arizonans for Official English v. Arizona*,
  520 U.S. 43 (1997)................................................................................. 21
*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)............................................................... 19, 20, 43
*Baltimore Gas & Elec. v. FERC*,
  252 F.3d 456 (D.C. Cir. 2001)................................................ 25, 29, 31
*Barrick Goldstrike Mines Inc. v. Browner*,
  215 F.3d 45, 342 U.S. App. D.C. 45 (D.C. Cir. 2000) ........................ 33
*Bartko v. Dep't of Just.*,
  Civ. A. No. 13-1135 (JEB), 2015 WL 13673371 (D.D.C. Mar. 12, 2015) ...................... 45, 46
*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)............................................................................... 19
*Bennett v. Spear*,
  520 U.S. 154 (1997)....................................................................... 33, 34
*Bloch v. Frischholz*,
  587 F.3d 771 (7th Cir. 2009) ............................................................... 41
*Boyd v. Browner*,
  897 F. Supp. 590 (D.D.C. 1995)........................................................... 43
*Brady Campaign to Prevent Gun Violence v. Salazar*,
  612 F. Supp. 2d 1 (D.D.C. 2009)......................................................... 47
*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006)....................................................... 45, 47
*Cisneros v. Alpine Ridge Grp.*,
  508 U.S. 10 (1993)................................................................................... 4
*CityFed Fin. Corp. v. OTS*,
  58 F.3d 738 (D.C. Cir. 1995)................................................................ 45
*Cody v. Cox*,
  509 F.3d 606 (D.C. Cir. 2007).............................................................. 24
*Conley v. Gibson*,
  355 U.S. 41 (1957)................................................................................. 19
*Conservation Force, Inc. v. Jewell*,
  733 F.3d 1200 (D.C. Cir. 2013)............................................................ 20
*Curran v. Holder*,
  626 F.Supp. 2d 30 (D.D.C. 2009) ........................................................ 18
*Dallas Safari Club v. Bernhardt, Civ. A.*,
  No. 19-3696 (APM), 2021 WL 495078 (D.D.C. Feb. 9, 2021)..................... 38, 41
*Damus v. Nielsen*,
  2018 WL 3232515 (D.D.C. 2018) ........................................................ 45
*Drake v. F.A.A.*,

291 F.3d 59 (D.C. Cir. 2002) ............................................................................ 27

*EEOC v. St. Francis Xavier Parochial Sch.*,
117 F.3d 621 (D.C. Cir. 1997) .......................................................................... 20

*Erickson v. Pardus*,
551 U.S. 89 (2007) ............................................................................................ 19

*Farris v. Rice*,
453 F. Supp. 2d 76 (D.D.C. 2006) .................................................................... 46

*FDIC v. Meyer*,
510 U.S. 471 (1994) .......................................................................................... 39

*Fund for Animals v. Frizzell*,
530 F.2d 982 (D.C. Cir. 1975) .......................................................................... 48

*Fund for Animals, Inc. v. United States BLM*,
460 F.3d 13 (2006) ............................................................................................ 33

*Goodwin v. Sec'y of HUD*,
356 F.3d 310 (D.C. Cir. 2004) .......................................................................... 25

*Heckler v. Chaney*,
470 U.S. 821 (1985) .......................................................................... 24, 27, 28, 31

*Henke v. Dep't of Interior*,
842 F. Supp. 2d 54 (D.D.C. 2012) .................................................................... 45

*Herbert v. Nat'l Acad. of*,
Sci., 974 F.2d 192 (D.C. Cir. 1992) .................................................................. 18

*Hospitality Staffing Solutions, LLC v. Reyes*,
736 F. Supp. 2d 192 (D.D.C. 2010) .................................................................. 45

*Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*,
920 F.3d 890 (5th Cir. 2019) ......................................................................... 6, 51

*Independent Bankers Ass'n v. Heimann*,
627 F.2d 486 (D.C. Cir. 1980) .......................................................................... 48

*Jafarzadeh v. Duke*,
270 F. Supp. 3d 296 (D.D.C. 2017) .................................................................. 21

*Jovanovic v. US-Algeria Bus. Council*,
561 F. Supp. 2d 103 (D.D.C. 2008) .................................................................. 19

*Lane v. Pena*,
518 U.S. 187 (1996) .......................................................................................... 39

*Larsen v. U.S. Navy*,
525 F.3d 1 (D.C. Cir. 2008) .............................................................................. 20

*Lauderhill Hous. Auth. v. Donovan*,
818 F. Supp. 2d 185 (D.D.C. 2011) .............................................................. 33, 35

*League of Women Voters of the U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) .......................................................................... 44, 45

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ......................................................... 15, 16, 25, 26, 27

*Lipton v. MCI Worldcom, Inc.*,
135 F. Supp. 2d 182 (D.D.C. 2001) .................................................................. 20

*Louis v. Hagel*,
221 F. Supp. 3d 40 (D.D.C. 2016) .................................................................... 20

*Louisiana v. United States*,

948 F.3d 317 (5th Cir. 2020) .............................................................................. 33

*Lujan v. National Wildlife Fed'n*,
497 U.S. 871 (1990) ........................................................................................... 33

*McGrath v. HUD.*,
722 F. Supp. 902 (D. Mass. 1989) ..................................................................... 38

*Multi-Family Mgmt. v. Hancock*,
664 A.2d 1210 (D.C. 1995) ................................................................................. 5

*Mylan Pharm., Inc. v. Shalala*,
81 F. Supp. 2d 30 (D.D.C. 2000) ....................................................................... 48

*Nat'l Law Ctr. on Homelessness & Poverty v. Dep't of Veterans Affairs*,
842 F. Supp. 2d 127 (D.D.C. 2012) ................................................................... 38

*Nat'l Mining Ass'n v. Dep't of Interior*,
251 F.3d 1007 (D.C. Cir. 2001) ......................................................................... 23

*Nat'l Mining Ass'n v. Jackson*,
768 F. Supp. 2d 34 (D.D.C. 2011) ..................................................................... 47

*Nat'l Parks Conservation Ass'n v. Dep't of Interior*,
794 F. Supp. 2d 39 (D.D.C. 2011) ..................................................................... 24

*Newdow v. Bush*,
355 F. Supp. 2d 265 (D.D.C. 2005) ................................................................... 48

*Norton v. S. Utah Wilderness, All.* ("SUWA"),
542 U.S. 55 (2004) ...................................................................................... 35, 38

*NRDC v. Pena*,
147 F.3d 1012 (D.C. Cir. 1998) ......................................................................... 47

*Oryszak v. Sullivan*,
576 F.3d 522 (D.C. Cir. 2009) ........................................................................... 25

*Power Mobility Coal. v. Leavitt*,
404 F. Supp. 2d 190 (D.D.C. 2005) .............................................................. 47, 48

*Pursuing Am.'s Greatness v. FEC*,
831 F.3d 500 (D.C. Cir. 2016) ...................................................................... 45, 51

*Rann v. Chao*,
154 F. Supp. 2d 61 (D.D.C. 2001) ..................................................................... 18

*Schering Corp. v. Heckler*,
779 F.2d 683 (D.C. Cir. 1985) ........................................................................... 29

*Sherley v. Sebelius*,
644 F.3d 388 (D.C. Cir. 2011) ........................................................................... 45

*Sierra Club v. Larson*,
882 F.2d 128 (4th Cir. 1989) ............................................................................. 29

*Smith v. Scalia*,
44 F. Supp. 3d 28 (D.D.C. 2014) ....................................................................... 39

*Texas v. United States*,
523 U.S. 296 (1998) ........................................................................................... 31

*Thompson v. Capitol Police Bd.*,
120 F. Supp. 2d 78 (D.D.C. 2001) ..................................................................... 18

*Tri-State Hosp. Supply Corp. v. United States*,
341 F.3d 571, 358 U.S. App. D.C. 79 (D.C. Cir. 2003) .................................... 39

*Unimex, Inc. v. HUD*,

594 F.2d 1060 (5th Cir. 1979) ..................................................................... 39
*United Farm Workers v. Chao,*
    593 F. Supp. 2d 166 (D.D.C. 2009) ........................................................ 45
*United States v. Mitchell,*
    463 U.S. 206 (1983) ................................................................................... 39
*Vanover v. Hantman,*
    77 F. Supp. 2d 91 (D.D.C. 1999) ............................................................ 18
*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ........................................................................... 40, 43
*Washington v. DOJ,*
    164 F. Supp. 3d 145 (D.D.C. 2016) ........................................................ 25
*Wendland v. Gutierrez,*
    580 F. Supp. 2d 151 (D.D.C. 2008) ........................................................ 27
*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,*
    139 S. Ct. 361 (2018) .......................................................................... 15, 25
*Winter v. NRDC,*
    555 U.S. 7 (2008) ...................................................................................... 44
*Wis. Gas Co. v. FERC,*
    758 F.2d 669 (D.C. Cir. 1985) ................................................................. 46

## **Statutes**

5 U.S.C. § 701 ................................................................................................ 25
5 U.S.C. § 701(a)(2) ................................................................................. 15, 24
5 U.S.C. § 702 ................................................................................................ 25
5 U.S.C. § 703 ................................................................................................ 25
5 U.S.C. § 704 ................................................................................................ 15
5 U.S.C. § 701-705 ........................................................................................ 25
5 U.S.C. § 706 ................................................................................................ 24
5 U.S.C § 706(1) ............................................................................................ 32
42 U.S.C. § 1437a(b)(6) ................................................................................ 51
42 U.S.C. § 1437f(c) ........................................................................................ 5
42 U.S.C. § 1437f(o)(8) ................................................................................. 51
42 U.S.C. § 1437f(a) ........................................................................................ 4
42 U.S.C. § 1437f(c)(1)(A) .............................................................................. 4
42 U.S.C. § 1437f(f)(1) ................................................................................. 22
42 U.S.C. § 1437f(f)(6) .................................................................................... 4
42 U.S.C § 1437f(t) ....................................................................................... 10
42 U.S.C § 1437f(t)(2) ................................................................................... 10
42 U.S.C § 1437f(d)(1)(B) ............................................................................... 5
42 U.S.C. § 3604 ........................................................................................... 39
42 U.S.C. § 3604(a) ................................................................................... 39, 40
42 U.S.C. § 3608 ........................................................................................... 39
42 U.S.C. § 3608(d) ...................................................................................... 32
42 U.S.C. § 3608(e)(5) .................................................................................. 37

## **Regulations**

24 C.F.R. Part 886............................................................................................ 15
24 C.F.R. Part 982............................................................................................ 51
24 C.F.R. pt. 886................................................................................................ 5
24 C.F.R. § 886.323(e)...................................................................................... 36
24 C.F.R. § 5.703.............................................................................................. 11
24 C.F.R. § 5.703(a).......................................................................................... 11
24 C.F.R. § 5.703(g).......................................................................................... 12
24 C.F.R. § 200.857...................................................................................... 11, 12
24 C.F.R. § 886.123(a)................................................................................... 5, 11
24 C.F.R. § 886.123(c)...................................................................................... 28
24 C.F.R. § 886.309............................................................................................ 4
24 C.F.R. § 982.1(b)(1)...................................................................................... 4
24 C.F.R. § 982.303(a)........................................................................................ 7

## **Other Authorities**

44 Fed. Reg. 70361.......................................................................................... 42
44 Fed. Reg. 70363 (Dec 6, 1979)................................................................... 43
P.L. 116-260................................................................................................... 6, 8
P.L. 557............................................................................................................ 10
Pub. L. No. 116-94................................................................................ 5, 8, 13, 21
Pub. L. No. 116-6....................................................................................... 8, 13

Defendant, the United States Department of Housing and Urban Development ("HUD"), moves to dismiss Plaintiffs' Second Amended Complaint ("SAC") under Federal Rules of Civil Procedure ("Rules") 12(b)(1) and 12(b)(6).  The grounds for this motion are set forth more fully below.  Based on the same grounds as Defendant's motion to dismiss, as well as the absence of a showing of irreparable harm, Defendant also opposes Plaintiffs' motion for preliminary injunction, which was filed almost 18 months after the filing of this lawsuit.

## INTRODUCTION

Plaintiffs are tenants at Compass Pointe Apartments (a/k/a Sandpiper Cove) ("Sandpiper Cove" or the "Property"), a privately-owned, HUD subsidized property subject to a Housing Assistance Payment Contract for project-based rental assistance. Sandpiper Cove is the only project-based rental assistance property available to low-income tenants in Galveston, Texas. Plaintiffs filed the instant lawsuit against HUD alleging substandard conditions at the Property and demanding that HUD choose from among the available enforcement options their preferred option, namely, the provision to them of Tenant Protection Vouchers so that they can vacate the Property.

As part of its normal oversight of project-based rental assistance properties, HUD conducted inspections at Sandpiper Cove to ensure compliance with HUD statutes and regulations. (SAC ¶ 3)  In May 2019, one such inspection resulted in a failing score for Sandpiper Cove. (*Id.*) As a result of that inspection, HUD issued a Notice of Default to the owner at that time, Compass Pointe Apartments, LLC (the "Previous Owner"). (*Id.* ¶ 37) The Notice of Default prompted HUD to undertake a series of discretionary enforcement actions. (*Id.* ¶¶ 3, 23, 31). Subsequently, on October 15, 2021, the Property was sold to a new owner, Galveston 3916 Winnie Street GP, LLC (the "New Owner"), who has committed to invest approximately $16.7 million to renovate the Property.  (Gamez Decl. ¶ 13). On October 29, 2021, HUD approved the assignment of the Housing Assistance Payments contract to the New Owner, thus concluding its enforcement action

based on the Notice of Default that had been issued to the Previous Owner. (*Id.* ¶ 13, Ex. 2) There is no extant Notice of Default of the current Housing Assistance Payments contract, and Plaintiffs have not alleged otherwise.   Although Plaintiffs amended their Complaint on November 15, 2021, they continue to base their claims on the now moot Notice of Default issued to the Previous Owner.

Plaintiffs assert that HUD withheld certain discretionary relief they argue is authorized under the Consolidated Appropriations Act, and that the withholding of that relief amounted to final agency action justiciable under the Administrative Procedure Act ("APA").   (SAC ¶¶ 9, 17, 48, 124 110, 119, 200) Specifically, they contend that HUD should have "rehouse[d] them to another location with a voucher or by transfer to another location." (*Id.* ¶ 107) Further, Plaintiffs contend that such relief was legally required and not optional within HUD's discretion. (*Id.* ¶ 124)

In an exercise of its statutorily conferred discretion, HUD instead had endeavored to obtain compliance by the Previous Owner after issuing it the Notice of Default.  As permitted by the Notice of Default and applicable law, the Previous Owner submitted, and HUD approved, an Action Plan to improve the conditions at the Property. The Previous Owner complied with the Notice of Default and Action Plan by working toward the completion of those improvements. (Gamez Decl. ¶ 7; SAC ¶ 23) At the time of the sale on October 15, 2021, the improvements at the Property remained ongoing, as did HUD's review of its enforcement options (Gamez Decl. ¶ 10), which culminated in HUD's approval of the assignment of the Housing Assistance Payments contract on October 29, 2021.

Ultimately, the Complaint should be dismissed for the following threshold reasons. First, the Appropriations Act language that Plaintiffs rely on does not apply here because there is no Notice of Default pending against the New Owner, and HUD's enforcement action based on the Notice of Default issued to the Previous Owner ended with HUD's final agency action of

approving the contract assignment on October 29, 2021.  The lawsuit, which does not challenge that final agency action, is therefore moot.  Second, even if the lawsuit is not moot, the "may" language in the Appropriations Act merely authorizes and gives HUD discretion to allocate a lump-sum appropriation to use for Tenant Protection Vouchers.  It does not contain a discrete legal mandate requiring that HUD take such action in Plaintiffs' case or any particular case. In other words, the decision to provide (or not provide) Tenant Protection Vouchers to particular Section 8 project-based tenants under the Appropriations Act is committed to agency discretion by law. Third, Plaintiffs have not challenged HUD's final agency action in approving the contract assignment to the New Owner, and because HUD's efforts regarding the Property under its new ownership remain ongoing, there is no final agency action that has been pled in the operative Complaint and which could support a claim under the APA.

Plaintiffs additionally assert intentional discrimination, arguing that HUD's alleged failure to act in the manner preferred by Plaintiffs constitutes an intentional decision to withhold relief for the discriminatory purpose of maintaining racial segregation and disadvantaging a group of minority households.  (SAC ¶ 114) Because Plaintiffs fail to plausibly plead racial animus in HUD's actions, these claims fall far short of the burden necessary to state a plausible claim, and therefore should be dismissed.

For similar reasons, Plaintiffs have failed to establish a substantial likelihood of success on the merits of their claims as would be required to obtain preliminary injunctive relief.  Having waited approximately 18 months to file their motion for preliminary injunction, they also have failed to establish the requisite irreparable harm.  Ultimately, their motion for preliminary injunction – which seeks not to maintain the status quo but rather the ultimate relief sought in this

action (i.e., Tenant Protection Vouchers) – fails to satisfy any of the required elements for such relief and should be denied.

## BACKGROUND

### I.   Contractual, Statutory, and Regulatory Background

#### A.   Section 8 Program Background

Section 8 of the United States Housing Act, as amended, authorizes several programs through which HUD provides financial assistance "to 'ai[d] low-income families in obtaining a decent place to live'" and "promot[e] economically mixed housing" 42 U.S.C. § 1437f(a). Section 8 programs take two principal forms: "tenant-based" assistance and "project-based" assistance. *Id*. § 1437f(6-7); *see id.* § 1437f(d)(2*)*, (o); 24 C.F.R. § 982.1(b)(1). Tenant-based assistance is linked to individual households, while project-based assistance is linked to specific housing units and is paid to the units' owner pursuant to a housing assistance payment contract. 24 C.F.R. § 886.309.

#### 1.   Project-Based Rental Assistance Program

This case concerns project-based assistance. "Under the [project-based] program, tenants make rental payments based on their income and ability to pay; [HUD] then makes 'assistance payments' to the private landlords in an amount calculated to make up the difference between the tenant's contribution and a 'contract rent' agreed upon by the landlord and HUD." *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 12 (1993); *see* 42 U.S.C. § 1437f(c)(1)(A). Further, "the term 'project-based assistance' means rental assistance . . . that is attached to the structure." 42 U.S.C. § 1437f(f)(6).

Under this program, HUD does not contract with the tenants, tenants do not apply to HUD for assistance, nor does HUD have any direct contractual relationship with tenants. Rather, participating owners enter into a Housing Assistance Payments Contract with a Contract

Administrator, subject to HUD oversight and enforcement, and through which HUD makes Housing Assistance Payments to the owner. 42 U.S.C. §1437f(c). Each tenant then enters into a lease directly with the owner. Pursuant to regulations applicable here, *see* 24 C.F.R. pt. 886, Subpart A, participating owners are required to "maintain and operate the project so as to provide decent, safe, and sanitary housing" and to fulfill all maintenance-related and utilities-related obligations under the Housing Assistance Payments contract. 24 C.F.R. § 886.123(a). HUD ensures compliance with these requirements by undertaking regular inspections and notifying owners of any deficiencies. *Id.* § 886.123(c).[1]

If the owner does not promptly resolve identified deficiencies, HUD may issue a Notice of Default to the owner and ultimately avail itself of various remedies, including, among other things, ceasing further payments to the owner, *id.* § 886.123(d), or "work[ing] with the owner, lender, or other related party to stabilize the property in an attempt to preserve the property through compliance, transfer of ownership, or an infusion of capital provided by a third-party that requires time to effectuate."  Pub. L. No. 116-94, § 219(c)(2), codified at 133 Stat. 2534, 3005-06 (Dec. 20, 2019). Or HUD may fund Tenant Protection Vouchers (defined below) for tenants to vacate an owner's assisted unit where (1) the owner has been issued a Notice of Default and (2) HUD determines the units pose an imminent healthy and safety risk to residents.  *See* 133 Stat. 2534, 2977. This action requires HUD to allocate a lump-sum appropriations to fund vouchers and, in effect, allows tenants to terminate their lease with the owner. Further, the Appropriations Act

---

[1]    Additionally, each individual tenant residing in a project-based Section 8 property executes an individual lease directly with the owner. 42 U.S.C § 1437f(d)(1)(B). Accordingly, such tenants, like any other private tenant, have rights to enforce local housing code violations directly against the owner under local law. *See, e.g.*, *Multi-Family Mgmt. v. Hancock*, 664 A.2d 1210, 1215 (D.C. 1995) (holding that so long as the D.C. Housing Code does not conflict with federal housing standards imposed by HUD, "the landlord will be subject to both federal and local law").

specifically mandates that HUD "take appropriate steps to ensure that project-based contracts remain in effect, subject to the exercise of contractual abatement remedies to assist relocation of tenants for major threats to health and safety after written notice to the affected tenants." P.L. 116-260, 134 Stat. 1898 §219(d).

HUD and its contract administrators administer more than 17,000 ongoing project-based Section 8 Housing Assistance Payments contracts, serving approximately 1.2 million families across the country, and at any time a significant number of those projects are troubled.[2]

### 2.    Tenant-based Rental Assistance

HUD administers another major form of Section 8 assistance: the Housing Choice Voucher Program. Under this program, federal assistance is tenant-based rather than project-based: "vouchers" administered by a local public housing agency are allotted to individual households based on availability and need. "Once admitted to the voucher program, [participating households] are responsible for finding a landlord in the private rental market willing to rent to them." *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019). "When a rent payment exceeds a specified percentage of a family's monthly income, the federal program pays the balance," subject to certain limits. *Id.* The Housing Choice Voucher Program currently funds approximately 2.6 million units across the country.[3] Also, there are consistently far more Housing Choice Voucher applicants than funding available, with prospective families spending an average of 28 months on the waiting list before being accepted into the program. *See* note 3. In calendar year 2021, Congress allocated $23 billion for the HCV renewal funding. *See* PIH Notice 2021-10

---

[2]     *See* 2021 HUD Congressional Justification Budget Request for the Office of Housing available at https://www.hud.gov/sites/dfiles/CFO/documents/24_FY21CJ_PBRA.pdf (last visited December 16, 2021)

[3]     Data may be accessed at https://www.huduser.gov/portal/datasets/assthsg.html (last visited December 14, 2021).

(March 24, 2021).[4] The initial "term" of the voucher is at least 60 days, to provide the family time to find a rental unit. 24 C.F.R. § 982.303(a). This time can be, and often is, extended, given difficulties in finding available and eligible rental units. *See id*. § 982.303(b). Once the family finds a landlord willing to rent, the family submits a request for approval of the tenancy to the public housing agency. *Id*. § 982.302. The public housing agency then goes through a process to approve the tenancy, which includes an inspection of the unit, an analysis to determine if the rent is reasonable, and a review of the owner. *See id*. §§ 982.305, 982.306.

### 3.   Tenant Protection Vouchers

One funding component for the Housing Choice Voucher program is a lump-sum appropriation through which HUD may provide voucher assistance to households that face displacement from certain kinds of HUD-owned or HUD-assisted households. *See* PIH Notice 2021-10 (March 24, 2021).  This type of Housing Choice Voucher is called a Tenant Protection Voucher. *Id.* Specifically, in the 2020 Act, the relevant paragraph, which is referred to herein as the "Paragraph 2 Appropriation," provided as follows:

> (2) $75,000,000 shall be for section 8 rental assistance for relocation and replacement of housing units that are demolished or disposed of pursuant to section 18 of the Act, conversion of section 23 projects to assistance under section 8, the family unification program under section 8(x) of the Act, relocation of witnesses in connection with efforts to combat crime in public and assisted housing pursuant to a request from a law enforcement or prosecution agency, enhanced vouchers under any provision of law authorizing such assistance under section 8(t) of the Act, Choice Neighborhood vouchers, mandatory and voluntary conversions, and tenant protection assistance including replacement and relocation assistance or for project-based assistance to prevent the displacement of unassisted elderly tenants currently residing in section 202 properties financed between 1959 and 1974 that are refinanced pursuant to Public Law 106-569, as amended, or under the authority as provided under this Act[.]

---

[4]      Available at https://www.hud.gov/sites/dfiles/PIH/documents/pih2021-10.pdf (last visited December 16, 2021)

2020 Act, div. L, tit II, "Public and Indian Housing," "Tenant-Based Rental Assistance," ¶ 2, 133 Stat. 2534, 2976. Substantially the same language has appeared in the 2019, 2020 and 2021 annual appropriations except for the amount allocated each year. *See* Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, div. G, tit. II, 133 Stat. 13, 435-436 (2019) (appropriating $85 million for fiscal year 2019); Further Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, div. H, tit. II, 133 Stat. 2534, 2976-2977 (2019) (appropriating $75 million for fiscal year 2020) Consolidated Appropriations Act, 2021, PL 116-260, 143 Stat 1182 (appropriating $116 million for fiscal year 2021).

Within each annual appropriations statute, the language excerpted above is then followed by a list of conditions applicable to the entire Paragraph 2 Appropriation. *See* 133 Stat. at 2976-77. For example, any voucher "made available from amounts under this [Paragraph 2 Appropriation] shall not be reissued . . . when the initial family that received any such voucher no longer receives such voucher," *Id.* at 2977.

In recent years, the Paragraph 2 Appropriation has also contained language authorizing HUD, in its discretion, to draw upon the appropriation for other enumerated purposes. As particularly relevant here, in 2017, Congress added a provision to Paragraph 2 Appropriation, explaining that HUD may now "provide section 8 rental assistance from amounts made available under this paragraph for units assisted under a project-based subsidy contract" if "the owner has received a Notice of Default and the units pose an imminent health and safety risk to residents." 132 Stat. at 2977. That language thus permits HUD to take funds otherwise destined for the classes of tenants enumerated at the beginning of Paragraph 2 and redirect them to relocation vouchers for tenants in project-based Section 8 housing instead.

Each year, HUD issues guidance concerning its implementation of the funding provisions for the Housing Choice Voucher Program. *See, e.g.*, HUD Office of Pub. & Indian Hous., Notice PIH 2021-10: Implementation of the Federal Fiscal Year (FFY) 2019 Funding Provisions for the Housing Choice Voucher Program, and Availability of FFY 2020 Housing Assistance Payments (HAP_ Set-Aside Funds for Second Round Per Unit Cost (PUC) Increases due to Unforeseen Circumstances (March 24, 2021), https://www.hud.gov/sites/dfiles/PIH/documents/pih2021-10.pdf (the "2021 Funding Notice").[5]  The Guidance includes a section specifically addressing use of the Paragraph 2 Appropriation.  *See id.* at 4-11 (sec. 6) (discussing the $116 million in the Paragraph 2 Appropriation for FY 2021).  The 2021 Funding Notice states that the Paragraph 2 Appropriation funds "tenant protection vouchers" that are intended to mitigate "hardship as a result of a variety of actions that occur in HUD's Public Housing (Low-Rent) and Multifamily Housing portfolios." *Id.* at 4.

In addition, the 2021 Funding Notice observes that—consistent with the appropriations provision described above, the 2021 Act also allows HUD to use the Paragraph 2 Appropriation to "provide [vouchers] for families in units under a Section 8 contract . . .  where the owner has received a Notice of Default and the units pose an imminent health and safety risk to residents." *Id.* at 38.

---

[5]     *See also* HUD Office of Pub. & Indian Hous., Notice PIH 2019-08: Implementation of the [FFY] 2019 Funding Provisions for the Housing Choice Voucher Program, sec. 6 (Apr. 18, 2019), https://go.usa.gov/xGUGR; HUD Office of Pub. & Indian Hous., Notice PIH 2020-04: Implementation of the [FFY] 2020 Funding Provisions for the Housing Choice Voucher Program, sec. 6 (Mar. 31, 2020), https://go.usa.gov/xGUGN.

This language expands HUD's ability to issue Tenant Protection Vouchers beyond the text of 42 U.S.C §1437f(t), under which HUD had only been authorized to issue Tenant Protection Vouchers to eligible families when certain "eligibility events" enumerated in 42 U.S.C §1437f(t) occurred, such as:

i.      Section 8 HAP contract expirations (when the HAP contract is not renewed). *See* Multifamily Assisted Housing Reform and Affordability Act (MAHRA) § 524(d)(1); Title V of Public Law No. 105-65, October 27, 1997, 111 Stat. 1384) as amended.

ii.     Preservation prepayments (or the voluntary termination of the insurance contract). *See* Low-Income Housing Preservation and Resident Homeownership Act of 1991 § 223(f)(1)

iii.    A transaction under which a project currently or previously subject to a flexible subsidy loan is preserved as affordable housing, as determined by Housing. *See* Housing and Community Development Amendments of 1978, 95 P.L. 557, 92 Stat. 2080, 95 P.L. 557, 92 Stat. 2080 § 201(p); and

iv.     A decision by HUD to renew a project eligible for Mark-to-Market (MTM) with tenant-based assistance rather than with a MTM renewal contract. *See* MAHRA, §§ 515(c)(3) and (4)

*See* 42 U.S.C §1437f(t)(2).  The notice of default and imminent risk language created an additional, yet narrow, situation in which HUD may use its discretion to issue Tenant Protection Vouchers by allocating from the lump-sum Paragraph 2 Appropriation.

Accordingly, in the context of the project-based Section 8 program, Tenant Protection Vouchers are authorized only in statutorily prescribed situations such as a Housing Assistance Payments contract termination or if HUD has issued a Notice of Default to the owner and HUD determines that a rental unit poses an imminent health and safety risk to the residents—a standard that is not the same as finding that the unit fails to meet the decent, safe, and sanitary requirement (a determination HUD has not made with respect to Sandpiper Cove).  *See* 133 Stat. 2534, 3005-07 (2019).

While the Secretary is authorized to use Tenant Protection Vouchers in certain situations (noted above), there are factors that HUD must weigh when making the decision to (or not to) issue them. For example, because Tenant Protection Vouchers are tenant-based assistance, if a tenant moves, the assistance moves with that household and no longer provides income to the property, hindering the ability of an owner to maintain or remediate conditions at the property. Additionally, because of historically low rents in properties with subsidized mortgages, some residents who receive Tenant Protection Vouchers may experience rent increases up to 30% of adjusted income. *See* Tenant Voucher Overview available at: https://files.hudexchange.info/course-content/hud-multifamily-affordable-housing-preservation-clinics/Preservation-Clinic-Tenant-Protection-Vouchers.pdf (last visited December 10, 2021) Ultimately, Congress left it to the Secretary of HUD to balance these factors and decide in what circumstances Tenant Protection Vouchers should be issued.

4.      **Decent, Safe, and Sanitary Requirements for the Project-Based Rental Assistance Program**

Section 8 "housing must be decent, safe, sanitary, and in good repair. Owners of [project-based Section 8] housing…must maintain such housing in a manner that meets the physical conditions standards set forth in this section to be considered decent, safe, sanitary and in good repair." 24 C.F.R. § 5.703; *see also* 24 C.F.R. §§ 886.123(a), 886.323(a). These standards require that the site be "free of health and safety hazards and be in good repair." 24 C.F.R. § 5.703(a).[6] This obligation of the owner is also found in the Housing Assistance Payments contract governing the project at issue. (SAC ¶ 18)

---

[6]      Many of the concerns Plaintiffs express regarding the property, e.g., crime and soil contamination, are not within the scope of the HUD's Real Estate Assessment Center inspection process (and accordingly were not a basis for the 2019 Notice of Default). 24 C.F.R. § 200.857

HUD's physical conditions standards do not supersede or preempt state or local housing code requirements that protect tenants from unsafe conditions. Rather, HUD's physical conditions regulations require "Compliance with State and local codes" and state, "The physical condition standards in this section do not supersede or preempt State and local codes for building and maintenance with which HUD housing must comply. HUD housing must continue to adhere to these codes." 24 C.F.R. § 5.703(g).[7] Additionally, as in any other private rental relationship, the lease requires the landlord to provide safe housing to the tenant. *See* Model Lease for Subsidized Programs.[8] https://www.hud.gov/sites/dfiles/OCHCO/documents/90105a.pdf (last visited December 16, 2021).

HUD's Real Estate Assessment Center performs inspections, assigning a numerical score on a 100-point scale. 24 C.F.R. § 200.857. The frequency of such inspections at a property is dependent on the previous physical condition score. 24 C.F.R. §§ 200.857.[9] The Assessment Center does not inspect every unit, but rather uses sampling to develop a score for the property.[10]

---

[7]     In Texas, for example, the state Property Code requires: "A landlord shall make a diligent effort to repair or remedy a condition if: (1) the tenant specifies the condition in a notice to the person to whom or to the place where rent is normally paid; (2) the tenant is not delinquent in the payment of rent at the time notice is given; and (3) the condition: (A) materially affects the physical health or safety of an ordinary tenant[.]" Tex. Prop. Code § Sec. 92.052(a). (Landlord's Duty to Repair or Remedy).

[8]     See   https://www.hud.gov/sites/dfiles/OCHCO/documents/90105a.pdf   (last   visited December 10, 2021).

[9]     In response to the COVID-19 pandemic, in March 2020, HUD suspended most in-person housing inspections by the Real Estate Assessment Center. HUD increased housing Real Estate Assessment Center inspections on June 1, 2021. *See* https://www.hud.gov/sites/dfiles/PA/documents/Signed_Sec_Fudge_PHA_Letter.pdf

[10]    For example, for a 192 unit property, the minimum sample size is 24 units. See Real Estate Assessment Center Minimum Unit Sample Size Reference Chart, https://www.hud.gov/sites/documents/MINUNITSAMPLESIZEREFCHART.PDF

A property that received a previous score of less than 80 points is inspected annually. *Id*.

### 5.   Congressionally Authorized Enforcement Tools

The Consolidated Appropriations Act also outlines the Congressionally authorized enforcement tools HUD has at its disposal should a Project-Based Rental Assistance property receive a failing physical inspection score. *See* 133 Stat. 2534, 3005-07 (Dec. 20, 2019).[11] Notably, pursuant to the Act, HUD is only required by law to take one discrete action in such a case; specifically, when a Project-Based Rental Assistance property receives an inspection score of 60 or less from HUD's Real Estate Assessment Center, HUD must, within 15 days of the issuance of a failing inspection score, "[p]rovide the owner with a Notice of Default with a specified timetable, determined by the Secretary, for correcting all deficiencies." *Id*. at 3005. The Act then provides HUD with a wide range of discretionary enforcement options HUD may take if deficiencies are not corrected in HUD's specified timetable, stating that:

> At the end of the time period for correcting all deficiencies specified in the Notice of Default, if the owner fails to fully correct such deficiencies, the Secretary *may*:
>
> a. require immediate replacement of project management with a management agent approved by the Secretary;
>
> b. impose civil money penalties, which shall be used solely for the purpose of supporting safe and sanitary conditions at applicable properties, as designated by the Secretary, with priority given to the tenants of the property affected by the penalty;
>
> c. abate the section 8 contract, including partial abatement, as determined by the Secretary, until all deficiencies have been corrected;

---

[11]     The 2020 Consolidated Appropriations Act and its successors (and predecessors) provide appropriations for HUD and other federal agencies and allocates funds to specific programs within the agency. The Act conditions the receipt of certain housing assistance payments on the recipient's maintaining decent, safe, and sanitary units, as determined by HUD, and requires that the recipient comply with all state and local regulations relating to the physical condition of any property under a Housing Assistance Payments contract. Pub. L. No. 116-94 133 Stat. 2534, 3005-07 (Dec. 20, 2019) (FY 2020). An identical provision appears in the 2019 Act. *See* Pub. L. No. 116-6, div. G, tit. II, § 221, 133 Stat. 13, 461-63 (Feb. 15, 2019) (FY 2019).

> d.  pursue transfer of the project to an owner, approved by the Secretary under established procedures, which will be obligated to promptly make all required repairs and to accept renewal of the assistance contract as long as such renewal is offered;
>
> e.  transfer the existing section 8 contract to another project or projects and owner or owners;
>
> f.  pursue exclusionary sanctions, including suspensions or debarments from Federal programs;
>
> g.  seek judicial appointment of a receiver to manage the property and cure all project deficiencies or seek a judicial order of specific performance requiring the owner to cure all project deficiencies;
>
> h.  work with the owner, lender, or other related party to stabilize the property in an attempt to preserve the property through compliance, transfer of ownership, or an infusion of capital provided by a third-party that requires time to effectuate; or
>
> i.  take any other regulatory or contractual remedies available as deemed necessary and appropriate by the Secretary.

*Id*. at 3005-06 (emphasis added). Additionally, Housing Notice 2018-08 provides further guidance for the implementation of the Act, outlining procedures for the issuance of a Notice of Default, owner requests for time extensions of Notice of Default requirements, and discretionary enforcement options in cases of owner noncompliance. *See* HUD Notice H 2018-08 pp. 3, 5-7, https://www.hud.gov/sites/dfiles/OCHCO/documents/2018-08hsgn.pdf (hereinafter, "Housing Notice 2018-08") (last visited Nov. 26, 2021).  HUD follows these guidelines in an effort to preserve affordable housing by bringing project-based rental assistance properties with failing Real Estate Assessment Center inspection scores back into compliance with HUD's decent, safe, and sanitary housing standards.

### B.  The Administrative Procedure Act

The APA generally authorizes judicial review of "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. When APA review is available, a court may

set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), or "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1).

Review under the APA is unavailable if the relevant agency action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Action is committed to agency discretion if it is of the kind "traditionally regarded as unreviewable, such as the allocation of funds from a lump-sum appropriation," *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 370 (2018) (citing *Lincoln v. Vigil*, 508 U.S. 182, 191-92 (1993)), or "an agency's decision not to institute enforcement proceedings," *Lincoln*, 508 U.S. at 191. Section 701(a)(2) also precludes review if the statute underlying a plaintiff's challenge "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln,* 508 U.S. at 191.

## II.   **Factual Background**

In March 2015, the Housing Assistance Payment Contract was assigned to the Previous Owner, Compass Pointe Apartments, LLC ("Previous Owner) subject to 24 C.F.R. Part 886, Subpart A (SAC ¶ 61) The Previous Owner was a party to the Housing Assistance Payments contract with the Southwest Housing Compliance Corporation, the contract administrator engaged by HUD to administer the project-based rental assistance program at Sandpiper Cove, formerly Parkland Apartments of Galveston.[12] (*Id.* ¶ 64) The Housing Assistance Payment contract was most recently renewed on March 3, 2012, for a term of twenty years.  (*Id.* ¶ 61) Sandpiper Cove is the *only* Section 8 project-based rental assistance housing option available to low-income residents in Galveston, Texas. (Ex. 3 to Gamez Decl. (Dec. 2, 2019 letter); *see also* SAC ¶ 50, referencing Dec. 2, 2019 letter))

---

[12]    The original contract was executed in April 1984 for an initial term of five years.  (Ex. 1 to Gamez Decl.)

On or about May 8, 2019, HUD's Real Estate Assessment Center conducted an on-site inspection of the property, which resulted in a failing score of 33c.  (SAC ¶ 3) The inspection identified deficiencies that demonstrated the Previous Owner was in default of its duties to maintain the project in decent, safe, and sanitary condition.  (*Id.*) As a result of the inspection score, the Fort Worth Asset Management Division issued the Previous Owner a Notice of Default on May 15, 2019.  (*Id.*)  In response and pursuant to the Notice of Default, the Previous Owner submitted to HUD an Action Plan to make corrective actions at the property. (SAC ¶ 66; Gamez Decl. ¶ 7) The Action Plan, which included a survey of the property, a status report of all deficiencies identified in the Real Estate Assessment Center inspection, and a repair plan to correct the remaining deficiencies, was originally approved by HUD on September 16, 2019, and updates to the plan were approved on October 7, 2019, July 28, 2020, and July 14, 2021.  (Gamez Decl. ¶ 7)

In September 2019, Plaintiffs' counsel sent a letter to HUD demanding relief similar to what they request of the Court in this matter.  (SAC ¶¶ 6, 50) On December 2, 2019, HUD sent a response letter outlining HUD's obligations under the Consolidated Appropriations Act and Housing Notice 2018-08 and detailing how HUD has complied and will continue to comply with those obligations.  (*Id.* ¶ 50.)  Further, the letter explained that "[b]ecause HUD continues to gather information regarding the owner's default, the condition of the property, and other relevant factors which will inform HUD's next steps, HUD has not committed to a final agency action."  (Ex. 3 to Gamez Decl. at 2)  Additionally, HUD's letter discussed the competing interests HUD must weigh when considering enforcement actions, explaining that:

> In all enforcement actions on subsidized properties, the Office of Multifamily Housing balances the need for timely improvement in living conditions at the subject property with the long-term preservation of the project-based subsidy. The decision to terminate a Section 8 contract is not a decision that HUD takes lightly.

> Such termination would require all tenants to relocate from the building or lose access to their project-based rental assistance. Further, if HUD terminates the subsidy contract on Sandpiper Cove, that affordable housing resource is lost to the community forever. Sandpiper Cove is the only subsidy contract in the City of Galveston and there are very few housing options for residents who have vouchers. HUD believes the loss of the subsidy contract may have substantial negative impact on the City, and the current residents may be unable to find suitable alternative housing in the locality.

(Ex. 3 to Gamez Decl. at 1-2)

After the Notice of Default was issued, the Previous Owner continued to make repairs to the property with oversight and coordination from HUD pursuant to the Notice of Default and the Action Plan. (Gamez Decl. ¶¶ 9-10; SAC ¶ 23) In addition to monitoring the continued progress on the Action Plan, on December 20, 2019, HUD required the Previous Owner to replace its on-site management company. (Gamez Decl. ¶ 8; SAC ¶ 23) HUD's Fort Worth Asset Management Division was in regular contact with the Previous Owner, the new management company, and the contract administrator. That regular contact included bi-weekly meetings in which the status of the repairs and improvements at the property were discussed. (Gamez Decl. ¶ 10)

Thereafter, on October 15, 2021, the Previous Owner executed a sale to the New Owner. (SAC ¶ 8; Gamez Decl. ¶ 11). The New Owner has plans to rehabilitate and make significant improvements to the property. (*Id.*) HUD approved the assignment of the HAP contract to the New Owner on October 29, 2021. (Gamez Decl. ¶ 12, Ex. 2)

The Complaint does not allege that any Plaintiffs have explored any landlord-tenant remedies to enforce owner compliance with local health and safety codes or lease obligations, other than filing suit against HUD pursuant to the APA.

**STANDARD OF REVIEW**

I.     **Rule 12(b)(1) Standard**

A motion to dismiss under Rule 12(b)(1) "presents a threshold challenge to the Court's jurisdiction, " and thus "the Court is obligated to determine whether it has subject-matter jurisdiction in the first instance." *Curran v. Holder,* 626 F.Supp. 2d 30, 32 (D.D.C. 2009) When reviewing a Rule 12(b)(1) motion to dismiss, "the court must accept the complaint's well-pled factual allegations as true and draw all reasonable inference in the plaintiffs favor." *Thompson v. Capitol Police Bd.*, 120 F. Supp. 2d 78, 81 (D.D.C. 2001); *Vanover v. Hantman*, 77 F. Supp. 2d 91, 98 (D.D.C. 1999). At the same time, "[t]he court is not required, however, to accept inferences unsupported by the facts alleged or legal conclusions that are cast as factual allegations." *Rann v. Chao*, 154 F. Supp. 2d 61, 64 (D.D.C. 2001), *aff'd*, 346 F.3d 192 (D.C. Cir. 2003). Plaintiff must carry the burden of establishing subject matter jurisdiction by a preponderance of the evidence. *Thompson*, 120 F. Supp. 2d at 81; *Vanover*, 77 F. Supp. 2d at 98.   In determining whether jurisdiction exists, a court may look beyond the allegations of the complaint, consider affidavits and other extrinsic information, and ultimately weigh the conflicting evidence.[13]   *See Herbert v. Nat'l Acad. of Sci.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

---

[13]     The Declaration of Michael Gamez and accompanying exhibits are being submitted in support of HUD's motion under the Rule 12(b)(1) standard.  In addition, certain of the exhibits attached to the Gamez Declaration are properly considered under the Rule 12(b)(6) standard because they are incorporated by reference into the Complaint, including the Housing Assistant Payment contract, May 2019 Notice of Default, and December 2, 2019 letter.

## II.        Rule 12(b)(6) Standard

A Rule 12(b)(6) motion tests the legal sufficiency of a complaint. In ruling on a motion to dismiss, the Court "must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *Jovanovic v. U.S.-Algeria Bus. Council*, 561 F. Supp. 2d 103, 110 (D.D.C. 2008).

In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), the Supreme Court clarified the standard of pleading that a plaintiff must meet in order to survive a motion to dismiss under Rule 12(b)(6). The Court noted that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'"  *Id.* at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47, 78 (1957)); *see also Erickson v. Pardus*, 551 U.S. 89, 93 (2007). Although "detailed factual allegations" are not necessary to survive a Rule 12(b)(6) motion to dismiss, to provide the "grounds" of "entitle[ment] to relief," a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555.  The Court stated that while there was no "probability requirement at the pleading stage," *id.* at 556, "something beyond . . . mere possibility . . . must be alleged[.]"  *Id.* at 557-58.  The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level," *id.* at 555, or must be sufficient to "state a claim for relief that is plausible on its face," *id.* at 570.   The Court referred to this newly clarified standard as "the plausibility standard."  *Id.* at 560-61 (abandoning the "no set of facts" language from *Conley v. Gibson*).

The Court in *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), further clarified the plausibility pleading standard, explaining that this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  Rather, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

19

face." *Id.* The plausibility standard "asks for more than a sheer possibility that a defendant acted unlawfully. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged but it has not 'show[n] that the pleader is entitled to relief.'" *Id.*

On a motion to dismiss, under Rule 12(b)(6), the Court may consider, in addition to the facts alleged in the complaint, documents either attached to, or incorporated into the complaint by reference, as well as matters of which it may take judicial notice. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624-25 (D.C. Cir. 1997); *see also Lipton v. MCI Worldcom, Inc.*, 135 F. Supp. 2d 182, 186 (D.D.C. 2001) ("[T]he court may consider the defendant's supplementary material without converting the motion to dismiss into one for summary judgment.  This Court has held that 'where a document is referred' to in the complaint and is central to plaintiff's claims, such a document attached to the motion papers may be considered without converting the motion to one for summary judgment.").  Additionally, "'the Court may consider documents specifically referenced in the complaint where the authenticity of the document is not questioned.'"  *Louis v. Hagel,* 221 F. Supp. 3d 40, 43 (D.D.C. 2016) (citations omitted).

## ARGUMENT

For the foregoing reasons, Plaintiffs' Second Amended Complaint should be dismissed under Rules 12(b)(1) and 12(b)(6).

## I.      **Plaintiffs' Claims are Moot**

A case is moot "'when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (quoting *Larsen v. U.S. Navy,* 525 F.3d 1, 3 (D.C. Cir. 2008)).  For instance, when a plaintiff challenges an agency action or policy, and the agency rescinds the action or policy

during the pendency of the litigation, the challenge becomes moot, and the Court is deprived of subject matter jurisdiction. *See, e.g., Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 303 (D.D.C. 2017) ("The twin doctrines of mootness and ripeness can be described as 'standing set in a time frame: The requisite personal interest that must exist at the commencement of litigation (standing) must continue throughout its existence (mootness).'" (*quoting Arizonans for Official English v. Arizona*, 520 U.S. 43, 68 n.22 (1997)); *Liu v. Blinken*, Civ. A. No. 21-629, 2021 U.S. Dist. LEXIS 114124 at *11-12 (D.D.C. June 18, 2021) ("Defendants are no longer applying the Proclamation to suspend processing of Plaintiffs' visa applications. There is thus no live controversy over Defendants' authority to do so.")

Here, Plaintiffs' claims under the APA rely exclusively on the discretionary authority to grant Tenant Protection Vouchers conferred upon HUD by the 2019, 2020, and 2021 Consolidated Appropriations Acts. Specifically, Plaintiffs point to the following language to support their claims:

> The Secretary *may* provide section 8 rental assistance from amounts made available under this paragraph for units assisted under a project-based subsidy contract funded under the "Project-Based Rental Assistance" heading under this title where the owner has received a Notice of Default and the units pose an imminent health and safety risk to residents.

Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, div. H, tit. II, § 219, 133 Stat. 2534, 3005-07 (2019) (FY 2020).

Plaintiffs contend that HUD violated the APA by unlawfully withholding Tenant Protection Vouchers in the context of the Notice of Default issued to the Previous Owner and instead pursued other available enforcement options that Plaintiffs contend to have been

inadequate.[14]  (SAC ¶¶ 109-204)  Even Plaintiffs' claim for alleged intentional discrimination is premised on the alleged unlawful withholding of Tenant Protection Vouchers by HUD in connection with the issuance of a Notice of Default to the Previous Owner.  (*Id.* ¶ 205-11)   As relief for all of their claims, Plaintiffs seek only injunctive relief, specifically, an order directing HUD to provide them with Tenant Assistance Vouchers based on the Notice of Default issued to the Previous Owner.  (SAC at § XIII, Prayer for Relief)

Plaintiffs allege that the Notice of Default set a time period to cure the violations contained in the notice, and that the Previous Owner did not comply with that deadline. (SAC ¶ 20-26) Although not germane to the mootness issue, HUD notes that the Previous Owner *did* comply with the Notice of Default by submitting an Action Plan which HUD approved, extending the time to cure the violations contained in the notice. *See* HUD Notice 2018-08 pp. 5-6; *see also* Gamez Decl. ¶ 7. Regardless of whether an owner "complies" with a Notice of Default, HUD still has discretion regarding enforcement remedies, including discretion over what tools and ongoing oversight it *may* use to spur compliance. Such options provided by Congress to HUD include requiring the replacement of project management with a management agent approved by the Secretary and working with the owner to stabilize the property in an attempt to preserve the property through

---

[14]    The term "owner" is defined as any private person or entity . . . having the legal right to lease or sublease dwelling units. 42 U.S.C. § 1437f(f)(1).  The Notice of Default that is the subject of Plaintiffs' Complaint was issued to the Previous Owner, which was the entity that had, at the time of the Notice of Default, the legal right to lease or sublease units at the Property.  Plaintiffs have not alleged that any Notice of Default has been issued to the New Owner, and the New Owner, therefore, is not an "owner [that] has received a Notice of Default" within the meaning of the above-referenced statutory provision. Thus, in the event the Court were to determine that the sale of the Property did not render the case moot, it still would require dismissal under Rule 12(b)(6) because Plaintiffs have not alleged that any Notice of Default has been issued to the New Owner, which is a prerequisite for the application of the statutory provision on which Plaintiff relies.

compliance, both of which HUD utilized here. *See* 133 Stat. at 3005-07; *see also* Gamez Decl.
¶¶ 7-10.

Whether or not HUD should have pursued Plaintiffs' preferred option of Tenant Protection
Vouchers, instead of working with the Previous Owner to obtain compliance, is now a moot issue.
HUD concluded its enforcement action based on the Notice of Default issued to the Previous
Owner when it approved the assignment of the Housing Assistance Payment contract to the New
Owner on October 29, 2021. (Gamez Decl. ¶ 12 and Ex. 2 thereto).   That final agency action has
superseded any claim by Plaintiffs concerning HUD's failure to pursue other enforcement options
based on the Notice of Default to the Previous Owner.   *See Nat'l Mining Ass'n v. Dep't of Interior*,
251 F.3d 1007, 1010-12 (D.C. Cir. 2001) ("The old set of rules, which are the subject of this
lawsuit, cannot be evaluated as if nothing has changed. A new system is now in place.").
Importantly, Plaintiffs have not asserted any claim challenging HUD's decision to approve that
assignment.  Nor do Plaintiffs allege that any Notice of Default has been issued to the New Owner.

Stated another way, when the Previous Owner executed the sale to the New Owner on
October 15, 2021, and HUD approved the contract assignment to the New Owner, the Notice of
Default issued on May 15, 2019 (which is specific to the then-owner not the Property) ceased to
have legal effect. The Act is clear that for HUD to have the authority and discretion to issue Tenant
Protection Vouchers to Plaintiffs, HUD must have issued a Notice of Default to "the owner."[15]
The New Owner has not been found to be in default of the Housing Assistance Payment Contract
and HUD has not issued any Notice of Default to the New Owner.   (Gamez Decl. ¶ 14)  Much

---

[15]     As explained above, Tenant Protection Vouchers may be issued following the issuance of
a Notice of Default, but a Notice of Default is not the only basis for the issuance of a Tenant
Protection Voucher.. However, Plaintiffs cite specifically to HUD's discretionary ability to issue
Tenant Protection Vouchers in the context of a Notice of Default. (SAC ¶ 7)

like the situation in *Liu v. Blinken*, here, because of the sale of the Property, the Notice of Default issued to the Previous Owner no longer is in effect. *See Liu*, 2021 U.S. Dist. LEXIS 114124 at *11-12.

Consequently, Plaintiffs' claims should be dismissed as moot. *See, e.g., In re Howard*, 2014 U.S. App. LEXIS 13380, at *3 (D.C. Cir. July 14, 2014) ("Any injunctive relief concerning appellant's student loans would be moot, as they have been discharged"); *Nat'l Parks Conservation Ass'n v. Dep't of Interior*, 794 F. Supp. 2d 39, 44 (D.D.C. 2011) ("If . . . an agency does respond to a petition, even after a suit to compel a response is filed, such a suit is rendered moot.").

## II.    HUD's Enforcement Decisions Are Committed to Agency Discretion

The APA generally permits judicial review of final agency action under the deferential standards set forth in 5 U.S.C. § 706. "[B]efore any review at all may be had," however, "a party must first clear the hurdle of § 701(a)." *Heckler v. Chaney*, 470 U.S. 821, 828 (1985). Section 701 of the APA precludes judicial review when, *inter alia*, agency action is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2).  Furthermore, to satisfy the jurisdictional requirements of 701(a)(2), Plaintiffs' claims must not relate to an agency's determination about how to spend a lump-sum appropriation. *Cody v. Cox*, 509 F.3d 606, 610 (D.C. Cir. 2007).  Here, the Complaint should be dismissed either under Rule 12(b)(1) for lack of jurisdiction or under Rule 12(b)(6) for failure to state a claim upon which relief can be granted because it (1) relates to HUD's determination about how to spend a lump-sum appropriation concerning Tenant Protection

Vouchers and (2) relates to HUD's exercise of its discretion in choosing among various enforcement options.[16]

### A. Plaintiffs' Claims Relate To HUD's Determination About How To Spend A Lump-Sum Appropriation.

Plaintiffs' claim amounts to an allegation that HUD failed to take the specific action of issuing Tenant Protection Vouchers using a lump-sum allocation, for tenants to relocate from Sandpiper Cove under HUD's discretionary ability to issue them where (1) the owner has been issued a Notice of Default and (2) the units pose an imminent health and safety risk to tenants. However, because HUD's use of Tenant Protection Vouchers in this situation is an action committed to agency discretion, HUD's alleged failure to take that specific action is judicially unreviewable under the APA.

Plaintiffs are challenging HUD's failure to draw upon the Paragraph 2 Appropriation to issue them relocation vouchers. Thus, their claims are unreviewable because "[t]he allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion." *Lincoln v. Vigil,* 508 U.S. 182, 192 (1993); *see also, e.g., Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.,* 139 S. Ct. 361, 370 (2018). In *Lincoln v. Vigil,* the Supreme Court considered a challenge to an agency's decision to discontinue a program aiding

---

[16]   The D.C. Circuit has observed that the judicial review provisions of the APA, 5 U.S.C. §§ 701-706, provide 'a limited cause of action for parties adversely affected by agency action'", but do not operate as a jurisdictional bar. *Oryszak v. Sullivan*, 576 F.3d 522, 524-25 (D.C. Cir. 2009); *but see Goodwin v. Sec'y of Hous. & Urban Dev.*, 356 F.3d 310, 312-13 (D.C. Cir. 2004) (holding that the availability of an alternative remedy deprived the Court of jurisdiction for a claim under the APA); *Balt. Gas & Elec. v. FERC*, 252 F.3d 456, 461 (D.C. Cir. 2001) (no jurisdiction over challenge to FERC's discretionary decision to settle an enforcement action rather than to see it "through to fruition"); *see also Citizens for Resp. & Ethics in Wash. v. Dep't of Just.,* 164 F. Supp. 3d 145, 150 (D.D.C. 2016) (noting "a dispute among the courts of this District as to whether the argument Defendants make here—FOIA offers an alternative remedy and thus precludes a claim under the APA—should be reviewed under Rule 12(b)(6) for failure to state a claim or under Rule 12(b)(1) for lack of subject matter jurisdiction"). Consequently, Rule 12(b)(1) is cited as an alternative basis for dismissal.

"handicapped Indian children in the Southwest" in order to "reallocate the Program's resources to a nationwide effort to assist such children" through other means. 508 U.S. at 184. The plaintiffs brought suit arguing that the agency's decision to discontinue the program was arbitrary and capricious. The Supreme Court held that the agency's decision was "unreviewable under § 701(a)(2)." *Id.* at 193. The Court observed that the program in question was not required by statute, but rather had been funded from "annual lump-sum appropriations" to the agency. *Id.* at 187. The Court explained that the "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. The Court thus reasoned that "as long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, [the APA] gives the courts no leave to intrude." *Id.* at 193; *see also id.* at 192. The Court accordingly held that plaintiffs could not compel the agency to continue directing funds to their preferred program.

The same reasoning applies with equal force here. Plaintiffs' claims rest on the Paragraph 2 Appropriation, which provides a lump sum for HUD to fund vouchers for tenants in various enumerated circumstances and allocate them among eligible tenants as it sees fit.  As discussed above, among the principal beneficiaries intended by Congress were residents of public housing slated for immediate demolition, as well as residents of project-based Section 8 housing whose owner has decided not to renew its contract.

As noted by Plaintiffs, another provision states that HUD "may" issue vouchers "from amounts made available under this paragraph" to residents of project-based Section 8 housing if "the owner has received a Notice of Default and the units pose an imminent health and safety risk to residents." (SAC ¶ 109) But that provision does not require HUD to exercise that authority,

much less to do so for any particular project. Rather, HUD itself is permitted to decide how to expend those finite resources, bearing in mind that its choice to use funds to relocate tenants in connection with HUD's enforcement at a Section 8 apartment complex will necessarily result in fewer funds available nationwide for other households, such as those being displaced from public housing that is being demolished. Because Congress left it to HUD to decide how best to allocate the funding made available under the Paragraph 2 Appropriation, section "701(a)(2) gives the courts no leave to intrude" in that decision. *Lincoln*, 508 U.S. at 193.

## B. HUD's Discretion To Choose Among Various Enforcement Options Is Not Reviewable Under The APA.

For this Court to have jurisdiction over an APA claim, or for Plaintiffs to state a claim under the APA, Congress must have provided the judiciary with "law to apply." *Wendland v. Gutierrez*, 580 F. Supp. 2d 151, 153 (D.D.C. 2008). As *Wendland* explains:

> There is "no law to apply" when there are no "substantive legal criteria against which an agency's conduct can be seriously evaluated." *Drake v. FAA,* 291 F.3d 59, 70 (D.C. Cir. 2002). Thus, when a statute provides an agency with such broad decision-making powers that no "concrete limitations . . . on the agency's exercise of discretion" or "'judicially manageable standards' are discernable, meaningful judicial review is impossible, and agency action is shielded from the scrutiny of the courts." *Id.* at 70.

*Wendland,* 580 F. Supp. 2d at 153. Additionally, the Supreme Court in *Chaney* held an agency's decision not to undertake a particular enforcement measure, or measures preferred by a plaintiff, is "generally committed to an agency's absolute discretion" and presumptively unsuitable for judicial review. *Chaney*, 470 U.S. at 831.

As is relevant here, the Court in *Chaney* explained that an agency's decision not to invoke its enforcement measures involves a complicated balancing of factors that is peculiarly within the agency's expertise, i.e., not only must the agency assess whether a violation has occurred, but it must also determine (1) whether its resources are best spent on a particular violation rather than

another; (2) whether the agency is likely to succeed if it acts; (3) whether the particular enforcement action under consideration best fits the agency's overall policies; and (4) whether the agency has the resources to undertake the action. *Id*. An agency cannot act on every violation of a statute or a regulation that it is charged with enforcing, and "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id*. at 831-32.

As explained above, the Real Estate Assessment Center inspection that served as the basis of the Notice of Default to the Previous Owner was conducted on a sample of units at the Property well over two years ago.  HUD, in an exercise of its discretion, elected to afford the Previous Owner an opportunity to obtain compliance rather than choosing Plaintiffs' preferred option of relocating them through Tenant Protection Vouchers, and ultimately approved a transfer of the Housing Assistance Payment contract to the New Owner after the New Owner purchased the Property.  Those discretionary determinations prior to the sale of the Property are not subject to judicial review on the basis of mootness as already addressed above.  But they also are not subject to judicial review under *Chaney*.

The relevant statutes entrust HUD with the task of determining how best to redress violations discovered during inspections of project-based Section 8 housing. The Consolidated Appropriations Act provides that, if an owner fails to adequately correct all deficiencies upon issuance of a Notice of Default, the agency "may" take any of various enforcement measures, including replacing project management, transferring the contract to another project or owner, and imposing civil money penalties. 133 Stat. at 3005-06. The 2020 Act also contemplates that HUD may invoke its contractual right to abate payments and use the abated funds to relocate tenants, *see id.*; *cf.* 24 C.F.R. § 886.123(c), or alternatively, that HUD may draw from its appropriation to fund the relocation of residents without abating the contract, *see* 133 Stat. at 2977. But the 2020

Act also expressly recognizes that HUD may "work with the owner . . . to stabilize the property" without immediately invoking those other remedies. *Id.* § 219(c)(2)(H), 133 Stat. at 3005-06.

Thus, nothing required HUD to follow Plaintiffs' preferred course of action and their assertion that HUD should have done so fails to state a cognizable claim under the APA. *Balt. Gas*, 252 F.3d at 460 ("FERC's decision to settle with Columbia, and its consequent decision not to see its enforcement action through to fruition, is a paradigmatic instance of an agency exercising its presumptively nonreviewable enforcement discretion."); *Schering Corp. v. Heckler*, 779 F.2d 683, 686 (D.C. Cir. 1985) (discretionary decision to hold enforcement action in abeyance pending further agency assessment is "a paradigm case of enforcement discretion"); *Sierra Club v. Larson*, 882 F.2d 128, 132 (4th Cir. 1989) (discretionary decision not to recommend a formal penalty action is nonreviewable).

Plaintiffs' attempt to plead around this deficiency, alleging that "[t]he law does not require that HUD terminate the owner's Housing Assistance Payment (HAP) contract with HUD before or as a result of providing the relocation assistance. HUD has the legal authority to continue the HAP contract in effect and provide the relocation assistance which can include the issuance of Tenant Protection Vouchers." (SAC ¶ 2)   However, providing the relief they seek, permanent relocation using Tenant Protection Vouchers, necessarily would have involved HUD's election of a particular enforcement action, specifically, the termination of the Housing Assistance Payment contract, as well as its discretion over a lump-sum appropriation.[17]   The model lease provides that

---

[17]   If HUD made an affirmative contemporary finding that a particular unit "pose[s] an imminent health and safety risk," it could issue a Notice of Default with respect to that unit, and issue a relocation Tenant Protection Voucher to temporarily rehouse the tenant while repairs are made. As Plaintiffs acknowledge, the New Owner's rehabilitation plan will involve temporary relocation while repairs are made. (SAC ¶ 8) However, HUD understands Plaintiffs' demand as a demand for permanent relocation. (SAC ¶ 212; Plaintiffs' Demand Letter, dated Sept. 5, 2019. EFC No. 27-2; *see also* Pl. Mot. at 36)

"[t]he lease agreement will terminate automatically, if the Section 8 Housing Assistance contract terminates for any reason."       See Model Lease at ¶ 30 (available at https://www.hud.gov/sites/dfiles/OCHCO/documents/90105a.pdf (last visited Dec. 16, 2021))

HUD has no other mechanism, in this scenario, to terminate the owner's lease with the tenant.  If HUD were to issue Tenant Protection Vouchers in the scenario Plaintiffs posit—where the owner was issued a Notice of Default and deemed the units a health and safety risk to the tenants (a standard higher than decent, safe, and sanitary)—HUD would need to also exercise its discretion to abate or terminate the Housing Assistance Payment contract for an uncured default to effectuate a termination of the tenants' lease agreements.  See Ex. 1 to Gamez Decl, HAP Contract § 26 ("Upon determining that a default has occurred, HUD will notify the Owner, by certified mail, of the nature of the default, the actions the Owner must take to cure the default, and the time within which the Owner must complete the corrective actions. If the Owner does not implement the requested actions, or other corrective action acceptable to HUD, within the prescribed time or does not do so to the satisfaction of HUD, HUD may terminate this Contract in whole or in part[.]").  Here, HUD chose a different enforcement path that culminated in the transfer of the Housing Assistance Payment contract (not its termination) to the New Owner.

In addition, in light of the sale of the Property to the New Owner, for Plaintiffs to receive the relief they seek would require HUD to (1) outside of its normal Real Estate Assessment Center process,[18] make an affirmative contemporary finding that their particular units "pose an imminent health and safety risk," (2) issue a Notice of Default to the New Owner with respect to those units, (3) assuming the New Owner did not cure the particular deficiencies in the new Notice of Default,

---

[18]       Nearly 20,000 Real Estate Assessment Center inspections are conducted on HUD-assisted Public Housing and Multifamily properties each year. https://www.hud.gov/program_offices/public_indian_housing/reac/products/prodpass.

abate or terminate the Housing Assistance Payment contract with respect to those units (thus denying funds for renovations and repair of the Property), and (4) use a portion of a limited lump sum appropriation to fund and issue Tenant Protection Vouchers.

In the first instance, these contingencies have not occurred (nor been alleged to have occurred) and thus are not ripe for judicial consideration because they "rest[] upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotes and citation omitted). Nor would the APA allow the Court to command HUD's discretion over its limited oversight resources (and the limited Tenant Protection Voucher appropriation) and enforcement options in that way.

Ultimately, as the D.C. Circuit has observed, "*Chaney*'s recognition that the courts must not require agencies to initiate enforcement actions may well be a requirement of the separation of powers commanded by our Constitution. The power to take care that the laws be faithfully executed is entrusted to the executive branch -- and only to the executive branch. . . . One aspect of that power is the prerogative to decline to enforce a law, or to enforce a law in a particular way." *Balt. Gas*, 252 F.3d at 459. Courts, therefore, presumptively lack jurisdiction over challenges to an agency's discretionary determination to "decline to enforce a law, or to enforce a law in a particular way" instead of a plaintiff's preferred way. *See id*. at 461.

Although *Chaney* also articulated the circumstances in which the presumption against judicial review of an agency's enforcement responsibilities may be overcome, none apply here. The Court described the relevant inquiry as whether Congress has "indicated an intent to circumscribe agency enforcement discretion, and has provided meaningful standards for defining the limits of that discretion." *Chaney,* 470 U.S. at 834-35. In other words, courts must ask whether Congress has provided the judiciary with "law to apply." *Id.* at 832-33. Here, Congress has not

provided the courts with any meaningful standard to judge HUD's exercise of discretion in pursuing certain enforcement options over others.

Although the Fair Housing Act imposes on HUD an affirmative duty to further fair housing goals, it does not provide this Court with "law to apply" or a meaningful standard against which to judge HUD's exercise of discretion in dealing with troubled properties. *See Wendland,* 580 F. Supp. 2d at 153.  The applicable section of the Fair Housing Act, 42 U.S.C. § 3608(d), is drawn in broad discretionary language, which courts have read to permit HUD to balance a number of factors, including expenses, personnel resources, and likelihood of success, in fulfilling its duty. *See Am. Disabled for Attendant Programs Today v. Dep't of Hous. & Urban Dev.*, 170 F.3d 381, 386-87 (3d Cir. 1999).  Accordingly, the Fair Housing Act does not provide any meaningful standards to rebut the presumption of unreviewability of agency inaction with regard to the discretionary enforcement action Plaintiffs seek, or upon which to base the assertion here that HUD, under 5 U.S.C § 706(1), must take some specific action. *See id.* (concluding that the Fair Housing Act's requirement that HUD administer programs in a manner affirmatively to further the Fair Housing Act's policies did not override the presumption that agency decisions not to enforce are unreviewable).

Similarly, as discussed above, the Consolidated Appropriations Act and HUD's regulations impose requirements on the landlord and provide enforcement authority to the Secretary, but do not require the Secretary to act and certainly do not provide any standards that could rebut the presumption of unreviewability of agency inaction. Therefore, while HUD takes its duties to enforce its rules seriously, enforcement decisions of its project-based Section 8 program are not subject to judicial review under the APA.  Accordingly, Plaintiffs' APA claims should be dismissed for this additional reason.

**III.**   **Plaintiffs Do Not Challenge Any Final Agency Action**

Plaintiffs' APA claims fail for another reason: they do not challenge final agency action. "When, as here, review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'" *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990)); *see* 5 U.S.C. § 704 (allowing review only of "final agency action for which there is no other adequate remedy in a court").

For agency action to be "final" and thus reviewable under the APA, several requirements apply. First, plaintiffs must challenge a specific, "identifiable action or event" rather than an agency's general course of conduct. *Lujan*, 497 U.S. at 899; *see also Louisiana v. United States*, 948 F.3d 317, 323 (5th Cir. 2020). Second, the identified agency action must both (1) "mark the 'consummation' of the agency's decisionmaking process" and (2) be an action "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997); see also *Lauderhill Hous. Auth. v. Donovan*, 818 F. Supp. 2d 185 (D.D.C. 2011) (citing *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48, 342 U.S. App. D.C. 45 (D.C. Cir. 2000). Whether there has been "agency action" or "final agency action" within the meaning of the APA are threshold questions; if these requirements are not met, the action is not reviewable. *Fund for Animals, Inc. v. United States BLM*, 460 F.3d 13, 18 (2006). Because Plaintiffs have failed to meet these requirements, this Court should dismiss the Complaint for failure to state a claim for which relief can be granted. *Lauderhill*, 818 F. Supp. 2d at 193 (citing *Fund for Animals,* 460 F.3d at 18 n.4); *see also Am. Forest Res. Council v. Hall*, 533 F. Supp. 2d 84, 94 (D.D.C. 2008).

Plaintiffs here allege that the final agency action they are challenging is HUD's failure to provide the tenants of Sandpiper Cove with Tenant Protection Vouchers and relocation assistance in connection with the Notice of Default issued to the Previous Owner, instead choosing to continue to "leave the project-based contract, the Housing Assistance Payment contract, in place." (SAC ¶¶ 48, 52-53) Plaintiffs allege that the Notice of Default set a time period to cure the violations contained in the notice, and that the Previous Owner did not comply with that deadline. (*Id.* ¶¶ 20-26)

But the culmination of that enforcement process—i.e., the final agency action—was HUD's approval of the assignment of the Housing Assistance Payment contract to the New Owner on October 29, 2021. (Gamez Decl. ¶ 12, Ex. 2). On that date, HUD's enforcement actions with regard to the Previous Owner were concluded. However, Plaintiffs do not challenge HUD's decision to assign the Housing Assistance Payment contract to the New Owner. Rather, Plaintiffs allege that HUD's efforts to bring the Previous Owner into compliance with the HAP contract constituted a "final decision to withhold relocation assistance from Plaintiffs." (SAC ¶¶ 49-60)

However, prior to the assignment of the contract, HUD had neither "consummat[ed]" its enforcement efforts at Sandpiper Cove nor taken any action to fix "the rights or obligations" of any party. *Bennett*, 520 U.S. at 178 (quotation marks omitted).  Rather, HUD had merely commenced the enforcement process with the Previous Owner by issuing a Notice of Default and actively monitoring the Previous Owner's response.

Contrary to Plaintiffs' assertion, the date specified in a Notice of Default does not reflect a hard deadline after which, HUD either will or will not have taken final enforcement action. This date merely marks when HUD expects an owner to repair physical deficiencies or else request an extension of the Notice of Default requirements, accompanied by a survey of the property, a status

report of all the deficiencies identified by the survey and the Real Estate Assessment Center inspection, and a thorough repair plan to correct all remaining deficiencies. *See* Housing Notice 2018-08; Ex.4 to Gamez Decl. Unless HUD had either determined that the Previous Owner was no longer in default or terminated the Housing Assistance Payment Contract as a result of the default, HUD's decision concerning how to handle the Previous Owner's default was still under consideration and not final.

Ultimately, because of the sale of the Property, HUD never took any final agency action with regard to the issuance of Tenant Protection Vouchers with regard to the Previous Owner. HUD was still considering its enforcement options concerning the Previous Owner's default of the Housing Assistance Payments Contract at the time of the sale. HUD's enforcement activities against the Previous Owner were consummated when HUD approved the assignment of the Housing Assistance Payment contract after the sale was executed. Thus, to the extent that there was a final agency action in this matter, it was that approval of that assignment, a decision Plaintiffs are not challenging nor alleging to be arbitrary and capricious. Ultimately, HUD's alleged failure to act in the specific manner in which Plaintiffs demanded does not "mark the consummation of the agency's decision making process" as required by the APA but was at most "merely tentative or interlocutory in nature" *Lauderhill,* 818 F. Supp. 2d at 193.

## IV.   Plaintiffs Have Failed To Identify Any Legal Requirement That HUD Take The Action They Prefer.

"[T]he only agency action that can be compelled under the APA is action legally required . . . § 706(1) empowers a court only to compel an agency to perform a ministerial or non-discretionary act, or to take action upon a matter, without directing how it shall act." *Norton v. S. Utah Wilderness All.* (*"SUWA"*), 542 U.S. 55, 63-64 (2004).  "[A] 'failure to act' is properly understood to be limited, as are the other items in § 551(13), to a discrete action."  *Id.* at 63. As

explained below, none of the legal authorities cited by Plaintiffs mandate a discrete action which HUD is legally required to take, and at most provide HUD with discretionary authority. Therefore, Plaintiffs have not identified an agency action which HUD was required to take, and the Complaint should be dismissed for this additional reason.

### A.   Plaintiffs do not identify a discrete action which HUD is required to take under the Consolidated Appropriations Act.

Plaintiffs allege that "[t]he relevant law and regulation require HUD to provide the relief of assistance for relocation once HUD has determined that the property owner is in violation of the HAP contract and the owner has not corrected the deficiencies set out in the notice, and HUD continues to keep the contract in effect and is paying rent to the owner under the contract." (SAC ¶ 9) Plaintiffs assert that such a requirement is set forth in the 2019, 2020, and 2021 Appropriations Act, but they are mistaken.[19]

As explained above, when a project-based rental assistance property receives an inspection score of 60 or less, the Appropriations Act mandates only that HUD provide the owner with a Notice of Default within 15 days of the issuance of the inspection score. The Appropriations Act then provides HUD with wide discretion to both set the timetable to cure the deficiencies specified in the notice, or if the owner fails to fully correct the deficiencies within that time period, the discretion to make or not make use of several enforcement options as HUD sees fit. *See* 133 Stat. at 3005-06 ("At the end of the time period for correcting all deficiencies specified in the Notice of Default, if the owner fails to fully correct such deficiencies, the Secretary may[.]")

---

[19]    As plaintiffs acknowledge, 24 C.F.R. §886.323(e), previously cited in the prior Complaint, is inapplicable and thus cannot form a basis for creating any mandatory duty in this case. (ECF No. 24).

Further, the 2020 Act provides that the Secretary *may* provide tenant protection vouchers where the owner has received a Notice of Default and the units pose an imminent health and safety risk to residents.[20]  *Id.*, 133 Stat. at 3006.   Here, the New Owner has not received a Notice of Default and HUD has not found that the units pose an imminent health and safety risk to the residents, a standard that is distinct from the decent, safe, and sanitary requirements set forth in the Act. Further even if the Notice of Default to the Previous Owner remained at issue and HUD had determined the units to pose an imminent risk to the health and safety of the residents (a determination that HUD had not made), the Act does not provide a discrete mandate to issue tenant protection vouchers but rather gives HUD the discretion to determine whether to issue such vouchers in that situation.

### B.      HUD has no duty under 42 U.S.C. §3608(e)(5) to provide plaintiffs with Tenant Protection Vouchers.

Plaintiffs allege that HUD's duty to affirmatively further fair housing requires HUD to provide plaintiffs with tenant protection vouchers.  (SAC ¶ 159) While HUD takes its statutory duty to affirmatively further fair housing seriously with respect to all its programs, section 3608(e)(5) does not compel HUD to take the specific acts Plaintiffs seek to compel. Plaintiffs have not cited to, nor is there any language in the statute that suggests otherwise. Rather, Plaintiffs rely solely on section 3608(e)(5)'s broad mandate to demand that this Court provide Plaintiffs with tenant protection vouchers. No such duty manifests in this statute. *See, e g., Am. Disabled for Attendant Programs Today v. Dep't of Hous. & Urban Dev.*, 170 F.3d 381, 388-89 (3d Cir.

---

[20]      Plaintiffs cite to the 2019, 2020, and 2021 Consolidated Appropriations Act as a basis for this argument. While all three Acts contain identical provisions regarding "decent, safe, and sanitary" conditions and the authorization for the Secretary to provide tenant protection vouchers if HUD determines units to be an imminent health and safety risk, neither mandates that HUD issue vouchers in the situation Plaintiffs describe. *See* 133 Stat. 13, 461-63; 133 Stat. 2534, 3005-07.

1999) (concluding that HUD did not violate § 3608(e)(5) and refusing to order HUD to, among

other things, "gather statistical information on housing discrimination" because to do so "we

would be creating an independent guideline to limit HUD's discretion that would conflict with

the plain text of the statute"); *SUWA*, 542 U.S. at 66-67 (no authority under APA to compel

compliance with broad statutory mandates).[21]

Further, as explained above, Section 8 project-based assistance is not tenant based, but

rather the funding is tied to the unit and project. Accordingly, tenants in such a project have no

legal right to transport the assistance for the unit elsewhere and therefore that does not create a

duty for HUD to take this action, and to the extent funding for remediation of conditions at the

property is necessary, funds for the project-based Section 8 program are used for that purpose.

*Id.*[22]

---

[21]     *See also McGrath v. Dep't of Hous. & Urban Dev.*, 722 F. Supp. 902, 907-909 (D. Mass. 1989); *Anderson v. Dep't of Hous. & Urban Dev.*, 2010 U.S. Dist. LEXIS 29244, at *25-26 (E.D. La. Mar. 23, 2010); *City of Fort Lauderdale v. Scott*, 2011 U.S. Dist. LEXIS 5093, at *12-13 (S.D. Fla. Jan. 19, 2011); *Jackson v. Dep't of Hous. & Urban Dev.*, 2020 U.S. Dist. LEXIS 259488, at *15-17, 25-26 (S.D. Tex. May 18, 2020), *appeal docketed*, No. 21-20317 (5th Cir. June 16, 2021).

[22]     Lastly, although Plaintiffs bring APA claims, the basis for Plaintiffs' challenge is not final agency action, but rather agency inaction. Accordingly, the requirement of the Local Rules to produce an administrative record with the filing of this dispositive motion does not apply. *See* LCvR 7(n) (requirement applies "[i]n cases involving the judicial review of administrative agency *actions*") (emphasis added); *Dallas Safari Club v. Bernhardt*, Civ. A. No. 19-3696 (APM), 2021 WL 495078, at *3 (D.D.C. Feb. 9, 2021) (noting the two flavors of APA review—review of agency action and agency inaction—concluding both are considered on an administrative, not discovery record, on summary judgment). Moreover, the production of an administrative record at this stage is unnecessary—the United States seeks to dismiss this case not based on an administrative record, but instead based on the facts alleged in the complaint. *See generally Nat'l Law Ctr. on Homelessness & Poverty v. Dep't of Veterans Affs.*, 842 F. Supp. 2d 127, 130 (D.D.C. 2012) (Lamberth, J.) (noting that often "if an agency fails to act, there is no 'administrative record' for a federal court to review.")

**V.**     **Plaintiffs' Discrimination and Equal Protection Claims Also Fail**

**A.**     **Plaintiffs' Section 3604 Fair Housing Act Claim Is Barred By Sovereign Immunity**

"It is axiomatic that the United States may not be sued without its consent and the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). Absent a waiver, sovereign immunity shields the federal government and its agencies from suit. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). A waiver of sovereign immunity "must be unequivocally expressed in statutory text, and will not be implied." *Lane v. Pena*, 518 U.S. 187, 192 (1996) (internal citation omitted). The burden is on the plaintiff to establish a waiver. *Smith v. Scalia*, 44 F. Supp. 3d 28, 40 (D.D.C. 2014) (citing *Tri-State Hosp. Supply Corp. v. United States*, 341 F.3d 571, 575, 358 U.S. App. D.C. 79 (D.C. Cir. 2003)).

Here, Plaintiffs have alleged a non-APA claim for intentional discrimination pursuant to the Fair Housing Act, 42 U.S.C. § 3604(a).[23] However, Plaintiffs' complaint fails to identify an adequate statutory basis for a waiver of sovereign immunity for their Fair Housing Act claim. (SAC ¶¶ 203-204) It is well-established that the Fair Housing Act does not waive the federal government's sovereign immunity. *See, e.g.*, *Zhu v. United States*, Civ. A. No. 04-1216 (RMC), 2005 U.S. Dist. LEXIS 11503, at *12 (D.D.C. June 9, 2005) ("the Fair Housing Act does not waive sovereign immunity to permit suits against the federal government."); *see also Soniat v. Dep't of Hous. & Urban Dev.*, Civ. A. No. 16-0337, 2016 U.S. Dist. LEXIS 181397, at *7 (E.D. Tex. Dec. 16, 2016) (stating that "the Fair Housing Act … do[es] not include a waiver of the federal government's sovereign immunity") (citing *Unimex, Inc. v. Dep't of Hous. & Urban Dev.*, 594 F.2d 1060, 1061-62 (5th Cir. 1979) ("the Fair Housing Act does not apply to the federal government");

---

[23]     While Plaintiffs' claims pursuant to 42 U.S.C. § 3604 are specifically barred by Sovereign Immunity, Plaintiffs' claims brought under the APA based on 42 U.S.C. § 3608 are not.

*Edwards v. Alexander Cnty. Hous. Auth.*, No. 19-0879, 2021 U.S. Dist. LEXIS 5482, at *7 (S.D. Ill. Jan. 12, 2021) ("Because neither the Fair Housing Act, Title VI, nor the Illinois Civil Rights Act contains an unequivocal waiver of the Federal Government's sovereign immunity, Defendants HUD and Ben Carson are dismissed from the case."); *Rockwell v. Dep't of Def.*, Civ. A. No. 18-0001, 2018 U.S. Dist. LEXIS 208167, at *2 (D. Alaska Dec. 10, 2018) ("The government is correct that the Fair Housing Act does not contain a waiver of sovereign immunity. Therefore, the Rockwells' claims against the United States for violations of the Fair Housing Act are barred by the federal government's sovereign immunity and must be dismissed."); *Commission v. Dep't of Hous. & Urban Dev.*, Civ. A. No. 19-8390 (VSB), 2021 U.S. Dist. LEXIS 29457, at *1 (S.D.N.Y. Feb. 16, 2021) (same); *Tranchmontagne v. Dep't of Hous. & Urban Dev.*, Civ. A. No. 20-12842, 2021 U.S. Dist. LEXIS 120573, at *19 (E.D. Mich. June 29, 2021) (same).

Because Congress has not waived HUD's sovereign immunity, and Plaintiffs cannot meet their burden to establish that a waiver of sovereign immunity exists, Plaintiffs' Fair Housing Act claim should be dismissed.

### B.    Plaintiffs Have Failed to Plausibly Plead any Discriminatory Intent

Plaintiffs allege that HUD's "final decision" to withhold relocation assistance amounts to intentional discrimination in violation of 42 U.S.C. § 3604(a) (SAC ¶ 205-208) and to a violation of the Fifth Amendment's Equal Protection Clause.  (*Id*. ¶ 151) Because proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 265 (1977), both claims require the pleading of allegations that plausibly could give rise to an inference of discriminatory intent.  As Plaintiffs have failed to plausibly plead such intent, both claims should be dismissed.

Section 3604(a) makes it unlawful to "make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin."  Plaintiffs have failed to

allege that HUD has denied them a dwelling.  Rather, their apparent assertion is that HUD allowed them to continue to live in allegedly unsafe and unsanitary units (rendering the units in their view "unavailable") while it worked with the Previous Owner to obtain compliance after issuing a Notice of Default rather than immediately relocating them.   Plaintiffs view that HUD is denying them Tenant Protection Vouchers to replace a Section 8 project based rental assisted unit does not render any unit unavailable based on race. *See Bloch v. Frischholz*, 587 F.3d 771, 782 (7th Cir. 2009) (explaining that § 3604 requires that "the plaintiffs dwelling be made truly unavailable, or that defendants deprived plaintiffs of their privilege to inhabit their dwelling")

Moreover, Plaintiffs have failed to plausibly plead that HUD's actions were motivated by intentional discrimination as opposed to HUD's discretionary determination to attempt to pursue certain enforcement options before terminating the Housing Assistance Payments contract for the reasons explained in HUD's letter dated December 2, 2019.  (Ex. 3 to Gamez Decl.)   Although the threshold for pleading facts in support of an inference of discriminatory intent may not be high, Plaintiff still must plead facts that make such an inference plausible. *Kabakova v. Off. of the Architect of the Capitol*, Civ. A. No. 19-1276, 2020 U.S. Dist. LEXIS 65101, at *43 (D.D.C. Apr. 14, 2020).  In *Kabakova*, for instance, the Court dismissed a claim for an allegedly discriminatory termination because the plaintiff acknowledged in her complaint that she had been absent from work for one year and alleged that the stated reason for her termination was her absence from work.  *Id.*  Because the complaint failed to plead any facts that could support an inference that her absence from work was not the real reason for her termination, the Court held that the plaintiff there had failed to plausibly plead a discrimination claim.  *Id.* at *45.

Here too Plaintiffs have failed to plead sufficient facts to make it plausible that HUD's initial decision to obtain compliance from the Previous Owner, rather than immediately

terminating the contract and relocating tenants, was a mere pretext for intentional discrimination. Plaintiffs acknowledge that HUD responded to their request for relocation assistance or tenant protection vouchers with the explanation set forth in the December 2, 2019 letter, which is incorporated by reference into the Complaint, and which explains that HUD was first attempting to obtain owner compliance.  (SAC ¶ 50) That approach is consistent with HUD's long-stated "intention to work with owners . . . to the extent possible" before choosing to abate assistance payments. *See* 44 Fed. Reg. 70,361, 70,363 (Dec. 6, 1979) ("HUD will provide assistance in finding eligible families suitable units in other buildings or projects in the event assistance payments are abated. However, it is the Department's intention to work with owners, tenants, and other interested parties to the extent possible to forestall such action[.]").  Plaintiffs have failed to plausibly plead how conduct by HUD that is consistent with such a long-stated intention constitutes intentional discrimination towards them.

While Plaintiffs allege differences in quality between Sandpiper Cove Village compared to that of other Section 8 properties in a majority-white census tract outside of Galveston, the allegation here focuses on alleged discriminatory intent in HUD's selection of certain enforcement actions over others following the issuance of a Notice of Default, not in the relative quality of available Section 8 property as between majority-white and majority-minority areas. (SAC ¶¶ 170-175) As to the claim actually asserted in this case—that is, HUD's alleged failure to choose a specific type of relocation assistance as its enforcement option—Plaintiffs have failed to plead any facts that could raise an inference of intentional discrimination by HUD.  For instance, Plaintiffs have not pled that HUD has taken that type of enforcement action more often in majority-white neighborhoods or properties under comparable circumstances.  Under Plaintiffs' rationale, a plausible inference of intentional discrimination would arise whenever HUD acts consistent with

its long-stated intention to first attempt owner compliance whenever the property at issue is in a predominantly minority neighborhood, and so long as the plaintiff alleges the existence of housing in good repair in a predominantly non-minority neighborhood. *See* 44 Fed. Reg. 70,363 (Dec 6, 1979)  That is insufficient.  *Iqbal*, 556 U.S. at 678 ("[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged but it has not 'show[n] that the pleader is entitled to relief.'"); *Boyd v. Browner*, 897 F. Supp. 590, 594 (D.D.C. 1995) ("The naked assertion that Carver Terrace is an African-American community and that residents of Times Beach, Missouri, and Forest Glen, New York, were 'almost entirely white,' . . . does not begin to establish the requirement of 'similar circumstances,' to establish an Equal Protection violation.)

Plaintiffs also cite in their Complaint to a Supreme Court case, *Arlington Heights,* as guidance on what may be considered evidence of intentional discrimination.  (SAC ¶ 176)  *Arlington Heights* states that "impact alone is not determinative," and evidence of invidious discrimination may be shown through the historical background of a decision, "particularly if it reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at 266-67.  *Arlington Heights* suggests as an example that discriminatory intent might be shown if a property that was zoned for one use was changed to another upon learning of plans to erect integrated housing. *Id*. Plaintiffs here allege no course of action taken because of race, and their only allegations of racial discrimination are that HUD contracted to provide housing assistance in predominantly minority census tracts many years ago and continues to provide assistance in such areas.  (SAC ¶ 71)  Under Plaintiffs' reasoning, decisions occurring decades ago relating to housing subsidies provided in a predominantly minority district raise a plausible inference of

discriminatory intent as to any enforcement decision undertaken by HUD since that time. Such conclusory and speculative assertions fail to satisfy Plaintiffs' pleading burden under *Iqbal*.

**VI.   Plaintiffs' Motion For Preliminary Injunction Should Be Denied.**

Approximately 18 months after filing this lawsuit, Plaintiffs filed a motion for preliminary injunction asking the Court to order HUD to issue Tenant Protection Vouchers, the very relief they seek from the Court in their Second Amended Complaint. However, as explained above, HUD is statutorily empowered to choose any number of actions when a Section 8 project-based rental assistance property fails to meet physical inspection requirements. *See* 133 Stat. 2534, 3005-07. The exercise of such agency discretion is especially essential when, as here, acquiescing to the demands of Plaintiffs could hinder the remediation of the property or result in the loss of affordable housing for the community. Further, Plaintiffs have failed to cite to any authority that states Plaintiffs are entitled to Tenant Protection Vouchers in this situation. Thus, for reasons already addressed above, Plaintiffs have failed to establish a likelihood of success on the merits. Plaintiffs also have failed to establish that they would suffer irreparable harm in the absence of preliminary injunctive relief, or the other requirements for such relief.

**A.   Preliminary Injunction Standard**

A "preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A party seeking preliminary relief must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (quoting *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016)). The moving party bears the burden of persuasion and must demonstrate, "by a clear showing," that the requested relief is warranted. *Hospitality Staffing Solutions, LLC v. Reyes*, 736

F. Supp. 2d 192, 197 (D.D.C. 2010) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).

Before the Supreme Court's decision in *Winter*, courts weighed these factors on a "sliding scale," allowing "an unusually strong showing on one of the factors" to overcome a weaker showing on another. *Damus v. Nielsen*, 2018 WL 3232515, at *4 (D.D.C. 2018). The D.C. Circuit has suggested, without deciding, that *Winter*—which overturned the Ninth Circuit's "possibility of irreparable harm" standard—"should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring Plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm." *Bartko v. Dep't of Just.*, Civ. A. No. 13-1135 (JEB), 2015 WL 13673371, at *1 (D.D.C. Mar. 12, 2015) (citing *Sherley v. Sebelius*, 644 F.3d 388, 392–93 (D.C. Cir. 2011), and *Davis v. Pension Benefit Guar. Corp*, 571 F.3d 1288, 1292 (D.C. Cir. 2009)); *see also League of Women Voters*, 838 F.3d at 7 (declining to address whether "sliding scale" approach is valid after *Winter*).

Even before *Winter*, courts in the D.C. Circuit consistently stressed that "a movant must demonstrate 'at least some injury' for a preliminary injunction to issue." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (quoting *CityFed Fin. Corp. v. Off. of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995)). Thus, "if a party makes no showing of irreparable injury, the court may deny the motion without considering the other factors." *Henke v. Dep't of Interior*, 842 F. Supp. 2d 54, 59 (D.D.C. 2012); *see also Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (same).

A movant alleging "speculative injuries" cannot meet the "'high standard for irreparable injury' sufficient to warrant the extraordinary relief of a TRO," and "the Court need not reach the other factors relevant to the issue of injunctive relief." *United Farm Workers v. Chao*, 593 F.

Supp. 2d 166, 171 (D.D.C. 2009); *see Bartko*, 2015 WL 13673371 at *2 ("The Court need not

grant injunctive relief 'against something merely feared as liable to occur at some indefinite time'")

(quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  "[T]he movant must

demonstrate the injury is of such 'imminence' that there is a clear and present need to equitable

relief to prevent irreparable harm."  *Id.*  And "where a party seeks to change the status quo through

action rather than merely to preserve the status quo—typically the moving party must meet an even

higher standard than in the ordinary case: the movant must show 'clearly' that [it] is entitled to

relief or that extreme or very serious damage will result."  *Farris v. Rice*, 453 F. Supp. 2d 76, 78

(D.D.C. 2006).

      **B.**      **Plaintiffs Have Failed to Meet Their Burden for Preliminary Injunctive Relief.**

     Plaintiffs are not entitled to a preliminary injunction because they fail to satisfy any of

the four requirements justifying such extraordinary relief. To begin with, Plaintiffs cannot show

a likelihood of success on the merits. As explained above, Plaintiffs claims fail for several

reasons: (1) Plaintiffs' APA claims are now moot following the sale of the property, (2) HUD's

actions are committed to agency discretion, (3) Plaintiffs do not challenge any final agency

action, and (4) Plaintiffs fail to identify any legal requirement that HUD take the specific

enforcement actions that Plaintiffs prefer.  Defendant incorporates by reference the discussion

above identifying these threshold legal defects with Plaintiffs' claims.

     Because Plaintiffs' claims are legally deficient, Plaintiffs cannot establish a likelihood of

success on the merits.  For the same reason, it is unnecessary for HUD to respond to the factual

assertions made by Plaintiffs in the declarations submitted with their motion.  Those factual

assertions do not cure the threshold legal deficiencies with Plaintiffs' claims and thus are

immaterial to the request for preliminary injunctive relief.  Defendant is not conceding the factual

assertions made by Plaintiffs, and Defendant's failure to respond to those assertions should not be construed as any concession relating to them.

Plaintiffs fare no better on the other three criteria. As discussed below, Plaintiffs fail to plausibly allege that they are likely to suffer irreparable harm in the absence of preliminary relief or that balance of equities or public interest are in their favor. By contrast, HUD's efforts to facilitate the rehabilitation of the property could be significantly hampered by such an injunction.

> 1.   **Plaintiffs cannot demonstrate they are likely to suffer irreparable harm in the absence of preliminary relief**

A preliminary injunction should be issued only when irreparable injury is likely to occur in the absence of an injunction. *Nat'l Mining Ass'n v. Jackson*, 768 F. Supp. 2d 34, 50 (D.D.C. 2011) (citing *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1 (D.D.C. 2009)). Further, the failure to demonstrate irreparable harm is "grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Id.* (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006)). Finally:

> Proving 'irreparable' injury is a considerable burden, requiring proof that the movant's injury is 'certain, great and actual- not theoretical- and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm.

*Id.* (quoting *Power Mobility Coal. v. Leavitt*, 404 F. Supp. 2d 190 (D.D.C. 2005)).

Plaintiffs repeatedly note that it has been over two years since HUD found the Previous Owner in default. (ECF No. 26-1 at 17, 19, 22, 28, 31). But, what is relevant to the issue of irreparable harm is that Plaintiffs waited almost 18 months after filing their lawsuit before seeking preliminary injunctive relief. That delay, by itself, undermines Plaintiffs' assertion of irreparable harm in the absence of preliminary injunctive relief. *See, e.g., Nat. Res. Def. Council v. Pena*, 147 F.3d 1012, 1026 (D.C. Cir. 1998) ("If the plaintiff has failed to prosecute its claim for injunctive relief promptly, and if it has no reasonable explanation for its delay, the district court

should be reluctant to award relief."); *Independent Bankers Ass'n v. Heimann*, 627 F.2d 486, 488 (D.C. Cir. 1980) ("The venerable maxim vigilantibus non dormientibus aequitas subvenit (equity aids the vigilant, not those who slumber on their rights) requires that a suit in equity, though otherwise meritorious, be dismissed if two requirements are met: (1) unreasonable delay in bringing the claim for relief and (2) prejudice caused by the delay."); *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (denying preliminary injunctive relief and noting that a delay of forty-four days after final regulations were issued was "inexcusable"); *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005) ("This delay in seeking a preliminary injunction has placed defendants and the federal courts in a difficult position. An unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm."); *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp. 2d 30, 43-44 (D.D.C. 2000) (noting that an over two-month delay "further militates against a finding of irreparable harm").

Delay aside, Plaintiffs have failed to meet their burden for additional reasons. Although Plaintiffs attach nearly 1,000 pages of declarations in support of their motion, only three are direct accounts from two tenants, who also happen to be the named Plaintiffs in the matter.[24] (ECF No. 33-35) Those three declarations outline the complaints those two tenants have about the conditions at the Property. While the allegations are serious, the tenants' allegations do not rise to the level of proof that Plaintiffs' injury is "certain, great, actual, and imminent." *Power Mobility*, 404 F. Supp. 2d 190. Furthermore, while Plaintiffs purport to speak for the tenants at the property,

---

[24]     Betty Ann Dergin submitted two declarations, one in a personal capacity and another as the representative of the Sandpiper Residents Association.

at least 60 of the residents support the New Owner's current rehabilitation plan.  (ECF No. 29-12 at ECF p. 3)

Next, Plaintiffs did not seek a preliminary injunction at the time they filed either the original Complaint in June 2020 or when they filed the First Amended Complaint in September 2021.  Plaintiffs do not explain what conditions have changed so drastically since they filed their original and first amended pleading that emergency relief is now necessary.  Indeed, neither tenant declaration lists any specific health concern pertaining to them that has arisen since the filing of their First Amended Complaint that would be exacerbated if this Court does not take the extraordinary step of granting a preliminary injunction.

In addition to the three pages of direct tenant accounts, Plaintiffs cite to two documents prepared by the New Owner (prior to taking possession of the property) that Plaintiffs purport to show that the harms to Plaintiffs are currently life-threatening and "certain and great."  *See* Pl. Exs. 19, 30.  (ECF Nos. 29-1, 29-12)  However, Plaintiffs' Exhibit 30 is a March 4, 2021 letter from the New Owner, prior to taking possession of the property, to the Texas State Affordable Housing Corporation, addressing concerns the organization had regarding the issuance of certain tax credits that were ultimately approved.  (ECF No. 29-12)  Moreover, Plaintiffs' Exhibit 19 is an undated renovation cost estimate prepared by the New Owner prior to the execution of the sale. (ECF No. 29-1)

Plaintiffs assert, without evidence, that the conditions "pose imminent health and safety risks [that are] beyond remediation and cannot be cured by future action." (Pl. Mot. at 18) Plaintiffs make this claim even as the document they cite, Exhibit 30, notes that 60 residents representing 54 units at the property signed onto a letter of support for the rehabilitation of the property. (Exhibit 30 at 3) Further, Plaintiffs' submission reflects that the New Owner's plan includes the temporary

49

relocation of particularly vulnerable tenants while the renovations are ongoing. (ECF No. 28-1 at ECF p. 4; SAC ¶ 8 ("[t]he plan requires the forced relocation of 50% of the current tenants"))

If, indeed, life threatening conditions exist at the property, Plaintiffs are moving for emergency relief against the wrong party in the wrong court. Under Texas state law, tenants have the right to demand that the landlord repair any condition that materially affects their physical health or safety pursuant to §92.052 of the Texas Property Code. Tenants can file a petition and obtain a repair order pursuant to §92.0563. The Texas Attorney General advises tenants:

> You have a right to demand that the landlord repair any condition that materially affects your physical health or safety. § 92.052.
>
> Justices of the peace have authority to order landlords to repair or remedy conditions affecting a tenant's physical health or safety, as long as the cost of the repair does not exceed $10,000. Tenants can go to justice court without an attorney to obtain a repair order. § 92.0563.

Website of the Texas Attorney General, Renters' Rights, https://www.texasattorneygeneral.gov/ consumer-protection/home-real-estate-and-travel/renters-rights.[25]   Even without going to court, tenants could file for code enforcement with the Code Enforcement Division of the City of Galveston.[26] It bears repeating that HUD is not the landlord and has no physical control over the Property. Plaintiffs have all rights against their landlord (under state law and the terms of their leases) as all tenants in private housing have.

Further, the issuance of Tenant Protection Vouchers would not be an immediate solution to Plaintiffs' alleged emergency situation. First, even if HUD were to issue such vouchers, HUD

---

[25]    Similarly, the Texas State Law Library has a section on Repairs discussing how tenants can go to local courts to force a landlord to repair a problem if it "materially affects the physical health or safety of an ordinary tenant." https://guides.sll.texas.gov/landlord-tenant-law/repairs.

[26]    *See* https://www.galvestontx.gov/447/Code-Enforcement

does not directly administer the voucher program, and would need to select a voucher administrator to administer the vouchers. 42 U.S.C. 1437a(b)(6). After a voucher administrator is selected, tenants would then need to find an available unit being rented by a private landlord. *Inclusive Cmtys. Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 900 (5th Cir. 2019). And, after the tenant finds an available unit, the unit would have to be inspected to ensure the unit meets HUD's Housing Quality Standards. 42 U.S.C. §1437f(o)(8); 24 C.F.R. Part 982. Accordingly, the requested relief would not remedy any asserted emergency on which Plaintiffs seek the extraordinary remedy of preliminary injunctive relief.

### 2. The balance of equities and public interest are not in Plaintiffs' favor

Plaintiffs rightly note that when the Defendant is the government, the final two factors— balance of equities and public interest—merge. *Pursuing Am.'s Greatness v. FEC,* 831 F.3d 500, 511 (D.C. Cir. 2016). The D.C. Circuit has observed that the agency's "harm and the public interest are one and the same, because the government's interest is the public interest." *Id*.

In seeking preliminary injunctive relief, Plaintiffs fail to acknowledge HUD's goal to rehabilitate the Property, which many of Plaintiffs' neighbors support. (See SAC ¶¶ 8, 45; *see also* Pl. Mot. at 9, 18.; ECF No. 29-12 at ECF p.3) Project-based Section 8 owners rely, in part, on rent payments from tenant to fund the operation and remediation of conditions at those properties. If HUD is forced to provide Tenant Protection Vouchers any time plaintiffs complain about conditions at a property, an owner's ability to finance repairs would be significantly hindered without those tenants' rental payments. Issuing a preliminary injunction in this case, before the New Owner has had an opportunity to enact its renovation plan, could cause an exodus from the property, severely hindering the New Owner's and HUD's efforts to remediate the remaining deficiencies at the property. Ultimately, the disruption of tenant rent, when HUD believes the property can be remediated, could have serious consequences. Notably, as a result, HUD could be

forced to abate and/or terminate the Housing Assistance Payment contract altogether. Further, an influx in vacant units could leave the Property more vulnerable to crime and disrepair.

Further, the precedent set by issuing this injunction could have far ranging impact on the project-based Section 8 program. The Tenant Protection Voucher program's limited funds are not solely meant to assist tenants who reside in project-based assisted units, but other HUD-assisted families as well. For example, tenants of Section 9 public housing units, of which there are nearly 970,000 across the country, are also eligible to receive Tenant Protection Vouchers when they are displaced by Public Housing action such as demolitions or conversions. If Plaintiffs can now force HUD to issue Tenant Protection Vouchers any time a Notice of Default is issued and a tenant proclaims the unit is an imminent health and safety risk, HUD would undoubtedly see an unprecedented influx of families being issued vouchers, which would strain HUD's Tenant Protection Voucher fund, directing the limited funds away from other families with greater need for them.

HUD relies on the discretion conferred on it by Congress to determine the best course of action to remedy poor conditions at Section 8 properties. If Plaintiffs can pick and choose which enforcement tools HUD must use in any situation, that deference is stripped from HUD. Accordingly, because Plaintiffs fail to meet any of the factors necessary to compel a preliminary injunction, this Court should deny Plaintiffs' motion.

## CONCLUSION

For the foregoing reasons, this Court should deny Plaintiffs' Motion for Preliminary Injunction, and dismiss this action with prejudice.

Respectfully submitted,

MATTHEW M. GRAVES, D.C. BAR #481052
United States Attorney

BRIAN P. HUDAK
Acting Chief, Civil Division

By: _____/s/_____
JEREMY S. SIMON, D.C. BAR #447956
Assistant United States Attorney
Civil Division
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-2528
Jeremy.Simon@usdoj.gov

Counsel for Defendant