**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SANDPIPER RESIDENTS ASSOCIATION, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 20-1783 (RDM) |
| UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, | |
| *Defendant*. | |

## <u>MEMORANDUM OPINION</u>

Compass Pointe Apartments, also known as Sandpiper Cove, is a privately owned apartment complex in Galveston, Texas, that is subsidized by the U.S. Department of Housing and Urban Development ("HUD") through a contract with Sandpiper Cove's owner under HUD's Project Based Rental Assistance ("PBRA") program. HUD's contract with the property owner and HUD regulations require the owner to maintain the apartment's PBRA units in decent, safe, and sanitary condition. In this action, Plaintiffs—two tenants and the tenant association of Sandpiper Cove—allege that Sandpiper Cove's owner has failed to maintain the apartment's units in a habitable condition, in violation of the owner's contractual and regulatory obligations. In May 2019, HUD shared that assessment and issued a Notice of Default to Sandpiper's prior owner, after an inspection found an array of deficiencies, including missing or inoperable smoke detectors, pest infestations, leaking or clogged pipes, missing or inoperable kitchen appliances, holes in walls, and damaged doors.

Plaintiffs do not, however, bring this action against the owner of the property. Rather, they have sued HUD on the theory that issuance of the Notice of Default, along with imminent

health and safety risks to the tenants posed by the deplorable conditions at the apartment complex, triggered an obligation by HUD to provide "Tenant Protection Vouchers" to the Sandpiper Cove tenants. Those vouchers, in turn, would enable the tenants to relocate to different housing that meets HUD's decent, safe, and sanitary standard. On Plaintiff's telling, HUD's failure to issue the vouchers violates the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and amounts to intentional discrimination on the basis of race and ethnicity in violation of the Fifth Amendment and the Fair Housing Act, 42 U.S.C. § 3604(a). As a result, Plaintiffs seek an injunction compelling HUD to issue Tenant Protection Vouchers to any qualified Sandpiper Cove tenant who wishes to leave the complex. Dkt. 25 at 59–60 (2d Am. Compl. ¶ 212).

Before the Court is Plaintiff's motion for a preliminary injunction, Dkt. 26, and HUD's motion to dismiss the complaint for lack of jurisdiction and for failure to state a claim, Dkt. 36. For the reasons set forth below, the Court will **DENY** Plaintiff's motion for a preliminary injunction and will **GRANT** HUD's motion to dismiss.

## I. BACKGROUND

### A.   Statutory Background

Section 8 of the United States Housing Act authorizes HUD to provide financial assistance to "aid[] low-income families in obtaining a decent place to live" and to "promot[e] economically mixed housing." 42 U.S.C. § 1437f(a). Under the Act, HUD may disburse this assistance through various programs, which generally take on one of two forms: (1) "tenant-based assistance," in which assistance is linked to individual households, or (2) "project-based assistance," in which assistance is linked to specific housing units and payments are made to the units' owners pursuant to a Housing Assistance Payment contract. *See id.* § 1437f(b), (f)(6)–(7), (*o*); *see also* 24 C.F.R. §§ 886.309, 982.1(b)(1).

2

Tenant-based assistance is provided through the Housing Choice Voucher Program, which is funded by HUD but administered by local public housing authorities.  Under this program, local public housing agencies issue housing vouchers to individual households based on availability and need.  *See* 42 U.S.C. § 1437f(*o*)(6).  Once a household is issued a voucher, it is responsible for finding a housing unit and a landlord who is willing to rent to it, which it must then submit to the public housing authority for approval.  24 C.F.R. § 982.302(a)–(b).  The public housing authority undertakes a process to approve the tenancy, which includes an inspection of the unit, an analysis to determine if the rent is reasonable, and a review of the owner.  *See id.* §§ 982.305, 982.306.  Once the tenancy is approved, HUD makes monthly financial assistance payments equal to the amount by which the household's rent exceeds a certain percentage of its monthly income.  42 U.S.C. § 1437f(*o*)(2)(A).

The units in question at Sandpiper Cove are subsidized through project-based assistance, not tenant-based assistance.  Under a project-based assistance program, HUD does not have a contractual relationship with tenants.  Instead, HUD enters into Housing Assistance Payments ("HAP") contracts with private landlords to designate certain units they own as project-based assistance units.  *Id.* § 1437f(c).  These contracts set forth the terms under which HUD will make annual assistance payments to landlords and subject the landlords to HUD oversight and enforcement.  *Id.*  The landlords, in turn, enter into private lease agreements directly with tenants.  *Id.* § 1437f(d)(1)(B).  HUD does not select the tenants who live in project-based assistance units; rather, landlords are authorized to select their own tenants, subject to any preferences or restrictions placed by the statute or the applicable HAP contract.  *Id.* § 1437f(d)(1)(A).  Tenants then make rental payments to their landlord based on their income and ability to pay, *Cisneros v. Alpine Ridge Grp.*, 508 U.S. 10, 12 (1993); *see* 42 U.S.C.

§§ 1437a(a), 1437f(c), and HUD pays the landlord the "difference between the tenant's contribution and a 'contract rent' agreed upon by the landlord and HUD," *Cisneros*, 508 U.S. at 12; 42 U.S.C. § 1437f(c)(2)(C)(3).  As of 2021, approximately 1.2 million households received project-based rental assistance at 17,200 multifamily housing properties.  *See* U.S. Dep't of Housing & Urban Dev., *Fiscal Year 2021 Congressional Justifications* 21-1, https://www.hud.gov/sites/dfiles/CFO/documents/FY21_HUDCongressionalJustifications.pdf.

HUD has promulgated numerous regulations implementing its housing assistance programs, including under Section 8.  *See* 24 C.F.R. pt. 5 (general HUD program requirements); 24 C.F.R. pt. 886 (Section 8 program requirements).  Among many other things, these regulations require PBRA unit owners to provide housing that is "decent, safe, sanitary, and in good repair" and to "provide all the services, maintenance, and utilities" required by the owner's HAP contract with HUD.  *Id.* §§ 5.703, 886.123(a).  To satisfy these conditions, owners must comply with various "physical condition standards," which generally require HUD housing to be "structurally sound," "secure," "habitable," and "free of health and safety hazards."  *Id.* § 5.703(a)–(f).  In addition to these standards, HUD housing owners must continue to comply with "State and local codes for building and maintenance," which the HUD regulations "do not supersede or preempt."  *Id.* § 5.703(g).

HUD ensures compliance with these requirements through periodic inspections, *id.* § 886.123(c), which are performed by HUD's Real Estate Assessment Center ("REAC"), *id.* § 200.857(a)(1).  The REAC inspects a sample of a property's units and then scores the property on a 100-point numerical scale.  *Id.* § 200.857.  A PBRA property fails its REAC inspection if it receives a score of 60 or less.  *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 219(b) & (c), 134 Stat. 1182, 1897-98 (2020).  Under the 2021 Consolidated Appropriations

Act (the "Act"), a failing REAC score triggers a mandatory enforcement action by HUD, which is required, within fifteen days, to "[p]rovide the owner with a Notice of Default" that includes "a specified timetable, determined by [HUD], for correcting all deficiencies." *Id.* at § 219(c)(1), 134 Stat. at 1898.

The Act then prescribes a range of discretionary enforcement actions that HUD "may" take "if the owner fails to fully correct [the] deficiencies" within the specified timetable, including:

> (A) requir[ing] immediate replacement of project management with a project management agent approved by the Secretary;
>
> (B) impos[ing] civil money penalties, which shall be used solely for the purpose of supporting safe and sanitary conditions at applicable properties, as designated by the Secretary, with priority given to the tenants of the property affected by the penalty;
>
> (C) abat[ing] the [S]ection 8 contract, including partial abatement, as determined by the Secretary, until all deficiencies have been corrected;
>
> (D) pursu[ing] transfer of the project to an owner, approved by the Secretary under established procedures, which will be obligated to promptly make all required repairs and to accept renewal of the assistance contract as long as such renewal is offered;
>
> (E) transfer[ing] the existing [S]ection 8 contract to another project or projects and owner or owners;
>
> (F) pursu[ing] exclusionary sanctions, including suspensions or debarments from Federal programs;
>
> (G) seek[ing] judicial appointment of a receiver to manage the property and cure all project deficiencies or seek[ing] a judicial order of specific performance requiring the owner to cure all project deficiencies;
>
> (H) work[ing] with the owner, lender, or other related party to stabilize the property in an attempt to preserve the property through compliance, transfer of ownership, or an infusion of capital provided by a third-party that requires time to effectuate; or
>
> (I) tak[ing] any other regulatory or contractual remedies available as deemed necessary and appropriate by the Secretary.

*Id.* at § 219(c)(2), 134 Stat. 1898.

One option available to HUD under the Act is to issue Tenant Protection Vouchers to residents in the affected property.  Tenant Protection Vouchers are a specific form of tenant-based rental assistance authorized annually through a lump-sum congressional appropriation. *See* PIH Notice 2021-10 at 4–7 (Mar. 24, 2021).  The relevant paragraph of the 2021 Consolidated Appropriations Act provides in part:

> $116,000,000 shall be for [S]ection 8 rental assistance for relocation and replacement of housing units that are demolished or disposed of pursuant to Section 18 of the Act, conversion of [S]ection 23 projects to assistance under [S]ection 8, the family unification program under [S]ection 8(x) of the Act, relocation of witnesses in connection with efforts to combat crime in public and assisted housing pursuant to a request from a law enforcement or prosecution agency, enhanced vouchers under any provision of law authorizing such assistance under [S]ection 8(t) of the Act, Choice Neighborhood vouchers, mandatory and voluntary conversions, and tenant protection assistance including replacement and relocation assistance or for project-based assistance to prevent the displacement of unassisted elderly tenants currently residing in [S]ection 202 properties financed between 1959 and 1974 that are refinanced pursuant to Public Law 106-569, as amended, or under the authority as provided under this Act[.]

134 Stat. at 1869.[1]  The paragraph then places several conditions on the use or issuance of Tenant Protection Vouchers.  As relevant here, one of these conditions states:

> [T]he Secretary may provide [S]ection 8 rental assistance from amounts made available under this paragraph for units assisted under a project-based subsidy contract funded under the "Project-Based Rental Assistance" heading under this title *where the owner has received a Notice of Default and the units pose an imminent health and safety risk to residents*[.]

---

[1] Substantially the same language has appeared in prior years' appropriations, with the only difference being the amount appropriated.  *See* Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, div. G, tit. II, 133 Stat. 13, 435–36; Consolidated Appropriations Act, 2020, Pub. L. No. 116-94, div. L, tit. II, "Public and Indian Housing," "Tenant-Based Rental Assistance," ¶ 2, 133 Stat. 2534, 2976 (2019).

*Id.* (emphasis added).  Thus, Congress has authorized HUD to issue vouchers to tenants of a PBRA property if, and only if, (1) the property owner has received a Notice of Default and (2) the tenants' PBRA units not only fail the decent, safe, and sanitary requirement, but also pose an "imminent health and safety risk to residents."

**B.     Factual Background**

Sandpiper Cove became a project-based rental assistance property in 1984, when HUD, through its contract administrator the Southwest Housing Compliance Corporation, executed a HAP contract with the owner of the apartment complex for a term of five years.  *See* Dkt. 36-2 at 2 (Gamez Decl. ¶ 3).  In the ensuing years, Sandpiper Cove's HAP contract has been renewed multiple times, most recently in 2012 for a term of twenty years.  Dkt. 25 at 23 (2d Am. Compl. ¶ 61).  At the time of the 2012 renewal, the owner of the property was Sandpiper Cove Apartments, LLC.  *Id.*  In March 2015, Sandpiper Cove's HAP contract was assigned (with HUD approval) to Compass Pointe Apartments, LLC (the "Previous Owner").  *Id.*

On May 8, 2019, the REAC conducted an onsite inspection of Sandpiper Cove.  *Id.* at 24 (2d Am. Compl. ¶ 65).  The resulting report gave the property a score of 33c out of a possible 100 points and listed six categories of deficiencies found in many of the units examined: (1) missing or inoperable smoke detectors; (2) insect and roach infestations; (3) poor plumbing, including leaking faucets and pipes and clogged drains; (4) inoperable, damaged, or missing kitchen ranges and stoves; (5) damaged walls and ceilings; and (6) damaged door frames and windows.  *Id.* at 5, 11 (2d Am. Compl. ¶¶ 3, 19); *see also* Dkt. 36-2 at 18.  Based on the property's failing REAC score, HUD issued a Notice of Default to the Previous Owner on May 15, 2019.  Dkt. 25 at 5 (2d Am. Compl. ¶ 3).  That notice gave the Previous Owner sixty days to "[c]onduct a survey of the entire Project, identifying all physical deficiencies" and to "[c]orrect

all physical deficiencies identified at the Project from the Owner's survey and REAC's inspection report." *Id.* at 11–12 (2d Am. Compl. ¶ 20).

In response to the Notice of Default, the Previous Owner submitted an "Action Plan" to HUD, which HUD approved on September 16, 2019. Dkt. 36-2 at 2 (Gamez Decl. ¶ 7). The Action Plan included a survey of the property, the status of the deficiencies that had been identified, and a plan and estimated time frame for correcting those deficiencies. *Id.* HUD approved updated Action Plans on October 7, 2019; July 28, 2020; and July 14, 2021. *Id.* In addition to the Action Plan, HUD required the Previous Owner to replace its management company at Sandpiper Cove, and on April 1, 2020, the Previous Owner hired J. Allen Management Co. ("J. Allen") to run the property. *Id.* at 3 (Gamez Decl. ¶ 8).

Through the efforts of the new management company, the Previous Owner made certain repairs to the property pursuant to the Notice of Default and Action Plan. *Id.* (Gamez Decl. ¶ 9). In particular, the management company improved the plumbing at the property, repaired inoperable air conditioning and heating units, corrected electrical issues with several building lights, fixed potholes and tripping hazards in the parking lot and walkways, and repaired fences and bannisters. Dkt. 25 at 12–13 (2d Am. Compl. ¶ 23). J. Allen also undertook "make ready" repairs and painting for 26 units between April 2020 and May 2021. *Id.* at 12 (2d Am. Compl. ¶ 23). HUD monitored the status of repairs and improvements at the property at bi-weekly meetings with the Previous Owner, the new management company, and HUD's contract administrator. Dkt. 36-2 at 3 (Gamez Decl. ¶ 10).

These repairs did not, however, address several of the deficiencies cited in the Notice of Default, including problems with smoke detectors, insect infestations, damaged or missing kitchen appliances, damaged walls and ceilings, and damaged doors and windows. Dkt. 25 at 13

8

(2d Am. Compl. ¶ 25).  According to Plaintiffs, those deficiencies still had not been corrected as of November 2021, when they filed their second amended complaint. *Id.* (2d Am. Compl. ¶ 26).

As part of its enforcement strategy, HUD encouraged a sale of Sandpiper Cove to a new, rehabilitation-focused owner. *See id.* at 20–22 (2d Am. Compl. ¶¶ 53–58).  In a letter to a state housing agency, HUD expressed its commitment to "retaining and preserving" Sandpiper Cove because the "market for affordable housing is very limited on Galveston Islands, and [Sandpiper Cove] is the only Project Based Section 8 housing on the Island." *Id.* at 21 (2d Am. Compl. ¶ 54).  In early 2021, the Previous Owner proposed a sale of the property to Galveston 3916 Winnie Street GP, LLC (the "New Owner"). *Id.* at 20–21 (2d Am. Compl. ¶ 53).  HUD supported the sale, citing the New Owner's "proven track record of successfully obtaining and turning around other similarly distressed and troubled affordable properties." *Id.* at 21 (2d Am. Compl. ¶ 53).  The Previous Owner and New Owner executed the sale of the property on October 15, 2021, and HUD approved the assignment of the HAP contract to the New Owner on October 29, 2021.  Dkt. 36-2 at 3 (Gamez Decl. ¶¶ 11–12).  According to HUD, this "approval concluded the enforcement action based on the Notice of Default that had been issued to the Previous Owner on May 15, 2019." *Id.* at 3 (Gamez Decl. ¶ 12).

The New Owner plans to make significant improvements to the property and to that end has secured $16.7 million in financing, for an average of $86,900 per unit. *Id.* (Gamez Decl. ¶ 13).  The proposed improvements include new roofs, plumbing, flooring, cabinetry, countertops, fixtures, appliances, and paint. *Id.*  As of December 2021, construction was set to begin in February 2022, *id.*, and is expected to last fifteen months, Dkt. 25 at 16 (2d Am. Compl. ¶ 37).  Although many of the issues identified in the 2019 REAC inspection remain uncorrected pending that rehabilitation effort, *see id.* at 15 (2d Am. Compl. ¶¶ 32–35), to date, HUD has not

found the New Owner to be in breach of the HAP contract and has not issued a Notice of Default to the New Owner, Dkt. 36-2 at 4 (Gamez Decl. ¶ 14).

**C.**     **Procedural Background**

Plaintiffs commenced this action on June 30, 2020.  Dkt. 1 (Compl.).  On October 30, 2020, HUD moved to transfer the case to the Southern District of Texas pursuant to 28 U.S.C. § 1404(a), Dkt. 13, which Plaintiffs opposed, Dkt. 14.  On June 23, 2021, the Court denied HUD's motion in a Memorandum Opinion and Order, Dkt. 17, concluding that HUD had "failed to carry its burden of demonstrating that the Southern District of Texas constitutes a more convenient forum than this one," *id.* at 6.

On September 8, 2021, HUD moved to dismiss the complaint for lack of jurisdiction and for failure to state a claim.  Dkt. 20.  Plaintiffs responded by amending their complaint, Dkt. 21 (Am. Compl.), and, in light of that development, the Court denied HUD's motion to dismiss Plaintiffs' original complaint as moot, Minute Order (Sept. 22, 2021).  Nearly two months later, on November 15, 2021, Plaintiffs amended their complaint a second time (with HUD's consent). Dkt. 25 (2d Am. Compl.); *see* Dkt. 24.  Plaintiffs amended their complaint to eliminate their claim based on a regulation, 24 C.F.R. § 886.323(e), which arguably imposed a mandatory requirement that HUD issue vouchers if an owner (1) fails to maintain a dwelling in a decent, safe, and condition; (2) the owner fails to take corrective action; and (3) the tenant "wishes to be rehoused in another dwelling unit."  As Plaintiffs explained, they dropped this claim because "counsel have been unable to confirm that the Sandpiper Cove PBRA project was the subject of the sale of HUD-owned multifamily rental housing projects or to the foreclosure of a HUD-held mortgage" and, thus, could not confirm that § 886.323 applies to Sandpiper Cove.  Dkt. 24 at 2. And, although the regulation applicable in this case is similar in some respects to § 886.323, "it does not include the assistance provision [that is] set out" in § 886.323.  *Id.*  On the same day

that Plaintiffs filed their second amended complaint, they also moved for a preliminary

injunction, Dkt. 26.  On December 17, 2021, HUD opposed the motion for a preliminary

injunction and moved to dismiss the second amended complaint for lack of jurisdiction and for

failure to state a claim, Dkt. 36.

## II.  LEGAL STANDARD

### A.    Federal Rule of Civil Procedure 12(b)(1)

Federal courts are courts of limited subject-matter jurisdiction and "possess only that

power authorized by the Constitution and statute."  *Kokkonen v. Guardian Life Ins. Co. of Am.*,

511 U.S. 375, 377 (1994).  Given "the nature and limits of the judicial power of the United

States," the Court must assess its jurisdiction "as a threshold matter" and may not decide the

merits of a case without first addressing the issue of jurisdiction.  *Steel Co. v. Citizens for a*

*Better Env't*, 523 U.S. 83, 94–95 (1998) (quoting *Mansfield, C. & L.M. Ry. Co. v. Swan*, 111

U.S. 379, 382 (1884)).  The plaintiff bears the burden of establishing jurisdiction.  *Kokkonen*,

511 U.S. at 377.  "[S]ubject matter jurisdiction may not be waived."  *NetworkIP, LLC v. FCC*,

548 F.3d 116, 120 (D.C. Cir. 2008) (quotation marks omitted).

A motion to dismiss under Rule 12(b)(1) challenges the Court's jurisdiction to hear a

claim and may raise a "facial" or "factual" challenge to the Court's jurisdiction.  *See Hale v.*

*United States*, No. 13-1390, 2015 WL 7760161, at *3–4 (D.D.C. Dec. 2, 2015).  A facial

challenge to the Court's jurisdiction contests the legal sufficiency of the jurisdictional allegations

contained in the complaint.  *See Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006).

For a facial challenge, the Court must accept the allegations of the complaint as true and must

construe "the complaint in the light most favorable to the non-moving party."  *Id.*; *see I.T.*

*Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1188 (D.C. Cir. 2003).  In this sense,

the Court must resolve the motion in a manner similar to a motion to dismiss under Rule

12(b)(6).  *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).

Alternatively, a Rule 12(b)(1) motion may pose a "factual" challenge to the Court's jurisdiction.  *Erby*, 424 F. Supp. 2d at 182–83.  For factual challenges, the Court "'may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant,' but 'must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss.'"  *Id.* (quoting *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).  In this context, the factual allegations of the complaint are not entitled to a presumption of validity, and the Court is required to resolve factual disputes between the parties.  *Id.* at 183.  The Court may consider the complaint, any undisputed facts, and "the [C]ourt's resolution of disputed facts."  *Id.* (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

A motion to dismiss a complaint as moot is properly brought under Rule 12(b)(1) because mootness deprives the court of jurisdiction.  *See DL v. District of Columbia*, 187 F. Supp. 3d 1, 5 (D.D.C. 2016).  "Federal courts lack jurisdiction to decide moot cases because their constitutional authority extends only to cases or controversies."  *Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013) (quoting *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983)).  A case becomes moot "when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome."  *Larsen v. U.S. Navy*, 525 F.3d 1, 3 (D.C. Cir. 2008) (quotation marks omitted).  A party lacks a legally cognizable interest in the outcome of a case "when, among other things, the court can provide no effective remedy because a party has already obtained all the relief [it has] sought," *Conservation Force, Inc.*, 733 F.3d at 1204 (quotation marks omitted), or "when intervening events make it impossible to grant the

prevailing party effective relief," *Lemon v. Geren*, 514 F.3d 1312, 1315 (D.C. Cir. 2008) (quotation marks omitted); *see also Spencer v. Kemna*, 523 U.S. 1, 18 (1998) (noting that a case is moot when "there is nothing for [the court] to remedy, even if [it] were disposed to do so"). The "heavy burden" of establishing mootness rests on the party raising the defense. *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979); *Motor & Equip. Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 458–59 (D.C. Cir. 1998).

**B.      Federal Rule of Civil Procedure 12(b)(6)**

A motion to dismiss for failure to state a claim upon which relief can be granted under Rule 12(b)(6) "tests the legal sufficiency of the complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In evaluating a Rule 12(b)(6) motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim to relief,' and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face.'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (alterations in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)).  The complaint, however, need not include "detailed factual allegations" to withstand a Rule 12(b)(6) motion.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007).  A plaintiff may survive a Rule 12(b)(6) motion even if "recovery is . . . unlikely," so long as the facts alleged in the complaint are "enough to raise a right to relief above the speculative level." *Id.* at 555–56 (quotation marks omitted).  For the purposes of assessing a Rule 12(b)(6) motion, the Court may consider only "the facts contained within the four corners of the complaint, along with any documents attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record." *Afanasieva v. Wash. Metro. Area Transit Auth.*, No. 21-1881, 2022 WL 621398, at *3 (D.D.C. Mar. 3, 2022) (quotation marks omitted).

**C.**    **Federal Rule of Civil Procedure 65**

A preliminary injunction "is an extraordinary remedy never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), but "only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). To secure a preliminary injunction, a plaintiff "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

Before the Supreme Court's decision in *Winter*, the D.C. Circuit applied a "sliding-scale" approach to the preliminary injunction analysis under which "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). Since *Winter*, however, the court of appeals has "suggested, without deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring a plaintiff to independently demonstrate both a likelihood of success on the merits and irreparable harm." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 205 F. Supp. 3d 4, 26 (D.D.C. 2016) (quoting *Sherley*, 644 F.3d at 392–93); *see also Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (observing that *Winter* may be "properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned").

Before the Court may consider whether Plaintiffs have met their burden with respect to these factors, however, the Court must first confront whether it has jurisdiction over Plaintiffs' suit. *See Steel Co.*, 523 U.S. at 94–95. "This inquiry is antecedent to the question of preliminary relief because, where a court lacks jurisdiction, a plaintiff is 'not entitled to any relief, let alone the extraordinary remedy of a preliminary injunction.'" *McCray v. Biden*, No. 21-2882, 2021

14

WL 5823801, at *5 (D.D.C. Dec. 7, 2021) (quoting *Schindler Elevator Corp. v. Wash. Metro. Area Transit Auth.*, 514 F. Supp. 3d 197, 212 (D.D.C. 2020)).

## III.  ANALYSIS

HUD presses several arguments in favor of dismissal.  First and foremost, HUD argues that the Court lacks jurisdiction because the sale of Sandpiper Cove to a new owner rendered Plaintiffs' APA claims moot.  Dkt. 36 at 27–31.  Even if Plaintiffs claims are not moot, however, HUD maintains that the complaint fails to state a claim upon which relief can be granted because the issuance of Tenant Protection Vouchers is committed to agency discretion by law, *id.* at 31–39; Plaintiffs have not identified a "final agency action" that is reviewable under the APA, *id.* at 40–42; and HUD does not have a legal duty to issue Tenant Protection Vouchers such that it may be compelled to do so under the APA, *id.* at 42–45.  With respect to Plaintiffs' intentional discrimination claims, HUD argues that dismissal is warranted because Plaintiffs' statutory claim is barred by sovereign immunity, *id.* at 46–47, and because the complaint fails adequately to plead discriminatory intent, *id.* at 47–51.

For the reasons that follow, the Court concludes that Plaintiffs' APA and intentional discrimination claims are moot, and, accordingly, will grant HUD's motion to dismiss for lack of jurisdiction and will deny Plaintiffs' motion for a preliminary injunction.

### A.    Administrative Procedure Act Claims

In their second amended complaint, Plaintiffs allege that HUD's decision to withhold Tenant Protection Vouchers from Plaintiffs violates the Administrative Procedure Act because it was arbitrary, capricious, an abuse of discretion, and not in accordance with the 2021, 2020, and 2019 Appropriations Acts or HUD's affirmative statutory duty to promote fair housing under 42 U.S.C. § 3608(e)(5).  In response, HUD maintains that it no longer has the statutory authority to

issue the Tenant Protection Vouchers because the Notice of Default issued to the Previous Owner lapsed upon the transfer of the HAP contract to a New Owner and no new Notice of Default has issued against the New Owner. As a result, according to HUD, Plaintiffs' APA claims are now moot. The Court agrees with HUD and will therefore dismiss Plaintiffs' APA claims for lack of jurisdiction.

As explained above, the Consolidated Appropriations Act places two conditions on the issuance of Tenant Protection Vouchers to PBRA tenants: (1) "the owner" of the PBRA units at issue "has received a Notice of Default," and (2) "the units [assisted under the project-based subsidy contract] pose imminent health and safety risks to residents." 134 Stat. at 1869. Those requirements are necessary conditions: If both are met, then HUD "may" issue the vouchers; but if either condition is unmet, then HUD lacks authority to do so. *See* U.S. Const. art. I, § 9, cl. 7 ("No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.").

All agree that HUD issued a Notice of Default to the Previous Owner in May 2019. The problem for Plaintiffs, however, is that HUD has not issued a Notice of Default to the New Owner. That means that "the owner" of the PBRA units has not "received a Notice of Default," and, consequently, one of the two statutory preconditions for the issuance of Tenant Protection Vouchers to Sandpiper Cove residents is missing. Plaintiffs resist this conclusion on four grounds, none of which is persuasive.

*First*, they maintain that the Notice of Default issued to the Previous Owner remains extant, and so the sale of the property and assignment of the HAP does not pose an obstacle to the issuance of Tenant Protection Vouchers. Dkt. 39 at 25. On Plaintiffs' telling, all that matters for present purposes is that a Notice of Default *was* issued to the *then-current* owner of the

16

property and that the deficiencies noted in the Notice of Default have not yet been corrected. *Id.* at 21.  And although Plaintiffs acknowledge that the relevant PBRA units now have a new owner, they contend that the sale of the property and assignment of the HAP contract "did not extinguish or otherwise cause the Notice of Default to cease to exist." *Id.* at 25.  Rather, in their view, "[t]he Notice of Default continues to be the predicate for the compliance plan," which is premised on "the need to remedy the conditions in breach of the obligation to provide decent, safe, and sanitary housing [that are specified in] the Notice of Default." *Id.*  This theory fails for several reasons.

Starting with the statutory text, as the Court must, *see Sebelius v. Cloer*, 569 U.S. 369, 376 (2013), Plaintiffs' reading of the 2021 Consolidated Appropriations Act is untenable.  The Act provides that HUD may issue Tenant Protection Vouchers only "where *the* owner has received a Notice of Default," 134 Stat. at 1869 (emphasis added).  The statute, notably, does not say "*an* owner," nor does it permit the issuance of vouchers "where a Notice of Default has been issued with respect to the *property*."  Rather, HUD may issue Tenant Protection Vouchers only if, at the time of the issuance of such vouchers, a Notice of Default has been received by *the* owner of the property.  Because the owner of Sandpiper Cove is the New Owner, and the New Owner has not received a Notice of Default, this condition is no longer satisfied.

In construing statutes, courts often look "to Congress's choice of verb tense to ascertain a statute's temporal reach." *Carr v. United States*, 560 U.S. 438, 447 (2010).  Here, that endeavor is complicated by the fact that Congress used the present perfect tense in the 2021 Consolidated Appropriations Act.  The present perfect tense draws a link between the present and the past through the use of a present tense auxiliary verb (here, "has") and a past participle (here, "received").  *See* Chi. Manual of Style § 5.132 (17th ed. 2017); *see also id.* §§ 5.103, 5.110,

5.153.  Both verbs apply to the same subject (here, "the owner") and operate with respect to the same object (here, the "Notice of Default").  Although the present perfect tense is imprecise in certain respects (that is, it typically refers to some *undefined* point in the past), that imprecision has no bearing on the question presented here, which simply asks whether the Secretary is authorized to issue Tenant Protection Vouchers when, at the time the Secretary acts, the current owner has not received a Notice of Default.  Under the plain language of the provision, the answer to that question is plain: The Secretary may issue Tenant Protect Vouchers if and only if (1) at the time the Secretary acts, "*the* owner" "*has*" (present tense), (2) "*received* a Notice of Default" (past tense).  The problem Plaintiffs face is that *at the present time*, the owner of Sandpiper Cove *did not at some undefined point in the past* receive a Notice of Default.  Where, as here, the statutory text is unambiguous, "that is the end of [the] judicial inquiry 'in all but the most extraordinary circumstances,'" *United States v. Braxtonbrown–Smith*, 278 F.3d 1348, 1352 (D.C. Cir. 2002) (quoting *Estate of Cowart v. Nicklos Drilling Co*., 505 U.S. 469, 474 (1992)).

In response to this clear statutory text, Plaintiffs invoke the legislative history of the provision, which they contend shows that "Congress provided these tenant protection vouchers and standards for the issuance of these vouchers for this exact situation."  Dkt. 39 at 34.  In support of that contention, they quote a length from a floor statement made by the provision's sponsor, Senator Marco Rubio.  But even if (contrary to settled precedent) the Court could "resort to legislative history to cloud a statutory text that is clear," *Ratzlaf v. United States*, 510 U.S. 135, 147–48 (1994), Senator Rubio's floor statement sheds no light on the question presented in this case.  To be sure, his statement highlights the deplorable conditions that exist at some PBRA apartment complexes around the country and the failure of certain owners to remedy those conditions, and it stresses the need to make Tenant Protection Vouchers available

to "tenants living in units where the owner has been declared in default of a HUD Housing Assistance Payments contract due to physical deficiencies." 162 Cong. Rec. S2946 (daily ed. May 18, 2016). But that says nothing about whether Congress intended to make Tenant Protection Vouchers available where a new owner has acquired the property and HUD has not found *that* owner in default.

*Second*, to the extent that any question remains as to whether the Notice of Default might have transferred to the New Owner along with the assignment of the HAP contract—such that the Notice of Default remains extant and, consequently, the New Owner could be deemed constructively to have "received" the Notice of Default—HUD has represented that its "approv[al] [of] the assignment of the HAP contract to the New Owner . . . concluded the enforcement action based on the Notice of Default that had been issued to the Previous Owner on May 15, 2019," Dkt. 36-2 at 3 (Gamez Decl. ¶ 12), and, as a result, "[t]he Notice of Default no longer is in effect," Dkt. 42 at 7. The question whether an enforcement action is extant falls uniquely within the competence and authority of the executive branch, *cf. Heckler v. Cheney*, 470 U.S. 821, 831–32 (1985); *N.Y. State Dep't of Law v. FCC*, 984 F.2d 1209, 1214–15 (D.C. Cir. 1993), and the Court has no reason to doubt HUD's good faith representation that *its* enforcement action against the Previous Owner ended with the sale of the property to the New Owner.

HUD's position that the Notice of Default lapsed upon the sale of the property and assignment of the HAP contract to the New Owner, moreover, coheres with the structure of the enforcement scheme enacted by Congress. The HAP contract is between HUD and the "owner" of the "dwelling units covered by [the] [c]ontract," Dkt. 36-2 at 7, and the Notice of Default is

issued to the "owner," who is in breach of its contractual undertaking "to provide decent, safe, and sanitary housing," *id.* at 18.  Here, the May 2019 Notice of Default states:

> This letter constitutes formal notice (Notice of Default) by the Secretary of the United States Department of Housing & Urban Development ("HUD") [that] Compass Pointe Texas Ltd. ("Owner"), owner of Compass Pointe Apartments Texas ("Project"), is in default of the above referenced project-based housing assistance payments ("HAP") Contract, as authorized under section 8 of the United States Housing Act of 1937 ("Act").

Dkt. 36-2 at 18.  Thus, the Notice of Default itself makes clear that it was issued specifically to the Previous Owner—Compass Pointe Texas Ltd.—because Compass Pointe Texas Ltd. was in default of its contractual obligations.  Under the 2021 Consolidated Appropriations Act, moreover, a Notice of Default is issued to "the owner," along "with a specified timetable . . . for correcting all deficiencies."  *See* 134 Stat. at 1898.  "[I]f the owner fails to fully correct [the] deficiencies" identified in the Notice of Default within the specified time frame, then the Act authorizes HUD to take actions of varying severity against the owner to compel compliance.  *Id.* These actions include requiring the immediate replacement of the property's management; abating HAP contract payments to the owner; imposing civil money penalties against the owner; seeking a judicial order of specific performance requiring the owner to cure all deficiencies; or pursuing exclusionary sanctions against the owner, including suspensions or debarments from federal programs.  *Id.*  If these enforcement actions fail to induce the owner to correct the identified deficiencies, then HUD may seek to end the owner's relationship with HUD by "pursu[ing] [a] transfer of the project to [a new] owner," *id.*; "transfer[ring] the existing section 8 contract to another project or projects and owner or owners," *id.*; "work[ing]. . . to stabilize the property in an attempt to preserve the property though . . . transfer of ownership[] or an infusion of capital provided by a third-party that requires time to effectuate," *id.*; or "tak[ing] any other regulatory or contractual remedies available as deemed necessary and appropriate by the

Secretary," *id.*, including "terminat[ing] th[e] [HAP] [c]ontract in whole or in part," Dkt. 36-2 at 11 (HAP Contract § 26(b)).

This structure confirms that a Notice of Default initiates an enforcement action against a specific owner and thus, absent further action by HUD, lapses when (1) that owner remedies the deficiencies, (2) the property and HAP contract are transferred to a new owner, or (3) the HAP contract is terminated. If the rule were otherwise, upon transfer, the new owner of the property would immediately be in default and, as a result, would be subject to the wide array of remedies available to HUD under the statute, regulation, and contract, including civil penalties and suspensions or debarments from federal programs. It is difficult to reconcile those possible consequences with use of transfers as a *remedy* for the prior owner's default. HUD would find fewer willing buyers, particularly rehabilitation-minded owners prepared to undertake time- and capital-intensive renovations, if there was a risk that HUD might, at any moment, impose civil penalties or even suspend or bar the new owner from federal programs.

Plaintiffs do not grapple with these structural considerations. Rather, they maintain that the Notice of Default must have carried over to the New Owner because HUD's usual assignment and approval contract provides that "[n]othing in th[e] [assignment] [a]greement shall in anyway . . . affect or impair any rights, powers, or remedies under the HAP Contract," Dkt. 39 at 24 (quoting Dkt. 29-16 at 2), and the Notice of Default "is clearly a remedy under the HAP contract," *id.* Even assuming this language was used in the assignment at issue,[2] it does not support Plaintiffs' theory. The quoted language from the assignment contract merely clarifies

---

[2] Plaintiffs acknowledge that "HUD has not produced the documents upon which the assignment of the housing assistance payment contract is set out and upon which HUD relied in approving the assignment" in this case, and so Plaintiffs assume that HUD "used the HUD form assignment and approval required under the Project Based Rental Assistance Program." Dkt. 39 at 24.

that the assignment contract does not "alter, waive, annul, vary, or affect" any provision of the HAP contract, "except as . . . specifically provided."  Dkt. 29-16 at 2.  In other words, this language preserves the *availability* of all of HUD's rights and remedies under the HAP contract for use when the facts so warrant, but it does not follow that the language perpetuates any *existing* enforcement actions taken against the previous owner.  That construction of the contract is a not a reasonable one and, as discussed above, conflicts with the structure and purpose of the enforcement scheme enacted by Congress.

*Third*, even assuming that the Notice of Default was not received by the New Owner and that it is no longer operative, Plaintiffs argue that "[t]he next inspection is likely to result in another Notice of Default" because the underlying health and safety risks at Sandpiper Cove have not been repaired.  Dkt. 39 at 29.  This argument is too speculative and proves too much.  As Plaintiffs acknowledge, HUD has not yet issued a Notice of Default to the New Owner because the agency has yet to conduct a REAC inspection of the premises, much less an inspection resulting in a failing score of 60 or lower.  If that occurs, then HUD will be obligated, by statute, to issue a new Notice of Default "[w]ithin 15 days," 134 Stat. at 1898.  At present, however, the Court cannot speculate as to whether the New Owner will fail its next REAC inspection and cannot ignore the statutory condition for issuance of Tenant Protection Vouchers—that is, that "the owner *has received* a Notice of Default," 134 Stat. at 1869 (emphasis added).[3]

---

[3] In their motion to dismiss, HUD explains that, "[i]n response to the COVID-19 pandemic, in March 2020, HUD suspended most in-person housing inspections by the Real Estate Assessment Center" but that "HUD increased housing Real Estate Assessment Center inspections on June 1, 2021."  Dkt. 36 at 19 n.9.  This pause in operations may explain why Sandpiper Cove has not undergone a further REAC inspection since May 2019.  In the meantime, HUD's contract administrator, the Southwest Housing Compliance Corporation, has conducted at least two non-

*Finally*, Plaintiffs insist that the Court should nevertheless review HUD's decision not to issue Tenant Protection Vouchers because that decision falls within the "capable of repetition but evading review exception to mootness." Dkt. 39 at 30.  This exception to the mootness doctrine is available if Plaintiffs can demonstrate that "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [i]s a reasonable expectation that the same complaining party w[ill] be subjected to the same action again." *Sec'y of Labor, Mine Safety & Health Admin. v. M-Class Mining, LLC*, 1 F.4th 16, 24 (D.C. Cir. 2021) (quoting *J.T. v. District of Columbia*, 983 F.3d 516, 523 (D.C. Cir. 2020)).

Here, Plaintiffs have failed to meet their burden of showing that HUD's decision not to issue Tenant Protection Vouchers prior to the transfer of ownership was "in its duration too short to be fully litigated."  As discussed, HUD issued its Notice of Default to the Previous Owner on May 15, 2019, and it set forth a sixty-day period for the Previous Owner to correct the identified deficiencies.  Dkt. 25 at 11 (2d Am. Compl. ¶ 20).  After that period expired in July 2019, more than two years passed before HUD effected a transfer of the project and HAP contract to the New Owner in October 2021.  Dkt. 36-2 at 3 (Gamez Decl. ¶¶ 11–12); *cf. LaRouche v. Fowler*, 152 F.3d 974, 978 (D.C. Cir. 1998) (observing that "orders of less than two years' duration ordinarily evade review . . . as a rule-of-thumb").  And although Plaintiffs filed this action in June 2020, they did not move for a preliminary injunction until November 2021, one month *after* the change in ownership occurred.

---

REAC inspections known as "Management and Occupancy Reviews" in September 2019, Dkt. 25 at 28 (2d Am. Compl. ¶ 83), and again in February 2022, *see* Dkt. 43-1; Dkt. 44-1.  Because these reviews were not conducted by the REAC, they would not, in any event, trigger a Notice of Default under the Appropriations Acts in the event of a failing score.  *See* 134 Stat. at 1898.

Nor have Plaintiffs demonstrated that HUD's decisions concerning Tenant Protection Vouchers are "by [their] very nature short in duration, so that [they] could not, or probably would not, be able to be adjudicated while fully live." *LaRouche*, 152 F.3d at 978 (quoting *Conyers v. Reagan*, 765 F.2d 1124 ,1128 (D.C. Cir. 1985)).  Unlike election cycles, *see id.*, certain construction projects, *United Bhd. of Carpenters & Joinders of Am. v. Operative Plasterers' & Cement Masons' Int'l Ass'n of U.S. & Can.*, 721 F.3d 678 (D.C. Cir. 2013), or orders of limited duration, *S. Pac. Terminal Co. v. Interstate Com. Comm'n*, 219 U.S. 498 (1911), a decision by HUD to withhold Tenant Protection Vouchers from PBRA tenants lacks a natural expiration date: it lasts indefinitely until it is reversed, the complained-of deficiencies are corrected, the HAP contract is terminated, or the HAP contract is transferred to new ownership. The former two situations give PBRA tenants the relief they seek.  The latter two situations are also designed to remedy the deficiencies, and, in any event, there is no set time limit within which either action must occur.  Here, moreover, HUD has already transferred the HAP contract once to new ownership, and there is no reason to believe it would do so again within a short period of time, nor is there reason to believe that HUD would terminate the HAP contract altogether, *see* Dkt. 25 at 21 (2d. Am. Compl. ¶ 54) ("HUD is committed to[] retaining and preserving this affordable housing on Galveston Island.").  Accordingly, Plaintiffs have not demonstrated that any future decision by HUD to withhold Tenant Protection Vouchers (after issuance of a Notice of Default) would evade review if the necessary preconditions for issuing such vouchers were to recur.

Putting this all together, the Court concludes that one of the two statutory prerequisites for the issuance of Tenant Protection Vouchers is no longer present because the transfer of the HAP contract to the New Owner resolved the Notice of Default issued to the Previous Owner,

and HUD has not issued a Notice of Default to the New Owner of Sandpiper Cove.  Because

"the [C]ourt cannot order [HUD] to violate an act of Congress," *Alfonso v. District of Columbia*,

464 F. Supp. 2d 1, 8 (D.D.C. 2006), nor order HUD to pay money without a congressional

appropriation, see *OPM v. Richmond*, 496 U.S. 414, 424–31 (1990), "intervening events" have

"ma[de] it impossible to grant [Plaintiffs] effective relief," *Lemon*, 514 F.3d at 1315.  As a result,

Plaintiffs' APA claims are now moot, and the Court, accordingly, will dismiss those claims for

lack of jurisdiction.[4]

      Even if Plaintiffs' APA claims were not moot, and the Court were to conclude that HUD

does not lack the authority to issue Tenant Protection Vouchers, it is likely that Plaintiffs' APA

claims would nevertheless fail for lack of standing.  In its recent decision in *Marino v. Nat'l*

*Oceanic & Atmospheric Admin*., No. 20-5151 (D.C. Cir. May 17, 2022), the D.C. Circuit held

that plaintiffs lacked standing to bring an APA challenge to the National Marine Fisheries

Service's (NMFS) refusal to enforce a condition in a permit the NMFS had issued to a facility

that publicly displays marine animals.  *Id.* (slip op. at 4).  The NMFS declined to enforce the

condition because, in the agency's view, a 1994 statute "extinguish[ed] its authority to enforce

marine mammal permits."  *Id.*  Plaintiffs disagreed.  They maintained that the agency's

interpretation of the 1994 law was arbitrary and capricious and, consequently, requested an order

declaring that NMFS violated the APA and vacating the agency's non-enforcement decision.  *Id.*

(slip op. 4, 6).  Without taking a view on the scope of NMFS's statutory authority, the D.C.

Circuit held that plaintiffs lacked standing because they "fail[ed] to establish that the relief they

---

[4] Because Plaintiffs' APA claims fail for lack of jurisdiction, the Court does not have occasion to
consider HUD's nonjurisdictional challenges to the complaint, including whether the decision to
issue Tenant Protection Vouchers is committed to agency discretion by law or whether Plaintiffs
have challenged a final agency action.  *See Steel Co.*, 523 U.S. at 94–95.

[sought] would redress the injury they allegedly suffered." *Id.* (slip op. at 5). The court of appeals explained that, "it is of no moment whether, as the plaintiffs contend, the 1994 [statute] did not extinguish the NMFS's ability to enforce its permit conditions, because the NMFS has prosecutorial discretion not to enforce them," and the plaintiffs failed to allege that the agency was likely to exercise its prosecutorial discretion differently on remand. *Id.* (slip op. at 6).

 The D.C. Circuit's decision in *Marino* poses similar hurdles for Plaintiffs in this case. Although Plaintiffs here seek an injunction ordering HUD to issue Tenant Protection Vouchers, the relief that is typically available in an APA arbitrary-and-capricious case is a remand to the agency to take action consistent with the court's decision. *See N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) ("When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is simply to identify a legal error and then remand to the agency."); *see also Hurry v. Fed. Deposit Ins. Corp.*, No. 18-2435, 2022 WL 670857, at *18 (D.D.C. Mar. 7, 2022). With that basic tenet of administrative law in mind, Plaintiffs' APA claim appears to raise a redressability problem similar to the one presented in *Marino*. As with NMFS's decision to enforce permit conditions in *Marino*, the issuance of Tenant Protection Vouchers is a discretionary one under the Appropriations Act, which provides only that the agency "may" rather than "shall" issue vouchers under the conditions at issue here, *see* Consolidated Appropriations Act, 2021, 134 Stat. at 1869, and which lists the issuance of vouchers to address "imminent health and safety risks" as only one of several potential uses of Congress's lump-sum appropriation that HUD might select, *id.*; *see Lincoln v. Vigil*, 508 U.S. 182, 191-92 (1993); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan,* 746 F.2d 855, 861 (D.C. Cir. 1984). Even more to the point, the complaint fails to identify any mandatory duty or to allege facts

sufficient to support a claim that HUD would exercise its discretion to issue Tenant Protection

Vouchers differently if the case were remanded to the agency.[5]  Ultimately, however, the Court

need not decide whether *Marino* compels dismissal for lack of standing because, for the reasons

explained above, Plaintiffs' APA claims are, in any event, moot.

Three final observations bear note.  First, the limitation on HUD's authority to issue

Tenant Protection Vouchers only in situations where the current owner of a PBRA unit "has

received" a Notice of Default makes sense in light of the structure of the PBRA program.  That is

because HUD is not in contractual privity with PBRA tenants; rather, the tenants have a private

contractual relationship with their PBRA unit owner.  A decision by HUD to issue a Tenant

Protection Voucher intrudes on that private contractual relationship—it requires HUD either to

abate or to terminate the PBRA tenant's obligation to pay rent to her present landlord to enable

the tenant to enter a new rental agreement with a different landlord.  *See* Dkt. 36 at 37; Dkt. 42 at

16 n.9.  Under the HAP contract, however, the only mechanism at HUD's disposal to abate a

tenant's obligation to pay rent does not become available until after HUD issues a Notice of

Default to the owner.  *See* Dkt. 36 at 37; Dkt. 36-2 at 11 (HAP Contract § 26(b)).  Against this

backdrop, it makes sense that the Appropriation Act would not authorize the Secretary to issue

Tenant Protection Vouchers until the owner of the property has received a Notice of Default.

---

[5] As explained above, prior versions of the complaint invoked 24 C.F.R. § 886.323(e), which
employs mandatory language, arguably requiring HUD to "provide assistance in finding [another
dwelling] unit for [a] family" where (1) "HUD notifies the owner that he/she has failed to
maintain a dwelling unit in decent, safe, and sanitary condition, and the owner fails to take
corrective action within the time prescribed in the notice" and (2) "the family wishes to be
rehoused in another dwelling unit."  *See* Dkt. 1 at 20, 44–45 (Compl. ¶¶ 60, 137–39); Dkt. 21 at
36, 57, 58 (Compl. ¶¶ 120, 199–201). The second amended complaint, however, drops any
references to that regulation, and so the Court does not address it further here.  *See* Dkt. 25 (2d
Am. Compl.); Dkt. 36 at 43 n.19.

Second, although the Court concludes that HUD lacks the authority, at present, to issue Tenant Protection Vouchers to Plaintiffs, that determination does not tie the agency's hands in carrying out its statutory duty to ensure that PBRA unit owners provide housing that is decent, safe, and sanitary.  Even though HUD is only statutorily *required* to issue a Notice of Default to a PBRA unit owner within 15 days of a failing REAC score, Consolidated Appropriations Act, 2021, 134 Stat. at 1898, the agency nevertheless retains the discretion, pursuant to its HAP contract with the owner, to issue a Notice of Default under several additional circumstances. These include when the owner has (1) "violated or failed to comply with any provision or obligation of [the HAP contract];" (2) "asserted or demonstrated an intention not to perform some or all of his/her obligations under [the HAP contract] or any lease;" (3) "violated or failed to comply with any applicable HUD regulation;" or (4) "furnished any false statements or misrepresentations to HUD."  Dkt. 36-2 at 11 (HAP Contract § 26(a)).  Thus, if HUD determines that any of these conditions applies, it need not wait for a new failing REAC score to issue a Notice of Default to the new owner.

Finally, if and when a Notice of Default is issued to the New Owner, Tenant Protection Vouchers are one of only several enforcement tools available to HUD to address a PBRA unit owner's failure to maintain decent, safe, and sanitary conditions.  In addition to changing the PBRA owner's management company and effecting a transfer of the property and assignment of the HAP contract, both of which HUD pursued here, HUD may, among other options, request a court-appointed receiver to manage the property, take possession of the project itself, or impose civil money penalties on the owner and use those funds to correct deficiencies in PBRA units. Consolidated Appropriations Act, 2021, 134 Stat. at 1898; Dkt. 36-2 at 11 (HAP Contract § 26(b)).

28

Because the New Owner has not received a Notice of Default with respect to the PBRA units at Sandpiper Cove, however, the Court concludes that HUD lacks the authority to issue Tenant Protection Vouchers to Plaintiffs.  Accordingly, the Court will dismiss Plaintiffs' APA claims for lack of jurisdiction.

**B.**      **Intentional Discrimination Claims**

In addition to their APA claims, Plaintiffs claim that HUD's failure to issue the Tenant Protection Vouchers constituted an act of intentional discrimination, in violation of the Fair Housing Act, 42 U.S.C. § 3604(a), and the equal protection guarantee of the Fifth Amendment, U.S. Const. amend. V.  Plaintiffs allege that "HUD's final decision to withhold the assistance . . . including Tenant Protection Vouchers . . . necessary for Plaintiffs to obtain decent, safe, and sanitary housing elsewhere makes the decent, safe, and sanitary housing that would be available with that assistance unavailable to a group that is predominantly Black or African American and almost exclusively minority," Dkt. 25 at 59 (2d Am. Compl. ¶ 210); *accord id.* at 58 (2d Am. Compl. ¶ 207), and thus constitutes an act of "intentional discrimination on the basis of race and ethnicity" in violation of 42 U.S.C. 2604(a) and the Fifth Amendment, *id.* at 58, 59 (2d Am. Compl. ¶¶ 208, 211).

HUD urges the Court to dismiss Plaintiffs' intentional discrimination claims for two reasons: first, it contends that sovereign immunity bars Plaintiffs' Section 3604(a) claim, Dkt. 36 at 46, and, second, it maintains that both the statutory and constitutional claims fail because the complaint does not allege any facts that could plausibly give rise to an inference of discriminatory intent by HUD, *id.* at 47.

As an initial matter, the Court concludes that HUD's sovereign immunity challenge to Plaintiffs' Section 3604(a) fails.  "It is axiomatic that the United States may not be sued without

its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983).  "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit."  *FDIC v. Meyer*, 510 U.S. 471, 475 (1994).

HUD argues that the Court lacks jurisdiction over Plaintiffs' Section 3604(a) claim because the Fair Housing Act does not contain a waiver of the sovereign immunity of the United States.  The premise of HUD's argument is true, but its conclusion is wrong.  Although HUD is correct that the Fair Housing Act does not include a waiver of sovereign immunity, that observation is immaterial because Plaintiffs' claim is covered by the general waiver of sovereign immunity contained in the Administrative Procedure Act.  *See* 5 U.S.C. § 702.  For the purposes of § 702, it makes no difference that Plaintiffs' cause of action does not arise under the APA.  As the D.C. Circuit has observed, "[t]here is nothing in the language of . . . § 702 that restricts its waiver to suits brought under the APA.  The sentence waives sovereign immunity for '[a]n action in a court of the United States seeking relief other than money damages,' not for an action brought under the APA."  *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 186 (D.C. Cir. 2006).  Here, Plaintiffs seek only injunctive relief, and they "claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority" in a manner that caused Plaintiffs to "suffer [a] legal wrong."  5 U.S.C. § 702.  To invoke Section 702's waiver, that is all they are required to do.

Ordinarily that would leave HUD's Rule 12(b)(6) arguments for dismissal.  But before the Court may turn to those arguments, it must first consider a further, threshold jurisdictional question: whether Plaintiffs' intentional discrimination claims, like their APA claims, are now moot in light of the transfer of the property to the New Owner, who has not received a Notice of Default.  HUD does not argue this point in its motion to dismiss.  "A case that becomes moot at

any point during the proceedings," however, "is 'no longer a "Case" or "Controversy" for purposes of Article III,' and is [therefore] outside the jurisdiction of the federal courts." *United States v. Sanchez-Gomez*, 183 S. Ct. 1532, 1537 (2018) (quoting *Already, LLC v. Nike, Inc*., 568 U.S. 85, 91 (2013)); *see also Conservation Force, Inc.*, 733 F.3d at 1204.  Because federal courts lack jurisdiction to adjudicate a case that is constitutionally moot, the courts have a corresponding duty to address mootness *sua sponte*. *United States v. Baucum*, 80 F.3d 539, 541 (D.C. Cir. 1996).  Here, the Court concludes that Plaintiffs' intentional discrimination claims are moot because HUD no longer has the statutory authority to provide the relief that Plaintiffs seek—that is, issuance of Tenant Protection Vouchers premised on the no-longer-operative Notice of Default issued to the Previous Owner.  In other words, Plaintiffs' intentional discrimination claims, like their APA claim, are no longer redressable.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 102–12 (1983).

At an initial glance, Plaintiffs' discrimination claims appear to challenge a broader swath of agency conduct than simply HUD's decision to withhold Tenant Protection Vouchers.  Certain allegations in the complaint, for example, fault HUD for maintaining superior housing in majority white non-Hispanic PBRA units and census tracts but not at Sandpiper Cove, where the tenants are overwhelmingly Black.  Dkt. 25 at 48–56, 58, 59 (2d Am. Compl. ¶¶ 164–198, 206, 209).  Plaintiffs allege, moreover, that this disparity "is based at least in part on the race of Plaintiffs and the other tenants."  *Id.* at 58, 59 (2d Am. Compl. ¶¶ 206, 209).

More careful study, however, reveals that the only specific agency action that Plaintiffs challenge in their intentional discrimination claims is HUD's decision to withhold Tenant Protection Vouchers from Plaintiffs.  *See* Dkt. 25 at 58 (2d Am. Compl. ¶ 208) ("HUD's final decision to withhold the assistance and the Tenant Protection Vouchers is intentional

discrimination on the basis of race and ethnicity in violation of 42 U.S.C. § 3604(a)."); *id.* at 59 (2d Am. Compl. ¶ 211) ("HUD's final decision to withhold the assistance and the Tenant Protection Vouchers is intentional discrimination on the basis of race and ethnicity in violation of the Equal Protection component contained in the due process clause of the Fifth Amendment."). Even more to the point, Plaintiffs do not seek monetary relief as a remedy for HUD's alleged discriminatory acts, nor do they ask the Court to order HUD to remedy the more sweeping racial disparities that they allege throughout their complaint.  Instead, they ask the Court to issue an injunction ordering HUD to provide Plaintiffs with relocation assistance "to obtain affordable decent, safe, and sanitary housing in neighborhoods without substandard conditions"— specifically, "an injunction ordering HUD to provide Plaintiffs with Tenant Protection Vouchers."  *Id.* at 60 (2d Am. Compl. ¶ 212.B).  As the Court has already explained, such an order would run counter to the 2021 Consolidated Appropriations Act, under which HUD may issue Tenant Protection Vouchers to PBRA tenants only "where the owner has received a Notice of Default and the units pose an imminent health and safety risk to residents."  134 Stat. at 1869. Although those conditions might have existed before the sale of Sandpiper Cove to the New Owner in October 2019, "intervening events," have since "ma[de] it impossible to grant [Plaintiffs] effective relief," *Lemon*, 514 F.3d at 1315.

The Court pauses here to consider one possibility that might save Plaintiffs' discrimination claims from mootness.  At times, certain paragraphs of the complaint gesture toward other forms of relocation assistance that HUD could potentially provide to Plaintiffs beyond Tenant Protection Vouchers.  Plaintiffs' intentional discrimination claims, for example, refer to "relocation assistance and relief necessary to obtain decent, safe, and sanitary housing elsewhere, *including* Tenant Protection Vouchers," Dkt. 25 at 58 (2d Am. Compl. ¶ 207)

(emphasis added); *accord id.* at 59 (2d Am. Compl. ¶ 210), and Plaintiffs' prayer for relief generally requests "an injunction ordering HUD to provide Plaintiffs with the assistance necessary to obtain . . . housing" elsewhere and also asks the Court to issue "an injunction ordering HUD to provide Plaintiffs with Tenant Protection Vouchers," *id.* at 59–60 (2d Am. Compl. ¶ 212).

Despite these references, the Court concludes that the only relocation assistance Plaintiffs meaningfully identify in their complaint are Tenant Protection Vouchers.  At no point do Plaintiffs identify an alternative statutory source of relocation assistance for which they might be eligible other than Tenant Protection Vouchers.  The factual allegations in the complaint, moreover, single-mindedly focus on Tenant Protection Vouchers and do not discuss (or even identify) other sources of relocation assistance that they requested and that HUD declined to provide to them.  *See, e.g.*, *id.* at 33–35 (2d Am. Compl. ¶¶ 106–22).  Absent any specificity (in Plaintiffs' 60-page complaint) regarding some plausible, alternative form of relief, the second amended complaint's vague references to other forms of relocation assistance—which may or may not exist—cannot salvage the complaint as currently pleaded.[6]

Accordingly, the Court will dismiss Plaintiffs' Fair Housing Act and Fifth Amendment intentional discrimination claims for lack of jurisdiction.

---

[6] For similar reasons, the complaint's reference to "other relocation assistance authorized by the 2021 and 2020 and the 2019 Appropriations Acts" as a partial basis for Plaintiffs' APA claim for HUD's alleged violation of 42 U.S.C. § 3608(e), Dkt. 25 at 57 (2d Am. Compl.), does not save that claim from mootness.  As currently pleaded, the complaint does not identify another form of relocation assistance under the Appropriations Acts for which Plaintiffs arguably might be eligible.

**C.      Preliminary Injunction**

Upon filing their second amended complaint, Plaintiffs simultaneously moved for preliminary injunctive relief.  Dkt. 25.  That motion, however, necessarily fails because the Court lacks jurisdiction to consider Plaintiffs' claims on the merits.  The Court will, accordingly, deny Plaintiffs' motion.  *See McCray*, 2021 WL 5823801, at *5.

**CONCLUSION**

For the foregoing reasons, the Court will **DENY** Plaintiffs' motion for a preliminary injunction, Dkt. 26, and will **GRANT** Defendant's motion to dismiss the complaint, Dkt. 36.  A separate order will issue.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date:  May 21, 2022